## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

GEORGE S. HARASZ, and
DOUGLAS A. WIRTH,

                    Plaintiffs,

  v.                                                    3:15-cv-1528

                                                    _____
JOETTE KATZ,
ELIZABETH FERREIRA,
TOWN OF GLASTONBURY,
JAMES A. KENNEDY, and                               MARCH 3, 2017
WILLIAM TRANTALIS,


                    Defendants.

## RULING ON MOTIONS TO DISMISS

### HAIGHT, Senior District Judge:

Plaintiffs commenced this civil rights action in Connecticut Superior Court.  Defendants removed the case to this Court.  Federal question jurisdiction under 28 U.S.C. § 1331 stems from Plaintiffs' claims that their rights conferred by the United States Constitution were violated by Defendants' conduct.  Plaintiffs assert that Defendants acted under color of state law, giving rise to this Court's original subject matter jurisdiction under 42 U.S.C. § 1983 and 28 U.S.C. § 1331.  Plaintiffs also allege state law claims, which fall within this Court's pendent jurisdiction.  28 U.S.C. § 1367.

An Amended Complaint [Doc. 33] (sometimes hereinafter "AC") is the operative pleading.  All Defendants now move to dismiss the Amended Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.  Plaintiffs resist those motions.  This Ruling resolves them.

1

## I.   INTRODUCTION

During the pertinent times, Plaintiffs George S. Harasz and Douglas Wirth were citizens of the United States and the State of Connecticut.  They resided together in the Town of Glastonbury, Connecticut.  Plaintiffs advised the Connecticut Department of Children and Families ("DCF") that they were willing to take in foster children for adoption, providing that none had past sex abuse issues.  Over the years, DCF was responsive to Plaintiffs' offer.  Prior to 2011, Harasz and Wirth adopted nine children, who were born during the years 1990 though 2006.

In November 2011, Harasz and Wirth were arrested by the State of Connecticut authorities on charges of misconduct with respect to some of the adopted children in their care.  Specifically, the Plaintiffs were charged, *inter alia*, with sexual assault, cruelty to persons, and risk of injury to a minor.  Plaintiffs denied all charges.  In September 2014, following a bench trial before a state court judge, Wirth was found not guilty of all charges against him.  In October 2014, Harasz moved successfully for the dismissal of all charges against him.  Plaintiffs' state court exonerations on these charges led directly to the federal constitutional and state law claims they allege in the present action in this Court.

Defendant Joette Katz is the Commissioner of the Connecticut DCF, having assumed that position in February 2011.  Defendant Elizabeth Ferreira was employed as a DCF social worker, assigned to its Manchester, Connecticut office.

Defendant Town of Galstonbury, Connecticut is a municipality which operates, directs and controls the Glastonbury Police Department.  Defendants James Kennedy and William Trantalis are Glastonbury police officers.

The Amended Complaint alleges eight counts, which may be summarized thus:

Count One:  against Katz pursuant to 42 U.S.C. § 1983 based upon failure to train and supervise (violations of Fourth and Fourteenth Amendments).

Count Two:  against Kennedy and Trantalis pursuant to 42 U.S.C. § 1983 based upon malicious prosecution (violations of Fourth and Fourteenth Amendments).

Count Three:  against Katz pursuant to 42 U.S.C. § 1983 based upon malicious prosecution (violations of Fourth and Fourteenth Amendments).

Count Four:  against Ferreira, Kennedy and Trantalis pursuant to 42 U.S.C. § 1983 based upon fabrication of evidence (violation of constitutional due process).

The remaining counts purport to assert state law claims similar to, if not exactly duplicative of, the first four federal claims.

Count Five:  against Kennedy and Trantalis based upon malicious prosecution (violations of state law and constitution).

Count Six:  against Katz based upon malicious prosecution (violation of state tort law).

Count Seven:  against Ferreira, Kennedy and Trantalis based upon fabrication of evidence (violation of constitutional due process).

Count Eight: against Town of Glastonbury claiming that the Town must indemnify Kennedy and Trantalis pursuant to the applicable state statute.

The individual Defendants are sued in their individual capacities only.  Appearing through different counsel, the DCF Defendants and the Glastonbury Defendants move to dismiss all claims in the Amended Complaint.  Plaintiffs resist the motions.

## II.   BACKGROUND

### A.   Preliminary Considerations

The factual recitations appearing in this Part are derived principally from the Amended Complaint.  However, the manner in which that document is drafted requires this preliminary consideration of the standard of review the Court must apply on these defense motions to dismiss.

Defendants base their motions to dismiss upon Fed. R. Civ. P. 12(b)(6), relief to which they are entitled if Plaintiffs' Amended Complaint "fail[s] to state a claim upon which can be granted." In deciding that motion, the district judge looks to what the complaint *says* (or "*states*") is the plaintiff's claim.  Evidence does not enter into Rule 12(b)(6) analysis.  That comes later, during Rule 56 summary judgment practice, after completion of discovery.

The trial judge's principal function on a defense motion to dismiss is to read the complaint and decide if it states a viable claim under governing law: a reading subject to clearly defined instructions laid down by appellate authority.  The district judge must accept as true "all of the factual allegations of the complaint." *Hill v. Curcione*, 657 F.3d 116, 122 (2d Cir. 2011).  However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), or to "conclusory allegations or legal conclusions masquerading as factual conclusions," which "will not suffice to prevent a motion to dismiss." *Smith v. Local 819 I.B.T. Pension Plan*, 291 F.3d 236, 240 (2d Cir. 2002) (citation and internal quotation marks omitted).

On a Rule 12(b)(6) motion to dismiss, the trial judge owes deference to well-pleaded allegations of fact, but disregards conclusions and arguments, no matter how the pleader captions them.  The Supreme Court made that limitation explicit in *Iqbal*:  Justice Kennedy's opinion gives

4

district judges  practical advice:  "[A] court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the presumption of truth."  556 U.S. at 679.  The Court added:  "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations."  *Id.*  Only "[w]hen there are well-pleaded factual allegations" should a court "assume their veracity and then determine whether they plausibly give rise to an entitlement to relief."  *Id.* at 679.

Given the manner in which the Plaintiffs at bar have composed their Amended Complaint, I must keep *Iqbal*'s strictures very much in mind.  Section III of the Amended Complaint, imprecisely captioned "Statement of Facts," consists of 29 single-spaced pages and 163 numbered paragraphs.  The text contains a number of factual allegations, some requiring a charitable reading to be characterized as "well-pleaded."  But the Amended Complaint is also replete with conclusory, argumentative or subjective assertions.  For example: paragraph 89 of the Amended Complaint, which purports to describe a forensic interview of the child Doe #9 on August 11, 2011, states that when Doe #9

> refused to give the "disclosure"  DCF needed in order to prosecute Harasz and Wirth, the interviewer stepped out of the room, to consult with the observers, DCF handlers and Glastonbury Agent Kennedy. Then the interviewer came back in the room and kept at Doe #9 with a repeated barrage of bullying and leading questioning.  In short, it was appalling.

One would be hard pressed to find a well-pleaded factual allegation in this passage.  Indeed, the last quoted sentence abandons any effort to plead them.  The reader is told that someone, seemingly not present during this incident, feels that the events as described are "appalling."  Whether Harasz, Wirth, or their attorney, or all of them were "appalled" is not clear, but it is of no conceivable consequence.

In portions such as these, the "Amended Complaint" is more a polemic than a pleading.  For purposes of these motions to dismiss, I accept the factual allegations in the complaint and entirely disregard the polemic.  That task has required a considerable effort at editing.  The "Allegations of Fact" that follow in this Ruling are intended to reflect, for the most part, the mandated distinction between pleading and polemic.  The Court may not have succeeded entirely in separating wheat from chaff.  At the end of the day, the reader should disregard any chaff that survived the process, as will the Court in making its Ruling.

**B.      Allegations of Fact**

The "Allegations of Fact" in this Part are adopted from the numbered paragraphs in the "Statement of Facts" in the Amended Complaint.  Quotation marks in what follows indicate quotations from the Amended Complaint.

Over a number of years, Harasz and Wirth adopted nine children:  John Doe #1, born in 1990; John Doe #2, born in 1992; John Doe #3, born in 1993; John Doe #4, born in 1995; John Doe #5, born in 2000; John Doe #6, born in 2003; John Doe #7, born in 2000; John Doe #8, born in 2004; and John Doe #9, born in 2006.

Plaintiffs allege that one of their adoptive children, Doe #4, suffered from Post Traumatic Stress Disorder ("PTSD") and Reactive Attachment Disorder ("RAD"), among other diagnoses.  RAD is a disorder associated with children who have suffered abuse.  RAD can result in attempts to sabotage relationships through lying and other socially destructive behaviors.  In May 2005, Doe #4 was admitted to Saint Francis Hospital due to auditory hallucinations.   Doe #4 reported hearing voices telling him to kill himself.  During this visit, Doe #4 was evaluated by a psychiatrist, Dr. Richard B. Salder, who noted that: "The patient has been making multiple false statements.  The

6

Patient reported his parents to the Department of Children and Families, who found no justification for the report."

Earlier in the spring, Doe #4 broke a window of a shed out of anger.  He was instructed to remove the rocks from the area using a bucket and then to clean up the glass that fell between the rocks.  He told a neighbor that he was being made to carry rocks as punishment for breaking a window, that he had been locked out and left alone at the house, and that there was a baby in the house unattended.  The neighbor called the police, but also told the police that Doe #4's story had changed. The police returned Doe #4 to his house and found the family at home and the doors unlocked.  Plaintiffs also allege that Doe #4 had a history of making false sexual allegations.  In 2008, Doe #3 and Doe #4 made sexual allegations against a dentist, which were ultimately found to be untrue.

In 2010, Doe #4 threatened suicide a second time, resulting in a call to the police.  DCF became involved; and Doe #4 stated that while he did not want to stop seeing his fathers, he did not want to live in the house anymore.  DCF did not find any evidence of neglect or abuse, but placed Doe #4 with a foster family.  In September 2010, Doe #4 began to have serious behavioral issues in school, including aggressive behavior against other students, stealing, and other disruptive conduct.

In January 2011, DCF took custody of both Doe #3 and #4 because they complained of neglect and mean treatment.  At that time there were no allegations of sexual abuse.  In late January 2011, Doe #4 reportedly inappropriately touched a female student.  The vice-principal of the school told Plaintiff Harasz that Doe #4 would have to be evaluated and might be placed in an alternative learning environment.

During the evaluation required by the school after Doe #4 inappropriately touched another student, Doe #4 made allegations of sexual misconduct by Harasz.  Shortly thereafter, on February 8, 2011, DCF removed the five younger boys from the Harasz-Wirth household (Does #5-#9).  On that same day, DCF interviewed the youngest children.  During the interview, Doe #9 did not disclose any inappropriate sexual conduct by Harasz or Wirth and referred to his penis as his "weiner."  AC ¶ 47.  Doe #2 and Doe #3 were also interviewed at the local high school.  Doe #2 stated that he had never seen or experienced anything inappropriate in the household.

The next day, DCF arranged for a forensic interview of Doe #4 at the Children's Advocacy Center at St. Francis Hospital.  Plaintiffs allege that in this interview, Doe #4 made numerous statements that were found to be inaccurate or not credible.  Doe #4 stated that he had previously disclosed the alleged sexual abuse to a doctor; however, this generally was found to not be credible.  Additionally, Doe #4 stated that he had never met his parents, that his mother was dead, and that his father had been put to death in Connecticut for raping women.  These statements were untrue.  Finally, Plaintiff alleges that Doe #4 said that "the other day, when that psychiatrist lady come and asked questions, I answered. But she put words in my mouth."   AC ¶ 54.

In February 2011, Joette Katz became the Commissioner of the Department of Children and Families.  Plaintiffs allege that Katz began to take an active role in the case after her appointment.  Plaintiffs further allege that Katz is responsible for the failure to train DCF staff in recognizing symptoms of RAD.

Soon after Doe #4 made the allegations against Harasz and Wirth, a therapist who had previously treated Doe #4 for RAD, Laurie R. Landry, LMFT, LPC, called Elizabeth Ferreira, a social worker with DCF, to express her view that Doe #4 was not telling the truth in regards to the

8

allegations.   Landry persisted, and was ultimately given a meeting with two lawyers in the Manchester office of DCF; however, DCF still pursued the allegations.

In March, Sergeant William Trantalis of the Glastonbury Police Department took a statement from Joanne Devine, a friend of the Harasz-Wirth family.  She stated that, in late February, Doe #2 had contacted her because he was going to the theater to meet Doe #4 and wanted a third party there given the ongoing legal situation.   Devine arrived, and went to the Texas Roadhouse grill with Doe #2, Doe #4, and their girlfriends.  She reported that during the conversation, Doe #4 was asked why he said "those things" about Harasz and Wirth.  Doe #4 reportedly responded that he did not say "those things" (meaning the sexual assault disclosure); rather Doe #3 had said those things.  AC ¶ 60.  Devine left and Doe #2 then brought Doe #4 to the police department to recant.   However, Doe #4 did not mention withdrawing the sexual assault allegations to the police officer he spoke with; instead he asked about taking a restraining order out on Doe #3.  Sergeant Trantalis then spoke with Doe #4, who said he went to the movies with friends and saw Doe #2 there, but did not speak to him, and then he went to the Texas Roadhouse grill with friends, but again did not see Doe #2 there.   The police officer tried to verify with Texas Roadhouse using their surveillance system, but the footage had already been overwritten.  The report was approved by Agent James Kennedy.

The report also included a statement that "[p]revious to this there was information provided through DCF that Doe #4 had recanted his allegations."   AC ¶ 60.  The report provided no further detail on this statement.  The police did not interview Doe #4, his girlfriend, or Doe #2's girlfriend. A further supplemental police report states, "[o]n the morning of 3/21/11, I received a voice mail message from [Doe #4].  [Doe #4] reiterates the fact that all through this case he has told the truth and he does not want to discuss it any further as he wants to move forward. Based on this message,

I will not be re-contacting him at this point."  AC ¶ 64.  This report was also signed by Trantalis.

Plaintiffs allege that in early March, Doe #9 stated that he was afraid Doe #4 was going to kill him.  It is unclear from the Complaint who Doe #9 made this statement to.  Three days later, during a visit, Doe #4 was given alone time with Doe #9 while taking Doe #9 to the car to put him in a car seat.  A week later, during a visit, Doe #9 made repeated attempts to leave and said "Doe #4 was going to kill him" because "he loves Dad and Daddy and doesn't love [Doe #4] so much."  AC ¶ 66.  It is unclear from the Complaint who Doe #9 was speaking to when he made these statements.

In mid-April, the prosecutor submitted to a Judge the arrest warrant prepared by Sergeant Trantalis.  The judge was concerned that Doe #4 refused to be interviewed again; and on May 5, 2011, the judge refused to sign the warrant and sent it back to the prosecutor.  The prosecutor then decided not to pursue the case any further and not to resubmit the warrant.  In late July, the police also decided not to pursue Doe #4's allegations of sexual abuse because they believed he was not credible.

On May 5, 2011, Doe #9 began to see Dr. Carol M. Kagel, Ed.D., psychologist, for therapy.  He had ongoing sessions with her and another therapist, Kathi Legare, LCSW, who is a trauma therapist.  At the time, Doe #9 was four years old and had learning disabilities.  Two months earlier, he received a goal in his Individualized Education Plan, put into place by the Glastonbury school system's special education department, that he should be able to form a short sentence when speaking to peers.

In early August 2011, DCF claimed Doe #9 made a disclosure of sexual abuse to Dr. Carol Kagel.  Shortly thereafter, a forensic interview of Doe #9 was conducted.  The forensic interview

was conducted at the Children's Advocacy Center by Ann Glazer, who was hired by DCF. Plaintiffs allege, upon information and belief,[1] that the interview was part of the Multidisciplinary Team ("MDT") investigation, which is and was in turn part of the Governor's Task Force on Justice for Abused Children. The Task Force has established best practices for forensic interviews. These best practices suggest that the interview be conducted in a neutral, fact-finding manner, anatomically detailed interview aides such as dolls and drawings should be used with caution, and any interviewer that uses dolls should have received training in the use of anatomical tools. Plaintiff also alleges, upon information and belief, that Trantalis, Kennedy, and Ferreira were part of the MDT for this case, and the interview was set up at their request.

Doe #9 was interviewed by Ann Glazer, and the interview was observed by Ferreira, another DCF employee, Shannon Kiss, and Agent Kennedy. The observers could communicate with Glazer through an ear piece.

Plaintiff alleges that, though DCF claimed that the forensic interview of Doe #9 supported a disclosure of sexual abuse, it in fact did not. Plaintiff alleges that the recording of the DCF interview does not support the statements that DCF claims Doe #9 made, or the statements contained in the arrest warrants prepared by Agent James Kennedy. Plaintiff alleges that Doe #9 only said that his brother, Doe #5, touched him inappropriately, and did not say anything about his father. The interviewer then began to use anatomical dolls with Doe #9, who was interested only in playing with the dolls.

_____

[1] Some of the allegations in the Amended Complaint are made "upon information and belief." The Court must be skeptical of allegations based on "information of belief" that do not "make the inference of culpability plausible." *See Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010); *see also Salmon v. Blesser*, No. 1:13 CV 1037, 2014 WL 1883552, at *4 (N.D.N.Y. May 12, 2014) *aff'd in part*, *vacated in part and remanded on other grounds*, 802 F.3d 249 (2d Cir. 2015).

After the interview, Ferreira claimed that Doe #9 made a disclosure to her in her office when they were alone.  Plaintiff alleges that DCF's policy is that a second witness be called in during a disclosure.  Ferreira allegedly wrote the report after being the only witness to the statement.

Plaintiffs also allege that the police made no effort to interview their live-in housekeeper, Harasz's brother Richard, who lived with the family for two years, Harasz's mother, who lived with the family the entire time, or Wirth's parents, who visited frequently.

On September 1, 2011, Agent Kennedy submitted and swore to a revised arrest warrant and Sergeant Trantalis signed the jurat.  The arrest warrant included a paragraph on the disclosure made to Dr. Kagel on August 3, 2011: "The victim said, 'Daddy', [meaning Harasz] . . . 'put it in my butt.' The victim indicated that it hurt. The doctor asked what was put into his butt and the victim said, 'penis.' The victim went on to explain that he was sleeping and screamed real loud."  AC ¶ 108.  It also included descriptions of the August 2011 forensic interview disclosure and the subsequent disclosure made to Ferreira.

On November 30, 2011, Harasz and Wirth were arrested.  Harasz was charged with two counts of first-degree sexual assault, aggravated first-degree sexual assault, three counts of risk of injury to a minor, third-degree sexual assault, fourth-degree sexual assault, and cruelty to persons. Wirth was charged with third-degree sexual assault and risk of injury to a minor.  Wirth was put on unpaid administrative leave by his employer, The Hartford insurance company, after his arrest.

On December 1, 2011, Doe #2 allegedly said that having lived with Harasz and Wirth for over ten years, he had never witnessed or experienced the abuse of which they were accused.  He also said that he and his siblings had been moved around to various foster families, and that they were suffering from RAD, which led to the allegations against Harasz and Wirth.  It is unclear from

12

the Amended Complaint to whom he made these statements.

On December 2, 2011, Katz was quoted in the news as saying that the allegations against Wirth and Harasz were "shocking and appalling."  AC ¶ 122.  She also stated that she "hope[d] that going forward, we can make horrible incidents like this as rare as humanly possible."  *Id.*  An article in the "*Hartford Courant*" recounted that she said "[w]e immediately removed the children from the home and ordered a close examination of our involvement and ensured that we would fully cooperate with police."  AC ¶ 124.  She also stated that she "was horrified that adopted children could be so terribly abused by adults responsible for their care."  *Id.*

Initially, because of concerns within the State's Attorney Office, the state offered Harasz and Wirth a plea deal.  Both would plead guilty to risk of injury to a child, and would receive a suspended sentence of five to ten years, be on probation for five years, and would not be required to register on the Sexual Offender Registry.   Plaintiffs allege that DCF staff "had a difficult time with the fact that there would be no jail time." AC ¶ 129.  Katz allegedly agreed and made calls to the Hartford State's Attorney Gail Hardy regarding the plea offer.  Katz ultimately met with State's Attorney Hardy on Monday, December 10, 2012.  Additionally, at some point during 2012, Harasz's and Wirth's parental rights to the adoptive children were terminated and the children were removed from their home.

At the plea hearing, held on January 4, 2013, the Assistant State's Attorney David Zagaja said that the state pursued a plea agreement because the State's Attorneys Office thought they would not be successful at trial in establishing many of the allegations.  Katz attended this hearing. Thereafter, at the sentencing hearing on April 5, 2013, the plea deal was withdrawn because new charges were filed.  During the sentencing hearing, Doe #4 met privately with Katz and made

13

another disclosure.  He claimed "that he had scars on his legs from being held down, raped and cut with a belt buckle, coat hanger and box cutter."  AC ¶ 134.  Doe #2 also testified at the sentencing hearing and noted he had not witnessed or experienced any neglect or abuse during his time living in the Harasz-Wirth household.  He also testified that his brothers had RAD.  Katz spoke at the hearing, and stated that "the younger boys were starting to make 'disclosures' to their therapists."  AC ¶ 136.

On June 25, 2013, Katz emailed the Chief State's Attorney Kevin Kane regarding additional information that "resulted in an arrest warrant application that the state's attorney never signed."  AC ¶ 139.  The additional warrants would add charges of sexual assault in the first degree, conspiracy to commit sexual assault in the first degree, and two counts of risk of injury to a minor for Douglas Wirth.  The warrants would also add conspiracy to commit sexual assault in the first degree and risk of injury to a minor for George Harasz.   The next day, Kane responded by stating that the State's Attorney's Office would reconsider the affidavits.  Katz, through Matthew LaRock, Assistant Agency Legal Director for DCF, followed up on July 2, 2013.  On September 9, 2013, the "*Hartford Courant*" reported that the State's Attorney's Office had rejected the new warrants because it was "not adequately investigated."

On November 17, 2013, a psychologist employed by DCF, Dr. Suzanne Ciaramella, Psy. D., completed a psychological testing evaluation of Doe #4.  She found that Doe #4 had a history of lying, inventing stories, and embellishing stories.  There was also concern that Doe #9 was too fragile to testify, but DCF refused to agree to appoint an independent guardian ad litem, citing Katz's involvement in the case as sufficient to protect the child's interests.

On July 18, 2014, a plastic surgeon, Dr. Alan Babligan, M.D., examined the scars on Doe

#4's legs, and determined that they were stretch marks.  The doctor concluded that the scars could not have been the result of the abuse alleged by Doe #4 during the sentencing hearing on January 4, 2013.

On September 9, 2014, the bench trial in *State v. Wirth* began before Judge Dewey, a Connecticut judge.  The trial testimony concluded on September 17, 2014.  One of the witnesses was Dr. Candra Smith-Slatas, a pediatrician who had treated the Harasz-Wirth family for ten years.  She testified that the scars on Doe #4 were stretch marks, rather than scars from physical abuse.  She also testified that she and another doctor in her practice were not interviewed by DCF, which was unusual given the allegations of sexual abuse.

On September 29, 2014, Judge Dewey found Wirth not guilty of all charges.  She noted that right before trial, DCF handed over between ten and twelve thousand documents to the court pursuant to a subpoena, which contained exculpatory information.  The court gave defense counsel approximately two thousand pages of documents.  Additionally, more material was revealed during trial.   The Judge noted that neither side's attorneys had access to the pre-adoption records for Doe #4, which contained "extraordinarily exculpatory information."   AC ¶ 162.  She ultimately found that Doe #4 was not a credible witness.  The Judge found that "the complainant's disclosure was more opportunistic than therapeutic."  *Id.*

Thereafter, on October 14, 2014, Harasz filed a motion to dismiss and a motion for a hearing in *State v. Harasz*.  The motion was filed on the grounds that there was insufficient evidence to justify putting Harasz on trial, that there were "defects in the institution of the prosecution and failure to disclose exculpatory materials."  AC ¶ 163.  On October 16, 2014, there was a pretrial hearing in *State v. Harasz*.  Dr. Leslie Lothstein, a forensic psychologist interviewed Doe #9 and

15

testified that "[w]hatever memory [Doe #9] had has been influenced by repeated narratives presented to him by forensic evaluations and treatment. . . . It seemed to me that the ground rules for the interview were compromising to any forensic approach, asking direct questions to [Doe #9]."  AC ¶ 164.  On October 28, 2014, all charges against Harasz were dismissed.

As a result of the allegations against them, Plaintiffs allege that they lost their jobs, businesses, and children.  Additionally, they had to pay for costly legal services.  Wirth was terminated from his job as an IT Manager at The Hartford.  Wirth and Harasz also lost their dog breeding business.  Additionally, they used much of their savings to pay for their defense, and they lost their home to foreclosure in 2013.

### III.   LEGAL STANDARD

This Part partially reiterates the discussion appearing in Part II.A.

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) asks the court to dismiss counts in a complaint for "failure to state a claim."  Fed. R. Civ. P. 12(b)(6).  In analyzing whether a plaintiff has stated a claim upon which relief can be granted, the court must accept as true all facts alleged in the complaint.  *Hill*, 657 F.3d at 122.  However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678.  Moreover, "[c]onclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss."  *Smith*, 291 F.3d at 240 (citation and internal quotation marks omitted).  The Court must then determine if the well-pleaded factual allegations give rise to a plausible claim.  *Iqbal*, 556 U.S. at 679.

Furthermore, claims set forth by the plaintiff in the complaint must be facially plausible.  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim has "facial plausibility when the

plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556).  A complaint does not need to put forth "detailed factual allegations" to survive a 12(b)(6) motion, but must involve more than "unadorned, the-defendant-unlawfully-harmed-me accusation[s]." *Id.* (quoting *Twombly*, 550 U.S. at 555) (internal quotation marks omitted).  Finally, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

## IV.   EXTRINSIC EVIDENCE

Plaintiffs assert that the Court should consider the video of the forensic interview of Doe #9. That raises the question of the extent to which a district court may consider evidence outside the four corners of the complaint in evaluating a motion to dismiss the complaint for failure to state a claim.

Under Rule 12(b)(6), the Court may only consider extrinsic evidence, such as the video of the forensic interview of Doe #9, in certain circumstances without converting the motion to dismiss to a motion for summary judgment and giving both parties further opportunity to submit evidence. *See* Fed. R. Civ. P. 12(d); *Global Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 156 (2d Cir. 2006).  A court may consider extrinsic information that is integral to the Complaint, if the "plaintiff rel[ied] on the terms and effect of [the] document in drafting the complaint . . . ; mere notice or possession is not enough." *Global Network*, 458 F.3d at 156 (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002)) (internal quotation marks omitted).  A court may also consider extrinsic evidence where the document is subject to judicial notice. *Id.* at 156.

Plaintiffs argue that because they refer extensively to the forensic interview in the Amended

Complaint, the Court can review the video.  This argument is unpersuasive.  Though the Amended Complaint does reference and describe the video, it is not something that the Court can take judicial notice of, nor is it so integral to the Amended Complaint that the Amended Complaint cannot be read or understood without also viewing the video.  Thus, the Court will not review the video at this stage in the litigation.

Plaintiffs next assert that the documents attached to Defendants' Motions to Dismiss constitute an "inappropriate and an attempt [sic] get highly prejudicial material before the court in a sneaky fashion."  Doc. 37, at 5.  Defendants' Appendix included several orders of the Juvenile Session of Superior Court regarding the juvenile court proceedings.  Defendants argue that these may be considered because Plaintiffs reference and incorporate the juvenile proceedings in their Amended Complaint.  The Court agrees.  The Court may also take judicial notice of the orders of another court.  However, the Court will not consider any findings of facts contained therein.  *See Cabrera v. Schafer*, 178 F. Supp. 3d 69, 73 (E.D.N.Y. 2016).  Furthermore, these documents are not critical to the case, and provide little relevant information that was not contained in the Complaint.  "The more critical an issue is to the ultimate disposition of the case, the less appropriate judicial notice becomes."  *Pina v. Henderson*, 752 F.2d 47, 50 (2d Cir. 1985).  Finally, it is not disputed that the children were adjudicated neglected and Harasz and Wirth's parental rights were terminated, which is the primary value of the attached documents.  Plaintiffs do not challenge the other materials placed before the Court, including the applications for arrest warrants for Harasz and Wirth.[2]

---

[2] I may consider these warrants on this motion to dismiss.  They are referenced and relied upon in the Amended Complaint to a degree sufficient for the Court to regard the documents as incorporated in the pleading.  Alternatively, I may judicially notice the warrants under Fed. R. Evid. 201.

## V.      MALICIOUS PROSECUTION - DEFENDANT KATZ

In Count Two of the Amended Complaint, Plaintiffs sue Kennedy and Trantalis under 42 U.S.C. § 1983 for malicious prosecution, in violation of the Fourth and Fourteenth Amendments. Katz is sued for malicious prosecution under the same provisions in Count Three. Plaintiffs also sue Kennedy and Trantalis in Count Five, and Katz in Count Six, for malicious prosecution under state law.

The malicious prosecution claims against these three Defendants will be considered separately. In this part of the Ruling, I discuss the claim against Defendant Katz only.

## A.      Preliminary Considerations

Count Three of the Amended Complaint asserts a claim against Katz for malicious prosecution in violation of the Fourth and Fourteenth Amendments to the United States Constitution. Count Six asserts a claim against Katz for malicious prosecution in violation of Connecticut law.

Among the necessary elements of the tort of malicious prosecution, a plaintiff must show that the defendant in question initiated or procured the institution of criminal proceedings against the plaintiff, which were subsequently terminated in favor of the plaintiff. In the case at bar, it is undisputed that criminal proceedings were commenced against Harasz and Wirth, which were terminated in their favor: Wirth was found not guilty after a bench trial before state court Judge Dewey. The charges against Harasz were then dropped.

Defendant Katz asserts that it is not plausible that she was responsible for initiating the criminal cases against these Plaintiffs because at the time of initiation, Katz was the Commissioner of the Connecticut Department of Children and Families, and under the state statutory scheme responsibility for initiating criminal prosecutions rests with the Office of the State's Attorney.

19

I am aware of Commissioner Katz's public office, and sensible of the importance of her position.  But I cannot discern a reason why Katz's public office, standing alone, should insulate her from liability for malicious prosecution if her conduct satisfies the elements of that tort.  The brief for this Defendant does not suggest why Katz's office should confer such an immunity.

Insulating Katz from liability for malicious prosecution solely because she is the Commissioner would be counterintuitive to a tort whose boundaries courts paint with a relatively broad brush.  The first element of malicious prosecution is satisfied if a plaintiff proves that "the defendant *initiated or procured* the institution of criminal proceedings against the plaintiff."  *Turner v. Boyle*, 116 F. Supp. 3d 58, 85 (D. Conn. 2015) (quoting *McHale v. W.B.S. Corp*., 187 Conn. 444, 448 (1982)) (emphasis added).[3]  The emphasized phrase demonstrates that to be liable for malicious prosecution, an individual need not personally *initiate* a criminal proceeding against the plaintiff; he or she may *procure* that initiation by someone else.

It is of course inherent in the ordinary functions of the head of an agency responsible for the safety of children to "initiate or procure" on occasion prosecutions by other public servants of those charged with abusing children.  But the procuror of a prosecution and its prosecutor need not both be public servants in order to hold the former liable for a malicious prosecution.  What counts for the tort liability is what a defendant did, not what his office or job was.  Thus it is clear under the Connecticut law of malicious prosecution that "a private individual may be held liable for initiating a criminal proceeding 'if he has insisted that the plaintiff should be prosecuted'; for example, by bringing 'pressure of any kind to bear upon the public officer's decision to commence the prosecution.'"  *Turner*, 116 F. Supp. 3d at 85 (quoting *McHale*, 187 Conn. at 448).  Moreover,"[a]

---

[3]  The other elements of this tort are discussed *infra*.

person is deemed to have initiated a proceeding if his direction or request, or pressure of any kind

by him, was the determining factor in the officer's decision to commence the prosecution . . . [or]

the defendant's request might reasonably have been found to be the proximate and efficient cause

of the arrest." *Acevedo v. Sklarz*, 553 F. Supp. 2d 164, 172 (D. Conn. 2008) (quoting *Zenik v.

O'Brien*, 137 Conn. 592, 596 (1951)) (internal quotation marks omitted).

To the extent that defense counsel contend that Katz cannot be liable for malicious

prosecution solely as a matter of law because she was Commissioner of the DCF, the contention has

no substance.  Katz's office as Commissioner *qua* office is not relevant to her liability *vel non* for

malicious prosecution of these Plaintiffs.  The decisive question is whether Plaintiffs' Amended

Complaint sufficiently alleges a plausible claim that Katz's conduct *vis-a-vis* Plaintiffs amounted to

their malicious prosecution by Katz.  I turn to that question.

**B.      Alleged Malice on the Part of Katz**

I begin the analysis of Plaintiffs' malicious prosecution claim against Katz by taking judicial

notice that the Connecticut Senate confirmed her as Commissioner of the Department of Children

and Families by a unanimous vote on February 4, 2011.[4]  Prior to that date, Katz had no authority

over or responsibility for any action taken by any DCF staff with respect to these Plaintiffs or indeed

anyone else.  Governor Malloy nominated Katz to be the DCF Commissioner.  Her prior position

had been an Associate Justice of the Connecticut Supreme Court.

The question presented by the present motion is whether Plaintiffs have alleged a plausible

claim that Katz, as DCF Commissioner, acted maliciously toward Harasz and/or Wirth.  The answer

---

[4] Connecticut's Official State Website, Joette Katz Biography, http://www.portal.ct.gov/ (last accessed February 28, 2017).

depends entirely upon what Katz did or did not do subsequent to February 4, 2011, the date on which she assumed the office of Commissioner.

Plaintiffs' Amended Complaint charges Katz with two counts of malicious prosecution. Count Three alleges that Katz's actions violated Plaintiffs' rights "under the Fourth and Fourteenth Amendments to the United States Constitution to be free from malicious prosecution," AC ¶ 197, a claim falling within federal subject matter federal jurisdiction under 42 U.S.C. § 1983 and 28 U.S.C. § 1331.  Count Six alleges that Katz's actions "constitute the tort of malicious prosecution under the laws of the State of Connecticut."  AC ¶ 206.

For the most part, these federal and state claims are defined by the same substantive law. "Under both federal and Connecticut choice-of-law rules, a claim for malicious prosecution is governed by the laws of the state in which the legal proceedings took place, unless a more significant relationship exists in another state." *Turner*, 116 F. Supp. 3d at 75-76 (citing *Md. Cas. Co. v. Cont'l Cas. Co.*, 332 F.3d 145, 151 (2d Cir. 2003)).  In the case at bar, all proceedings took place in Connecticut.  No other state figures in the case.  Accordingly Connecticut law governs both federal and state claims against Katz, with one additional requirement on the federal side.  To prevail on a Section 1983 claim of malicious prosecution, the plaintiff "must show a violation of his rights under the Fourth Amendment, and must establish the elements of a malicious prosecution claim under state law." *Manganiello v. City of New York*, 612 F.3d 149, 160-61 (2d Cir. 2010) (citations omitted).  "To state a malicious prosecution claim under Section 1983, a plaintiff must also plead that he suffered a post-arraignment liberty restraint sufficient to implicate his Fourth Amendment rights." *Turner*, 116 F. Supp. 3d at 85 (citation omitted).

Under Connecticut law, applicable to both the federal and state law claims, the plaintiff in

22

an action for malicious prosecution must establish each of these elements: "(1) the defendant initiated or procured the institution of criminal proceedings against the plaintiff; (2) the criminal proceedings have terminated in favor of the plaintiff; (3) the defendant acted without probable cause; and (4) the defendant acted with malice, primarily for a purpose other than that of bringing an offender to justice." *Id.* (quoting *McHale*, 187 Conn. at 447) (internal quotation marks omitted).

*Malice*, a defendant's state of mind essential to proving a claim for *malicious* prosecution, has a particular and precise meaning in the law of tort. The Second Circuit made the point bluntly in *Pinsky v. Duncan*, 79 F.3d 306, 313 (2d Cir. 1996): "The element of malice implicates an evil or unlawful purpose." *Id.* (citation omitted). Judge Miner's opinion in *Pinsky* expanded on this concept by following it with a quotation from *American Jurisprudence*:

> Impropriety of motive may be established by proof that the defendant instituted the prior proceedings against the plaintiff, for instance, for the purpose of obtaining a private advantage against him; thus, malice is sufficiently established in an action for malicious prosecution if it appears that the prior suit was commenced in bad faith to vex, annoy, or harass the adverse party.

*Id.* (quoting 52 Am. Jur. 2d *Malicious Prosecution* § 152, at 277-78 (1970)) (footnotes and ellipses omitted). Similarly, the Supreme Court of Connecticut said in *McHale* that a malicious prosecution plaintiff must prove "the defendant acted with malice, *primarily for a purpose other than* bringing an offender to justice." 187 Conn. at 447 (emphasis added and citation omitted); *see also Mulligan v. Rioux*, 229 Conn. 716, 746 (1994) ("In a malicious prosecution action, the defendant is said to have acted with malice if he [or she] acted *primarily for an improper purpose*; that is, for a purpose *other than that* of securing the *proper* adjudication of the claim on which [the proceedings] are based." (emphasis added) (citation and internal quotation marks omitted)). The *Pinsky*, *McHale* and *Mulligan* decisions make the same fundamental distinction: A defendant acting with malice

23

proclaims and professes himself to be acting for an honorable and acceptable purpose—to deserve the salutation "honest Iago"[5]—but in reality his [or her] evil or unlawful purpose is to injure someone else wrongfully.

In the case at bar, it is undisputed that Katz took certain actions with respect to the criminal cases brought against Harasz and Wirth. That conduct is insufficient without more to sustain a claim that Katz maliciously prosecuted Harasz or Wirth. To succeed on that claim, Harasz and Wirth must plead and prove, by direct evidence or compelling inference, that Katz, in her actions relating to Plaintiffs, was motivated by an evil or unlawful purpose—a purpose other than preventing Plaintiffs from abusing children in their care, the salutary purpose proclaimed by the agency Katz headed.

The cited authorities teach us that the law distinguishes between a *mistaken* or unsuccessful prosecution and a *malicious* one. The criminal charge against a particular defendant may be dropped by the prosecutor on a *nolle prosequi.* A defendant may stand trial and persuade the judge to enter a judgment of acquittal, or a jury to acquit him by its verdict. These are favorable results for a defendant, but he or she has no legal claim for malicious prosecution. Nor need the defeated prosecutor, who lost the case because of tactical miscalculations, inadequacies of proof, ineffective advocacy, or all three combined, fear a claim for malicious prosecution, so long as his or her heart was pure. The tort of malicious prosecution requires a defendant's bad faith formulation and pursuit of an evil or unlawful purpose.

The present motion poses the question of whether Plaintiffs' Amended Complaint adequately pleads a plausible claim for malicious prosecution, under federal or state law, against Defendant Katz. In order to evaluate that issue, it becomes necessary to revisit such well-pleaded allegations

---

[5] *See* Othello (2.3.6).

24

of fact as may be found in the Amended Complaint.

It is immediately apparent that the Amended Complaint fails to allege Katz *initiated* the criminal charges against either Harasz or Wirth.  As previously noted, Katz was confirmed as Commissioner of the Department of Children and Families on February 4, 2011.  The Amended Complaint alleges that before that date, before Katz had assumed her office and any agency action could be ascribed to her, DCF staff employees had become so concerned about Harasz's and Wirth's care of the several children entrusted to them that the agency had decided to remove the children from them.  In "late January 2011" one of those children, called "Doe #4" in Plaintiffs' papers and "RH" in Defendants', during a psychological evaluation "first made the claim of sexual misconduct against Harasz."  AC ¶ 45.  DCF staff responded by interviewing Doe #4 on February 7, 2011 "about his allegations of sexual abuse," and also interviewed "the younger kids in school" (also living with Plaintiffs) on February 8.  AC ¶¶ 46, 47.  DCF staff then arranged a "forensic interview" of Doe #4 which took place on February 9, 2011, AC ¶ 52, five days after Katz was confirmed as Commissioner.  The Amended Complaint further alleges at ¶ 48 that "DCF had made the decision to remove the younger children from the Harasz/Wirth home with a 96 hour hold before they interviewed them."  Thus on Plaintiffs' account, DCF had decided to take the children from them before Katz was on the scene as agency Commissioner.

DCF staff followed up on April 11, 2011, when an arrest warrant "submitted by Sgt. Trantalis" was "signed by the prosecutor and submitted to Judge Taylor," a Connecticut Superior Court judge.  AC ¶ 71.  "The judge had some questions regarding Doe #4's refusing to be interviewed again," and "[b]y 5/5/2011, the judge would not sign the warrant and returned it to the prosecutor."  AC ¶¶ 71, 73.  The Amended Complaint does not recite who was named in the warrant;

presumably it was for the arrest of Harasz, Wirth or both.  DCF staff then arranged a further "forensic interview" on August 11, 2011, this time of Doe #9, a smaller child who had also lived with Plaintiffs, who made further statements which Kennedy included when Trantalis "resubmitted the previously denied arrest warrant" to the Connecticut judge.  AC ¶¶ 107, 108.

On November 8, 2011, Judge Taylor signed an arrest warrant for Plaintiff Douglas A. Wirth.  The judge's written finding recites that from the supporting affidavits, "there is probable cause to believe that an offense has been committed and that the accused committed it."  Doc. 35 Ex. B, at 15-23.  On November 22, 2011, Judge Taylor signed an arrest warrant for George S. Harasz with the same finding.  *Id.* at 1-5.  On November 29, 2011, Superior Court Judge Fuger signed a second warrant for Harasz, based on a revised police affidavit.  *Id.* at 6-14.  On November 30, 2011, each Plaintiff was arrested by Glastonbury police on the warrants.  AC ¶ 121.

The arrests of Plaintiffs bring to a conclusion that phase of the case one may term the *initiation* of the criminal proceedings against them.  The Amended Complaint criticizes at length the manner in which DCF staff members conducted themselves during these events.  Particular criticism is directed at Elizabeth Ferreira, a DCF case worker centrally involved in the case and a co-defendant of Katz.  In other passages, the Amended Complaint is content to simply rail at the agency as a collective entity, as in ¶ 77 ("DCF claimed the children did not want to and were not comfortable visiting Harasz and Wirth") and ¶ 78 ("DCF now had a problem in that the five kids were removed due to allegations by Doe #4 which were determined not to be credible").  However, the alleged faults of others, named or unnamed, have no relevance to Plaintiffs' claims that *Katz* is *personally liable* for the tort of malicious prosecution of Harasz and Wirth.

To survive the motion to dismiss those claims against Katz, Plaintiffs must be able to point

26

to well-pleaded factual allegations which state a plausible claim that *Katz's* conduct amounted to malicious prosecution.  Not only are Plaintiffs unable to do so, at one point in the Amended Complaint they make something up.  The emphasized caption to ¶ 47 reads: **"On 2/8/2011, Katz caused DCF to remove the five boys Does #5-9."**  The following paragraphs, supposedly containing the pertinent narrative, contain specific descriptions of actions of DCF staffers, not Katz. Plaintiffs seek to justify ascribing the children's removal to Katz on the ground that "Katz had press releases issued that made it clear that 'Katz caused DCF to remove the five boys,'" Doc. 37, at 7, a specious notion, since the press releases do not say that and the Amended Complaint's allegations simply describe how DCF staffers decided upon and then implemented the removals.  Of equally little avail in this regard is ¶ 55 of the Amended Complaint, which says only: "Katz became aware of the allegations of abuse [by Plaintiffs] in February 2011.  Katz remained very active and involved in the Harasz and Wirth case throughout and in fact, attended several hearings in the case."  A DCF Commissioner's interest in a child abuse case brought by the agency seems natural rather than tortious, but in any event Katz's interest in and attendance at the hearings is not the stuff of which malicious prosecution is made.

The essence of Plaintiffs' malicious prosecution claims against Katz is expressed in the emphasized caption to a section in their brief, Doc. 37, at 7: **"Katz's improper involvement with the prosecution."**  The brief devotes that section, pages 7-11, to allegations of fact in the Amended Complaint and legal contentions in the brief which, in combination, are said by Plaintiffs to demonstrate that the Amended Complaint states plausible claims of malicious prosecution against Commissioner Katz.

It is not disputed that Katz took certain actions as the criminal cases against Harasz and

Wirth progressed following their arrests on November 30, 2011.  Plaintiffs characterize those actions as constituting Katz's "improper involvement" with the prosecution which amounts, on Plaintiffs' theory of the case, to malicious prosecution of the Plaintiffs by Katz through her alleged *procuring* of the prosecution.  The descriptions of those actions in Plaintiffs' brief at pages 7-11 are derived from quoting the allegations in ¶¶ 122-151 of the Amended Complaint.  Those allegations, referred to in detail in this Ruling *supra*, may be summarized thus:

On December 2, 2011, Katz was quoted in an article in the "*Hartford Courant*."  She called "the allegations" (presumably those against Harasz and Wirth) "shocking and appalling" and pledged the agency's full cooperation with the police.  AC ¶¶ 122, 124.

On Sunday, December 9, 2012, Katz placed an "urgent" telephone call to State's Attorney Gail Hardy, and met with Hardy in Katz's office on Monday, December 10.  AC ¶ 130.  On Friday, December 7, DCF staff members, Assistant State's Attorney Zagaja, and defense counsel had "reached a plea agreement at a judicial pre-trial with [Connecticut] Judge Alexander," calling for both Harasz and Wirth to plead guilty to certain charges, serve no jail time, and not be required to register on the State Sexual Offender Registry.  AC ¶ 128.  The DCF staffers "had a difficult time" with the absence of jail time and Katz had  "agreed with staff" before telephoning and meeting with State Attorney Hardy.  AC ¶¶ 128-130, 148.

On January 4, 2013, Judge Alexander conducted a plea hearing which Katz attended.  The cases were apparently continued.  On March 28, 2013, Katz expressed pleasure when she was informed that the State's pre-sentence investigation "recommended sex offender registry."  AC ¶ 132.

Plaintiffs allege that on April 5, 2013, "the plea deal was scheduled to be finalized but new

charges were lodged."  AC ¶ 133.  The Amended Complaint ascribes those "new charges" to Katz, who is alleged to have attended the April 5, 2013 hearing and "went privately into a side room with Doe #4 for a ten to fifteen minute private meeting," after which Doe #4 "came out of the room accompanied by the commissioner" and made new charges against Plaintiffs, specifically "that he had scars on his legs from being held down, raped and cut with a belt buckle, coat hanger and box cutter." AC ¶ 134.  Katz addressed the state court during the April 5 hearing, advising the judge that "the younger boys were starting to make 'disclosures.'"  AC ¶ 136.[6]

The Amended Complaint describes subsequent contacts between Katz and the State's Attorney's Office about the cases:  On May 17, 2013, a meeting between Katz, a DCF legal director, and "the prosecutor"; on June 25 and 26, e-mail exchanges between Katz and Chief State's Attorney Kevin Kane; and on July 2, 2013, e-mail exchanges involving DCF legal staff, Katz, and the prosecutors (in which a DCF lawyer said to prosecutor Zagaja that "Commissioner Katz asked me to provide you with an update regarding the new investigation" and inquired "if any determination has been made regarding the pending charges as well as the unsigned warrants").  AC ¶ 142.

The Amended Complaint sums up this aspect of the case at ¶ 148, alleging that "Katz was actively involved in the case" and Plaintiffs' favorable plea agreement involving no jail time "blew up when new allegations of misconduct, which were later found not to be credible, emerged." Plaintiffs' theory is that the "new allegations" were voiced by Doe #4, after Katz met privately with him during the April 5, 2013 hearing.  Plaintiffs assert that Doe #4's new charges were false, and that Katz's participation in the April 5 hearing in the manner described, combined with her conduct on subsequent dates, rose (or perhaps one should say "sank') to the level of malicious prosecution by

---

[6] Plaintiffs contend that this account by Doe #4 of additional injuries is untrue.

Katz of Harasz and Wirth.

 The facts of Katz's conduct—what she did and when she did it—are well pleaded.  I accept those allegations as true on this motion to dismiss.  Katz's intent and purpose in performing those acts is another matter.  The motion turns upon whether Plaintiffs' allegations are sufficient to state the necessary elements of a claim for malicious prosecution.

Plaintiffs make the threshold argument that the question of Katz's malice *vel non* cannot be considered on this Rule 12(b)(6) motion to dismiss the amended complaint.  They contend that "[m]alice and [m]otive are [q]uestions of [f]act" which must be decided by a jury: "Malice involves factual issues of motive, intent and good faith which are ill suited for a summary judgment, and a fortiori at the pleading stage on a motion to dismiss."  Doc. 37, at 31.  Plaintiffs purport to support that  proposition with a quotation from *Bizzaro v. Miranda*, 394 F.3d 82, 87 (2d Cir. 2005), but the language quoted in the brief does not seem to appear in the Second Circuit's opinion, which reversed the district court and held defendants were entitled to summary judgment dismissing employees' claims of wrongful disciplinary treatment.

More to the point, it is now well established that to survive a motion to dismiss, a plaintiff suing for malicious prosecution must allege facts sufficient to state a plausible claim that defendant acted with malice.  Over 30 years ago, in *Meiri v. Dacon*, 759 F.2d 989 (2d Cir. 1985), the Second Circuit affirmed summary judgment in favor of the defendant on the ground that plaintiff "failed to proffer any evidence suggesting that the stated reasons for her discharge were merely a pretext for religious discrimination."  *Id.* at 992.  Circuit Judge Kaufman's opinion addressed "the propriety of granting summary judgment in discrimination actions, where motivation and intent are crucial."  *Id*. at 995.  The Second Circuit acknowledged that "summary judgment is ordinarily inappropriate

where an individual's intent and state of mind are implicated," but went on to hold: "The summary judgment would be rendered sterile, however, if the mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise valid motion." *Id.* at 998. Affirming summary judgment for defendant in *Meiri*, the Court of Appeals held:

> To allow a party to defeat a motion for summary judgment by offering purely conclusory allegations of discrimination, absent any concrete particulars, would necessitate a trial in all Title VII cases. Given the ease with which these suits may be brought and expense required to defend such actions, we believe the trial judge properly granted summary judgment.

759 F.2d at 998.

Comparable reasoning informs the Supreme Court's opinions in *Twombly* and *Iqbal* on motion to dismiss practice.[7] In *Iqbal*, the plaintiff-respondent, a Pakistani citizen and a Muslim, was detained by federal authorities in the wake of the 9/11 terrorist attacks. 556 U.S. at 666. He sued the United States Attorney General and its FBI Director on the theory that these two officers "adopted an unconstitutional policy that subjected to harsh conditions of confinement on account of his race, religion, or national origin." *Id.* Thus, plaintiff's claims against the Attorney General and the FBI Director turned upon those officers' motivations and intent: states of mind which, if proven, could have resulted in liability for constitutional violations. However, the case was never

---

[7] The widely cited earlier case of *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957), referred to "the accepted rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." In the case at bar, the claims Harasz and Wirth assert against Katz impliedly echo that concept. However, in *Twombly* the Supreme Court did away with *Conley*. "There is no need," Justice Souter wrote for the majority in *Twombly*, "to pile up further citations to show that *Conley*'s 'no set of facts' language has been questioned, criticized, and explained away long enough. . . . [T]his famous observation has earned its retirement," 550 U.S. at 562-563, and is succeeded by the *Twombly–Iqbal* observation: "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570).

tried.  Reversing the Second Circuit, the Supreme Court held that the complaint should have been

dismissed by the district court for failure to state a claim.  The Court reasoned:

> [P]etitioners cannot be held liable unless they themselves acted on
> account of a constitutionally protected characteristic.  Yet
> respondent's complaint does not contain *any factual allegation
> sufficient to plausibly suggest petitioners' discriminatory state of
> mind.*  His pleadings thus do not meet the standard necessary to
> comply with Rule 8.

*Id*. at 683 (emphasis added).  The emphasized language makes it clear that where a particular state

of mind is an essential element to a claim, a plaintiff must include sufficient well-pleaded factual

allegations to make the claim plausible.

This evolution comes full circle in *Biro v. Conde Nast*, 807 F.3d 541 (2d Cir. 2015), a

defamation suit which posed the question "whether Rule 8 of the Federal Rules of Civil Procedure

requires a limited-purpose public figure to plead in a plausible way that defendants acted with actual

malice."  *Id.* at 542.  "We conclude," Circuit Judge Lohier wrote tersely, "that it does."  *Id*.  Rule

8(a), of central importance to the modern code pleading articulated by the Rules, provides:  "A

pleading that states a claim for relief must contain: . . . (2) a short and plain statement of the claim

showing that the pleader is entitled to relief."  The district court dismissed the complaint in *Biro*

> on the ground that Biro, as a limited-purpose public figure, failed to
> plead sufficient facts to give rise to a plausible inference of actual
> malice.  In doing so, the District Court relied on *Iqbal*'s instruction
> that, where a particular state of mind is an element of a claim, Rule
> 8 requires that it be plausibly pleaded and supported by factual
> allegations.

807 F.3d at 544 (citations omitted).

The Second Circuit affirmed this dismissal of the complaint in *Biro*, and it is instructive to

consider Judge Lohier's opinion carefully because it rejects several arguments made by Plaintiffs

in the case at bar. The defamation plaintiff in *Biro* contended that "he did not have to allege facts sufficient to render his allegations of actual malice plausible" because Fed. R. Civ. P. Rule 9(b) allows malice "to be alleged generally." *Id.* The Second Circuit rejected that notion; Judge Lohier wrote: "*Iqbal* makes clear that, Rule 9(b)'s language notwithstanding, Rule 8's plausibility standard applies to pleading intent." *Id.* at 545 (citing *Iqbal*, 556 U.S. at 686-87). For that proposition, the Court of Appeals in *Biro* quoted the Supreme Court's language in *Iqbal* that "Rule 9(b) requires particularity when pleading fraud or mistake, while allowing malice, intent, knowledge, and other conditions of a person's mind to be alleged generally," but "does not give [a plaintiff] license to evade the less rigid—though still operative—strictures of Rule 8." *Id.* To which, the Second Circuit added in *Biro*: "It follows that malice must be alleged plausibly in accordance with Rule 8. Our sister circuits that have considered the issue agree." 807 F.3d at 545 (collecting cases).

The brief for Harasz and Wirth opposing dismissal also stresses their need for and entitlement to discovery, in order to flesh out their theory that Katz acted maliciously toward them. In *Biro*, the Second Circuit squarely rejected that contention:

> To the extent that Biro reads *Boyd* [an earlier Second Circuit case decided prior to *Twombly* and *Iqbal*] as permitting an implausible claim to proceed to discovery, we think *Twombly* rejected this approach. 550 U.S. at 559 ("It is no answer to say that a claim just shy of a plausible entitlement to relief can, if groundless, be weeded out early in the discovery process. . . ."). Instead, a public-figure plaintiff must plead "plausible grounds" to infer actual malice by alleging "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of" actual malice. *Id.* at 556.

807 F.3d at 546 (lateral citations omitted).

Having determined that actual malice on the part of Katz must be plausibly alleged by Harasz and Wirth in order for their Amended Complaint to survive the present motion to dismiss, I now

consider whether their allegations meet that standard.  I conclude that they do not.

Plaintiffs' allegations charging Katz with malicious prosecution, scattered throughout the Amended Complaint, are gathered together and summarized in ¶ 196, the preface to ¶ 197. Paragraph 197 concludes:  "The actions of Katz violated plaintiffs' rights under the Fourth and Fourteenth Amendments to the United States Constitution to be free from malicious prosecution." Paragraph 196 reads:

> Katz meddled with the prosecutor by calling Chief State's Attorney Kevin Kane and Hartford State's Attorney Gail Hardy, meeting with Gail Hardy, and meeting with prosecutors, trying to put pressure on the prosecution to sign additional arrest warrants, and to throw the book at the plaintiffs from the first arrests, after the prosecutor had negotiated a plea deal.  Katz took actions to undermine the plea deal that had been reached.  Katz's meeting with the alleged victim, Doe #4, while court was in session on 4/5/2013, after which Doe #4 came forth with more malicious lies, was improper and had the effect of emboldening and encouraging Doe #4 with his lies.

The only well-pleaded allegations of fact in this passage are that Katz telephoned Kane and Hardy, met with Hardy and other prosecutors, and met with Doe #4 during the April 5, 2013 court hearing.  I am bound to accept the truth of those allegations, and do so.  But the pleading does not stop there.  It goes on to view these facts though a jaundiced eye and characterizes them in pejorative terms:  Katz "meddled with the prosecutor."  Her intentions were to "to put pressure on the prosecution," "throw the book at the plaintiffs after the prosecutor had negotiated a plea deal," and "undermine the plea deal that had been reached."  Katz's meeting with Doe #4 during the court hearing was "improper."[8]  As the Supreme Court said of a comparable pleading in *Iqbal*: "As such,

---

[8]  Plaintiffs' brief, Doc. 37, reflects the essence of their claim against Katz when it says at page 30: "Katz is one of the most powerful women in this State, and she attempted to use that power to influence and manipulate the criminal proceedings to get the result she wanted."  That is Katz's illicit purpose, on Plaintiffs' theory of the case, that resulted in violations of their constitutional rights.

the allegations are conclusory and not entitled to be assumed true."  556 U.S. at 681 (citing *Twombly*, 550 U.S. at 554-55).  *Iqbal* furnishes a useful analogy.  Conclusory allegations that defendants-petitioners were the "principal architect" and "instrumental" in executing a malicious policy of confinement were held to be insufficient to state a claim that petitioners respondents had wrongfully detained the plaintiff, where the complaint "does not contain any factual allegation sufficient to plausibly suggest petitioners' wrongful state of mind."  *Id*. at 683.  *Twombly* is to the same effect: allegations of competitors' "parallel behavior" were held to be insufficient to state a claim of conspiracy in restraint of trade, where "plaintiffs have not nudged their claims across the line from conceivable to plausible."  550 U.S. at 565, 570.

These Supreme Court decisions are instructive in the case at bar, where Plaintiffs accuse Katz of meddlesome and corrupt manipulation of the criminal process in order to achieve her personal purpose to punish Plaintiffs severely, but fail to include in their complaint factual allegations that plausibly show or even suggest Katz had that wrongful state of mind.  That omission is striking because Plaintiffs ascribe a wrongful motive to everything Katz did, but a virtuous explanation for the Commissioner's conduct is at least, if not more, plausible than a villainous one. Interaction between the Connecticut State's Attorney's Office and that of the Department of Children and Families is mandated by the State statutory scheme.  Conn. Gen. Stat. § 17a-106 provides: "All law enforcement officials, courts of competent jurisdiction, school personnel and all appropriate state agencies providing human services in relation to preventing, identifying, and investigating child abuse and neglect shall cooperate toward the prevention, identification and investigation of child abuse and neglect."  Given that legislative command, a DCF Commissioner's telephone calls to and meetings with State Attorneys about a case of possible child abuse, and her attendance at

35

related court hearings, may be more fairly characterized as doing the Commissioner's job, not meddling in the prosecutor's job.

Plaintiffs' Amended Complaint and brief lay particular emphasis upon Katz's encounter *a deux* with the child Doe #4 during the April 5, 2013 court hearing. The Amended Complaint's factual allegations convincingly portray Doe #4 as one of the most troubled and contentious members of the group of nine children Harasz and Wirth adopted over time. Paragraph 134 of the Amended Complaint alleges in part:

> During the 4/5/2013 hearing, Katz, the Commissioner of DCF, went privately into a side room with Doe#4 for a ten to fifteen minute private meeting, delaying the proceedings. Katz was not merely attending the hearing but interrupted the hearing to go into a private space with the accuser. It gave the appearance that Katz was coaching the alleged victim. Doe #4 came out of the room accompanied by the commissioner to elaborate on his final accusation of additional "facts."

Neither Plaintiffs nor their counsel on this motion go so far as to state with certainty that during this meeting Katz told Doe #4 what to say, nor could they, since only Katz and the child were in the room at the time. The asserted "appearance that Katz was coaching the alleged victim," a perception by some identified source, does no more than show the *possibility* of tortious behavior by Katz. But a *possible* claim is not a viable claim under Rule 8(a)(2) and Rule 12(b)(6). To survive a motion to dismiss, a claim must be shown by well-pleaded facts to be *plausible*.

Justice Kennedy's opinion for the Court in *Iqbal* states that proposition forcefully:

> Determining whether a complaint states a plausible claim for relief will, as the Court of Appeals observed, be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not "show[n]"—"that the pleader is entitled to relief." Fed. Rule Civ. Proc. 8(a)(2).

556 U.S. at 679 (citation omitted). That crucial distinction follows from the analysis in *Iqbal* that

emerges when *Twombly* and *Iqbal* are read together:

> To survive a motion to dismiss, a complaint must contain sufficient
> factual matter, accepted as true, to "state a claim to relief that is
> plausible on its face." A claim has facial plausibility when the
> plaintiff pleads factual content that allows the court to draw the
> reasonable inference that the defendant is liable for the misconduct
> alleged. The plausibility standard is not akin to a "probability
> requirement," but it asks for more than a sheer possibility that a
> defendant has acted unlawfully. Where a complaint pleads facts that
> are "merely consistent with" a defendant's liability, it "stops short of
> the line between possibility and plausibility of 'entitlement to relief.'"

*Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 556-57, 570) (citations omitted).

Justice Kennedy expressed the view in *Iqbal* that district judges have, in addition to "judicial

experience," some modicum of "common sense." *Id.* at 679 (citation omitted). Common sense

enables a judge to rank the relative plausibility of competing factual theories of events and discard

the less plausible; if the discarded theory is the one on which plaintiff bases his claim, the claim will

be dismissed. As the Court's opinion in *Iqbal* points out, that is precisely what happened in

*Twombly*:

> Acknowledging that parallel conduct was consistent with an unlawful
> agreement, the Court [in *Twombly*] nevertheless concluded that it did
> not plausibly suggest an illicit accord because it was not only
> compatible with, *but indeed was more likely explained by*, lawful,
> unchoreographed free-market behavior.

566 U.S. at 680 (emphasis added) (citing *Twombly*, 550 U.S. at 570).

The case at bar presents two competing explanations for the conduct of Commissioner Katz

in relation to Harasz and Wirth. The explanation upon which Plaintiffs base their claims of

malicious prosecution is that: virtually from the moment of her arrival at the DCF in February 2011,

Katz obsessively subjected these adoptive parents to a bad faith, dishonest and dishonorable effort

to "throw the book" at them, going so far as to coach a troubled child to lie to a state court judge about being abused by Plaintiffs.  The explanation offered by the defense is that Katz's entire involvement with Harasz and Wirth, including actions she took during the course of the ultimately terminated criminal proceedings against them, resulted solely from the Commissioner's good faith and honorable discharge of the duties of her office at the head of an agency charged with the protection of children.

Defendant Katz's motion to dismiss the malicious prosecution claims against her turns upon whether those claims as pleaded are plausible.  In evaluating plausibility in this case,  it seems clear that I must choose between these rival explanations.  To perform that function, Justice Kennedy commands me to draw upon my judicial experience and common sense.  *See Iqbal*, 556 U.S. at 679. Summoning these qualities, I conclude that Plaintiffs' portrayal of Commissioner Katz and the claimed reprehensible nature of her conduct is markedly lacking in plausibility.  Her conduct is, at the very least, equally explained by the honorable objectives and purposes of the DCF; indeed, I think that to be the more likely explanation.  The Amended Complaint contains no suggestion, hint, surmise or speculative conjecture, let alone a well-pleaded factual allegation, that explains why Katz, newly arrived in the DCF ranks, would immediately fix these two individuals in her sights and keep on squeezing the trigger, without any regard for fairness or truth.

The absence of such factual allegations puts one in mind of Judge Underhill's dismissal in *Turner,* 116 F. Supp. 3d at 86, of a malicious prosecution claim against defendant Bednarz, a legislative staffer:

> Instead of offering any factual allegations indicating that Bednarz made a false complaint or otherwise attempted to ensure that Hardy initiated criminal proceedings against Turner, Turner relies on conjecture, hyperbole and ad hominem attacks to encourage the court

to speculate that Bednarz acted with malice.

The Plaintiffs' Amended Complaint suffers from the same shortcomings. As a typical example, ¶ 134 states that Katz's speaking with Doe #4 in a private room during the April 5, 2013 court hearing "gave the appearance that Katz was coaching the alleged victim." That is not a well-pleaded factual allegation; it is, rather, a non-participant's subjective conjecture, tendered as an invitation to the Court to speculate that Katz acted with malice, an invitation the Court declines.

As noted *supra*, the Connecticut Supreme Court held in *McHale*, 187 Conn. at 447, that the fourth necessary element of malicious prosecution is that "the defendant acted with malice, primarily for a purpose other than bringing an offender to justice." To bring the case within that definition of malice, a plaintiff must plead and prove that the defendant's true purpose in initiating or procuring a prosecution was entirely different from that proceeding's ostensible purpose: bringing the plaintiff to justice. The distinction is exemplified by *Bhatia v. Debek*, 287 Conn. 397 (2008). Estranged parents bitterly disputed visitation rights to "T," their infant daughter. *Id.* at 400-03. The mother reported to local police that, according to what T had told her, the father had abused the child. *Id.* at 403. The father was arrested, charged with child abuse, acquitted after trial, and subsequently cast as party plaintiff, sued the defendant mother for malicious prosecution. *Id.* The trial judge at that bench trial found that the defendant mother "was not telling the truth about the incident that gave rise to the allegations of sexual abuse," and that "the defendant knowingly provided false information to police officers" on that subject. *Id.* at 408. The Connecticut Supreme Court, affirming a judgment in favor of the plaintiff father on his malicious prosecution claim, said of the element of malice:

> The last element of malicious prosecution requires that "the defendant acted with malice, primarily for a purpose other than that

39

of bringing an offender to justice." [citing and quoting *McHale*, 187 Conn. at 447].  There is ample support in the record for the trial court's findings that the defendant acted with malice.  The record reveals that the defendant repeatedly attempted to prevent the plaintiff from exercising his visitation rights with T, and the trial court found that the defendant's report of the alleged sexual abuse was one of many attempts to keep the plaintiff from being with T.

*Id.* at 411 (citation omitted).  In other words: the Connecticut Supreme Court held that the defendant mother acted with *malice* in procuring the plaintiff father's prosecution because the evidence showed that her true purpose (depriving plaintiff of his visitation rights) was quite different from its ostensible purpose (bringing a child abuser to justice).

A case like *Bhatia* is instructive in the case at bar because in order to show Katz acted with malice, Harasz and Wirth have the burden of showing that Katz's conduct toward them was for a purpose other than the declared public one of bringing them to justice for the alleged crime of abusing their adopted children.  Neither Plaintiffs' Amended Complaint nor their briefs on this motion state directly, or indirectly by suggestion, hint or innuendo, what that other unrelated purpose was; and the Court, in this Rule 12(b)(6) context, is not in a position to speculate about what it might have been.  Surely it will not suffice in this regard for Plaintiffs to say, as they do in ¶ 196 of the Amended Complaint, that Katz was motivated by a desire to "throw the book at the plaintiffs from the first arrests"—an inelegantly phrased intent, if Katz in fact entertained it, but consistent with a public officer's legitimate (and non-malicious) purpose to subject child abusers to substantial penalties.  The fact of the matter is that the only purpose on the part of Katz that Plaintiffs allege is the lodging and pressing of child abuse charges against them: in other words, "bringing these perceived offenders to justice," *see McHale*, 187 Conn. at 447, a principal reason for the DCF's existence.  That purpose does not establish malice, as defined by the cited cases, on the part of Katz:

on the contrary, the purpose negates malice.

As we have seen, the *leitmotiv* running through the Amended Complaint is that early on in the case, Commissioner Katz formed the intent to "throw the book at the plaintiffs" and, to achieve that purpose, used her considerable power "to influence and manipulate the criminal proceedings to get the result she wanted," including isolating and pressuring a troubled child to accuse his adoptive parent falsely.  A deplorable state of mind for a public servant:  but it will not suffice for Plaintiffs to simply allege Katz had it, particularly when Plaintiffs have no personal knowledge of the incident to which they assign a central importance.  *Iqbal* is determinative: Plaintiff-respondent's complaint against petitioners Attorney General and FBI Director was dismissed on motion because "respondent's complaint does not contain any factual allegation sufficient to *plausibly* suggest petitioners' discriminatory state of mind."  550 U.S. at 683 (emphasis added).  The Amended Complaint in this case displays the same inadequacy.

For the reasons stated *supra*, the Court finds itself unable to conclude that the Amended Complaint contains sufficient well-pleaded factual allegations to state plausible claims for malicious prosecution on behalf of Plaintiffs Harasz and Wirth against Defendant Katz.

## VI.    FABRICATION OF EVIDENCE

### A.    Introduction

Counts Four and Seven of the Amended Complaint assert claims against Defendants Ferreira, Kennedy and Trantalis for fabrication of evidence.  To recapitulate: Elizabeth Ferreira was a DCF social worker.  James Kennedy and William Trantalis were Town of Glastonbury police officers.

The wording of Counts Four and Seven is virtually identical.  The caption of each identifies the nature of the claim as "Due Process." Paragraphs 199 and 200 of Count Four allege:

199.   The defendants knowingly created false and misleading evidence, twisted and blatantly misrepresented the 8/11/2011 forensic into gross perversion of the facts, fabricated new "disclosures" which were not witnessed or corroborated, colluded with each other and witnesses to create new "disclosures" for the sole purpose of winning their case, not in the pursuit of justice.

200.   The fabrication of evidence did not stop with the 8/11/2011 forensic but continued up through September 2014, the time of the first trial, in State v. Wirth.  From 2011 to 2014, the defendants colluded with each other and with witnesses, coaching them into new "disclosures" for the sole purpose of winning their case, not in the pursuit of justice or in the best interest or anything close to it for any of the children.

Paragraphs 208 and 209 of Count Seven are cast in language identical to ¶¶ 199 and 200 of Count Four, with the exception of the last phrase of ¶ 209, which reads " . . . or in the best [sic] of the child."  I do not detect any intended substantive difference between Counts Four and Seven.  One may infer that the pleader simply failed to copy accurately the second of these counts from the first one.  The essential similarity of the Counts appears from paragraphs 201 and 210.  Paragraph 201 of Count Four alleges: "Such activity qualifies as an unconstitutional deprivation of the plaintiffs' rights.  Moreover, this right was clearly established at the time of the defendants' conduct."  Paragraph 210 of Count Seven contains the same allegations.[9]

Accordingly, Counts Four and Seven may be regarded as duplicative.  They will be considered together.

B.    **Structure of the Fabrication Claims**

Counts Four and Seven each begin with the recitation that "Paragraphs 1-174 are

---

[9] Although Plaintiffs purport to assert a state law claim in Count Seven, the Court is not aware of any basis for such a claim and Plaintiffs direct the Court to no such authority, instead treating these claims as duplicative themselves.

incorporated by reference."[10]   Paragraphs 1-174 of the Amended Complaint comprise a lengthy, sometimes disjointed recitation of factual allegations interspersed with conclusions, accusations and inferences, which spans the history of the case and the several parties' interactions with each other. All eight counts of the Amended Complaint, containing all of Plaintiffs' claims against all the Defendants, are based upon the 174 incorporated paragraphs.

The wording of the several Counts themselves is terse.  Thus Counts Four and Seven, which charge Ferreira, Kennedy and Trantalis with fabrication of evidence, do not distinguish in any way between the individual conduct of these three Defendants relevant to that claim.  Nor do those Counts contain specific allegations of what evidence was fabricated by which Defendant, alone or in concert with others.  In the main, the reader of the pleading must deduce those particulars by studying and interpreting the 174 previous incorporated paragraphs in relation to the fabrication counts, as they may be clarified by the briefs of counsel.[11]

The sufficiency of the allegations against each Defendant depends upon legal standards derived from Second Circuit decisions and their progeny.

## C.   Legal Standards

As more fully stated in Part VI.D.2., *infra*, Plaintiffs' principal accusation of evidence fabrication is that Glastonbury police officer Kennedy, after observing the forensic interview of the

---

[10] Paragraph 198 in Count Four and paragraph 207 in Count Seven (which also incorporates Paragraphs 199-202 from Count Four).

[11] Defendants Kennedy and Trantalis assert that this is a fatal fault of Plaintiffs' pleading relying on *Moore v. City of New York*, No. 08-cv-2449, 2011 WL 795103, at *7 (E.D.N.Y. Feb. 28, 2011) to assert that such claims without supporting facts are insufficient to show the plaintiff is entitled to relief.  Although the individual counts do not contain or repeat all of the allegations in the Amended Complaint they do include additional detail on the claims and it is discernable what incorporated allegations apply to the claims based on this detail.  The Court rejects Defendants' argument that such a manner of pleading is automatically fatal to Plaintiffs' claims here.

child Doe #9 on August 11, 2011, thereafter drafted, signed and swore to an affidavit which purported to describe accurately the substance of the interview, but instead deliberately and materially misrepresented what had occurred.  The purpose of this deplorable conduct by a police officer, Plaintiffs theorize, was to overcome a state judge's initial reluctance and persuade him to issue warrants for the arrest of Plaintiffs:  an unworthy purpose which succeeded when Judge Taylor issued the warrants and Harasz and Wirth were arrested.  Wirth was acquitted at trial; the prosecutors then dropped the charges against Harasz.[12]

It is distressing to discover, during the course of legal research, the significant number of cases demonstrating that law enforcement officers fabricated evidence in connection with criminal charges against individuals.  The Second Circuit, frequently required to confront this aberrational behavior, has for at least 20 years consistently condemned it in strong and uncompromising terms.

In *Ricciuti v. N.Y.C. Transit Authority*, 124 F.3d 123 (2d Cir. 1997), police officers fabricated a false confession by a defendant, forwarded it to prosecutors, and then argued in the subsequent § 1983 action against the officers that so long as there was probable cause for the plaintiff's arrest, independent of the allegedly fabricated evidence, "the fabrication of evidence is legally irrelevant. In essence, [the officers] argue that as long as the arrest complied with the Fourth Amendment, the Ricciutis can have no claim for post-arrest fabrication of evidence against them."  *Id.* at 130.  The Second Circuit dismissed that argument as "a grave misunderstanding of those responsibilities which

---

[12]  At the outset of the discussion in this sub-Part, it is appropriate to stress that Defendants entirely deny Plaintiffs' allegations that the Kennedy arrest affidavit misrepresented in any way events during the forensic interview of Doe #9.  Plaintiffs bear the ultimate burden of proving that misrepresentation occurred in fact.  This Ruling recites Plaintiffs' theory of factual misrepresentation solely for the purpose of delineating the legal principles governing this motion to dismiss.  Nothing in the Ruling should be read to state or intimate any view of the Court on Plaintiffs' prospects in proving that disputed issue of fact.

the police must have toward the citizenry in an open and free society," so that "[w]hen a police officer creates false information likely to influence a jury's decision and forwards it to prosecutors, he violates the accused's right to a fair trial." *Id.* (citations and internal quotation marks omitted).

Less than a year ago, the Second Circuit decided *Garnett v. Undercover Officer C0039*, 838 F.3d 265 (2d Cir. 2016), which cited and expanded upon *Ricciuti* and, most notably, restated and summarized the law of this Circuit with respect to the standards of review for a constitutional claim based upon fabrication of evidence by police officers. *Garnett* was a prosecution for a "buy and bust" drug transaction. *Id.* at 268. An undercover police agent fabricated a confession the defendant was said to have made during the arrest, and conveyed it to the prosecutor; defendant was acquitted at the state trial. *Id.* Thus acquitted, the defendant, now plaintiff, brought a federal § 1983 action against the agent. *Id.*

The Second Circuit's opinion in *Garnett*, affirming a jury verdict in plaintiff's favor, includes a number of holdings that are instructive in the case at bar. At the outset, the court rejected the officer's contention that *Ricciuti* did not apply because the falsified confession in that earlier case ostensibly occurred after the defendant was arrested, whereas in *Garnett* the purported confession occurred during the underlying crime itself. *Garnett*, 838 F.3d at 274-75. That made no difference to the Second Circuit: "*Ricciuti*'s reasoning applies as much to a situation where, as here, the falsified information was the officer's account, conveyed to prosecutors, of what he heard the defendant say or do during the alleged offense, as it did in *Ricciuti*, where the officer was describing what he heard the defendant say during an interview after the arrest." *Id.* at 275. That holding resonates in this case because officer Kennedy's falsified information in his affidavit was composed and given to the prosecutor before Plaintiffs' arrests, not after them.

45

As a second point on appeal in *Garnett*, the police agent called the Second Circuit's attention to the fact that plaintiff's § 1983 action included claims for "false arrest, malicious prosecution, failure to intervene, and denial of the right to a fair trial." *Id*. at 270, 278. From that array of claims, the officer argued that "Garnett's claim based on falsified information is only cognizable as a claim for malicious prosecution or for false arrest under the Fourth Amendment, and not as an independent fair trial claim," a contention the court of appeals rejected as "unpersuasive." *Id*. at 278. The Second Circuit's reasoning on this point is so instructive for present purposes that I quote it at some length:

> [C]laims alleging the denial of a right to a fair trial based on fabricated information are redressable under the Constitution, regardless of which constitutional provision provides the basis for the claim—certain wrongs affect more than a single right and, accordingly, can implicate more than one of the Constitution's commands. *See . . . Riley v. City of Montgomery, Ala.*, 104 F.3d 1247, 1253-54 (11th Cir. 1997). As the Fifth Circuit has observed, we, along with the Eighth, Ninth, and Tenth Circuits, have "all found denials of due process when charges rest on fabricated evidence," and the Fifth Circuit agrees that there is "a due process right not to have police deliberately fabricate evidence and use it to bring false charges" against an arrestee. [citing *Cole v. Carson*, 802 F.3d 752, 770-71 (5th Cir. 2015))]. . . . .

> [P]robable cause, which is a Fourth Amendment concept, should not be used to immunize a police officer who violates an arrestee's non-Fourth Amendment constitutional rights. . . . *[S]ee also Robinson v. City of Garland, Tex.*, No. 3:10-CV-2496, 2016 WL 1253557, at *8 (N.D. Tex. Feb. 29, 2016) (Ramirez, Mag. J.) ("There may be a due process violation when police intentionally fabricate evidence, successfully get someone falsely charged, and relief under the Fourth Amendment is unavailable. The presence of probable cause does not forestall Plaintiff's options under the Fourteenth Amendment.") Relatedly, using probable cause as a shield would unduly limit an arrestee's right to relief when a police officer fabricates evidence. Because probable cause is no defense to a denial of the right to a fair trial claim, fair trial claims cover kinds of police misconduct not addressed by false arrest or malicious prosecution claims.

46

838 F.3d at 278 (some citations and internal quotation marks omitted).

In *Garnett*, 838 F.3d at 277, the Second Circuit cited and quoted its earlier holding in *Jovanovic v. City of New York*, 486 F. App'x 149, 152 (2d Cir. 2012) (summary order), that the elements of a denial of the right to a fair trial claim were "an (1) investigating official (2) fabricates evidence (3) that is likely to influence a jury's decision, (4) forwards that information to prosecutors, and (5) the plaintiff suffers a deprivation of liberty as a result." The Second Circuit's opinion in *Garnett,* which complimented the district court for having "properly instructed" the jury, looked to "the standard in *Ricciuti*" for the elements of a fair trial claim, reiterated the first four elements articulated in *Jovanovic*, and added this expanded final element: "(5) the plaintiff suffers a deprivation of life, liberty, or property as a result." *Garnett*, 838 F.3d at 279.

A liberty deprivation is typically a Fourth Amendment concept. Since *Garnett* reasoned that a police fabrication of evidence also gives rise to an independent Fourteenth Amendment due process claim, the significance of the liberty deprivation element may be reduced. However, that question need not be pursued in the case at bar. Assuming *arguendo* that Kennedy's arrest affidavit falsified the substance of Doe #9's forensic interview, Plaintiffs have a cognizable constitutional claim whether that claim be analyzed under the Fourteenth or the Fourth Amendment. The detention of an individual need not be lengthy to violate his Fourth Amendment rights. It is undisputed that Harasz and Wirth were arrested on the warrants Judge Taylor ultimately issued, and then released on bail. The Supreme Court has held that a seizure of a person has occurred for purposes of the Fourth Amendment where an officer has made "a show of official authority such that a reasonable person would have believed that he was not free to leave." *Florida v. Royer*, 460 U.S. 491, 502 (1983) (citation and internal quotation marks omitted). The Court said in *Florida*: "If there is no

detention—no seizure within the meaning of the Fourth Amendment—then no constitutional rights have been infringed," 460 U.S. at 498, and found that a suspected drug courier's rights had been infringed at an airport:  "[W]hen the officers identified themselves as narcotics agents, told Royer that he was suspected of transporting narcotics, and asked him to accompany them to the police room, while retaining his ticket and driver's license and without indicating in any way that he was free to depart, Royer was effectively seized for the purposes of the Fourth Amendment," *id*. at 501, although he had not yet been arrested.  In the case at bar, arrest warrants for Harasz and Wirth had been issued, they were in fact arrested,  and they were presumably transported and detained until released on bail.  These individuals have a Fourth Amendment claim.   Under the Second Circuit's holding in *Garnett*, Harasz and Wirth do not need a Fourth Amendment claim in order to state a viable constitutional due process claim, but it is available to them in any event.

In the circumstances of this case, and on the record generated by the present motion to dismiss, it is apparent that if Plaintiffs are able to prove that the fabrication of evidence they allege actually occurred, Plaintiffs have established all the elements of a constitutional claim against *some* Defendant or Defendants.  Determination of a particular Defendant's potential liability on this claim requires separate consideration of the allegations against each individual concerned.  In that regard, the Court notes preliminarily that a plaintiff fails to state a claim against a defendant for fabrication of evidence sufficiently plausible to survive a motion to dismiss if "his factual allegations regarding the evidence used in the criminal case against him do not actually include any specific claims of fabrication." *Amory v. Katz*, No. 3:15-cv-01535, 2016 WL 7377091, at *9 (D. Conn. Dec. 19, 2016). Judge Bolden made that clear in *Amory*:

> Rather than accusing Detective DeLouis and Detective Mullin of
> creating false evidence against him, Mr. Amory accuses them of

48

omitting potentially helpful information; namely, interviews with important witnesses and potentially exculpatory video evidence. The only allegations that include actual fabrication or falsification of evidence are conclusory statements that the officers' descriptions of events were "false."

As Mr. Amory has not alleged any facts suggesting that Detectives DeLouis and Mullen fabricated evidence in violation of Mr. Amory's constitutional rights, Count Five of the Amended Complaint is dismissed.

2016 WL 7377091, at *9 (citations omitted).

*Amory* resonates in the instant case because the plaintiff in *Amory,* like Plaintiffs Harasz and Wirth at bar, was investigated by the DCF and local police on charges that he sexually abused children in his care, prosecuted on those charges and acquitted, and thereafter (also like these Plaintiffs) sued Commissioner Katz, a DCF social worker, and the local officers for constitutional violations.

The questions that arise on the present motion to dismiss this case are whether the Amended Complaint, read in light of these authorities, sufficiently alleges a claim for fabrication of evidence against the particular Defendants charged with that tort: Ferriera, Kennedy, or Trantalis. The principles underlying these standards of review are applicable to each individual Defendant. These three Defendants will be considered separately. However, preliminary observations are necessary with respect to Trantalis and Kennedy, the two Glastonbury police officers.

## D.      The Police Officers

The Amended Complaint is replete with generalized criticisms of the Glastonbury police department in its handling of the case. Plaintiffs complain that at various times unnamed police officers made mistakes in case reports, or did what they should not have done, or failed to do what they should have done. On occasion, these generalized claims summon up by name the dread shade

of fabrication of evidence.  Thus ¶ 167 states in non-specific, conclusory and argumentative fashion:

> The Glastonbury police did in fact participate in fabrication of
> evidence, ignored the truth when presented and chose what to bring
> as the truth, even neglecting to listen to recantation witnesses.  The
> Glastonbury police did not want the truth to interfere with their witch
> hunt.

If I am obedient to *Iqbal*, I must not accept, indeed cannot consider, this sort of "allegation" in
evaluating whether the Amended Complaint states a plausible claim for fabrication of evidence
against either police Sergeant Trantalis or Agent Kennedy.  Quoting *Iqbal* again, a claim has "facial
plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable
inference that the defendant is liable for the misconduct alleged."  556 U.S. at 679.  The quoted
passage from the Amended Complaint is invective, not factual content.  Transposing *Iqbal*'s
definition to the case at bar, to state a plausible claim against Trantalis or Kennedy for fabrication
of evidence, Plaintiffs must demonstrate by well-pleaded facts that the personal conduct of a
particular Defendant allows the Court to infer that the Defendant being considered is liable to an
identified Plaintiff for fabrication of specified evidence.

Personal liability necessarily depends upon personal conduct.  I consider these two officers
separately.

### 1.   *Trantalis*

The Amended Complaint introduces Glastonbury police Sergeant Trantalis as a party
Defendant in ¶ 9.  Thereafter, during the course of the pleading's prolix 174-paragraph purported
"Statement of Facts," mention of Trantalis by name is limited to several scattered incidents.

In the first of these incidents, the Amended Complaint alleges at ¶ 52 that Trantalis acted as
one of two observers during the forensic interview of Doe #4 on February 9, 2011.  The other

50

observer was DCF social worker Heather Squires.  The interviewer is not named.   The Amended Complaint is critical of the manner in which the interview was conducted; ¶ 52 concludes: "Doe #4's forensic interview was riddled with inconsistencies and outright known lies."  But those shortcomings, the pleading goes on to say, are ascribable to the child being interviewed, not to Trantalis or any other government official present.  "Doe #4's claim was not found to be credible," ¶ 53 says, and continues: "Doe #4 stumbled over facts and contradicted himself with many lies," which the Amended Complaint then enumerates.  The present point is that Trantalis (described only as "observing" the interview) is not alleged to have himself fabricated any evidence against Plaintiffs on this occasion.

Trantalis appears again in the Amended Complaint when ¶ 60 alleges that he "signed" a Glastonbury police incident report dated March 22, 2011, which Agent Kennedy "approved." Paragraph 60 of the Amended Complaint quotes that report at length.  It appears that Trantalis wrote it.  The report begins by noting: "On 3/17/11, Joann[e] Devine of Hartford came in to police headquarters to document some information related to this investigation."  AC ¶ 60.   That information related to a meeting Devine had at a restaurant during the evening of February 24, 2011, with Doe #2, Doe #4, and their respective girlfriends, during which Doe #4, according to Devine's reported statement to Trantalis, recanted charges of sexual misconduct Doe #4 had previously made against Harasz and Wirth.  *Id.*  Trantalis's report recites that he followed up with an inquiry into what Devine had told him about Doe #4's recantation.  *Id.*  The Amended Complaint criticizes the inconclusive results of that inquiry.

In addition, ¶ 64 of the Amended Complaint quotes a second, supplemental police report signed by Trantalis which states that on March 21, 2011, Trantalis received a voice mail message

from Doe #4 which "reiterates the fact that all through this case he [Doe #4] has told the truth and does not want to discuss it any further as he wants to move forward."   Trantalis concludes his supplemental report:  "Based on this message, I will not be re-contacting him at this point."  AC ¶ 64.  The Amended Complaint's criticism of Trantalis in connection with this incident is expressed in ¶ 65:  "If Trantalis had done a thorough investigation, he could have discovered that Doe #4 was committing a crime of false police reports."  The present point is that on this occasion, Plaintiffs do not allege that Trantalis fabricated any evidence against Plaintiffs.  On the contrary:  the Amended Complaint's criticism of Trantalis is not that he made up false inculpatory evidence, it is that he failed to unearth existing exculpatory evidence.

Trantalis's next appearance by name in the Amended Complaint is found in ¶ 71, which alleges in its entirety:  "By 4/11/2011, the arrest warrant submitted by Sgt. Trantalis was signed by the prosecutor and submitted to Judge Taylor.  The judge had some questions regarding Doe #4's refusing to be interviewed again."  (In point of fact, "by 5/5/2011, the judge would not sign the warrant and returned it to the prosecutor," AC ¶ 73).  That is the extent of Trantalis's alleged participation on this occasion.  There is no allegation that Trantalis fabricated false inculpatory evidence for inclusion in this arrest warrant, which in any event Judge Taylor regarded as inadequate to show probable cause.

The next incident described by the Amended Complaint in which Trantalis is mentioned by name is the forensic interview of Doe #9, conducted on August 11, 2011.  Plaintiffs attach marked significance to what they perceive as official misconduct in connection with that interview event, and the affidavit allegedly based upon it which persuaded the state judge to issue an arrest warrant. But Plaintiffs do not allege that Trantalis personally participated in these events.

With respect to Trantalis, ¶ 83 alleges only that this forensic interview "was part of the Multidisciplinary Team (MDT) investigation"; "Trantalis, Kennedy and Ferreira were part of the MDT in this case," ¶ 84; and "the Children's Advocacy Center was acting at the bequest of DCF/Ferreira, Kennedy and Trantalis in setting up and arranging for the interview," ¶ 86. Kennedy observed the interview; Trantalis was not present. Kennedy wrote the arrest warrant; Trantalis did not.

The last reference to Trantalis in the Amended Complaint appears in ¶ 108, which alleges that the Doe #9 forensic interview-based arrest warrant "was sworn to" by Kennedy "with the jurat signed" by Trantalis on September 1, 2011. In the parlance of Notaries Public, a "jurat" is distinguishable from an "acknowledgment." *See* Kelle Clarke, Notary Essentials: The Difference Between Acknowledgments and Jurats, *National Notary Association*, *available at* http://www.nationalnotary.org (last accessed February 28, 2017). An *acknowledgment* occurs when a signer of a document, whose identity has been verified, declares to a Notary that he or she has willingly signed a document. *See id.* The purpose of a *jurat* "is for a signer to swear to or affirm the truthfulness of the contents of a document to a Notary or notarial officer." *Id.* This means that Kennedy wrote the contents of the arrest affidavit in question and swore to Trantalis that they were true. If the affidavit contained fabricated evidence, as Plaintiffs claim, Kennedy is a possible fabricator, but Trantalis cannot be.

This present analysis need not be further extended. It is readily apparent that the Amended Complaint does not state a plausible claim for fabrication of evidence against Defendant William Trantalis. The several acts performed by Trantalis in connection with the underlying investigation were for the most part ministerial in nature, and—more to the point—never resulted in the creation

by Trantalis of evidentiary material Trantalis then forwarded to prosecutors.  Plaintiffs are upset by Trantalis's perceived lack of zeal in pursuing investigative leads, but their complaint is really that Trantalis failed to discover real evidence, not that he fabricated false evidence.

Counts Four and Seven against Trantalis will be dismissed.

**2.    *Kennedy***

Glastonbury police officer James Kennedy, whose rank appears to be "agent,"[13] is introduced as a party Defendant in ¶ 8 of the Amended Complaint.  Kennedy plays a larger role in the Amended Complaint's 174-paragraph narrative than his colleague, Sergeant Trantalis.  Principally that is because of the differing circumstances surrounding the forensic interview of Doe #9, which took place on August 11, 2011.  As noted *supra*, Trantalis did not attend that interview as an observer behind the hospital facility's one-way mirror, and consequently neither observed nor listened to the interview.  Kennedy, who was an observer on the occasion, both watched and listened.  He subsequently wrote an affidavit purporting to describe the substance of the interview's give-and-take.  Kennedy's affidavit succeeded in its purpose: to persuade state Judge Taylor to issue arrest warrants for Plaintiffs.

Plaintiffs' strenuous criticism of the manner in which this interview was conducted lies at the heart of one of their theories of the case: that government officers conducting an investigation fabricated evidence against them.  Professions of that theory are scattered copiously throughout the Amended Complaint; it is summarized at ¶ 88:

> DCF claims that the forensic interview of Doe #9 on 8/11/2011 at the Children's Advocacy Center at St. Francis Hospital supports a "disclosure" by Doe #9.  A review of the transcript of that forensic

---

[13] The status, duties and responsibilities of an "agent" of the Glastonbury Police Department are not revealed by the present record.

> interview and viewing the DVD of the forensic interview reveals that
> DFC's claim is false, as are the statement [sic] in the arrest warrants
> by the Glastonbury Police Agent James Kennedy, which contain [sic]
> manipulated wording to mislead the judge who signed off on the
> arrest warrant.

Those conclusory assertions are echoed in ¶ 94:

> The arrest warrant blatantly lied about what was actually said, and
> twisted the words.  Previously the judge would not sign the warrant
> when it is based only on Doe #4's allegations.  It was only after a
> judge saw the arrest warrant based on Doe #9's forensic with those
> twists of truth and manipulated wording that the warrant was signed.

The wording of this paragraph requires interpretation.  The phrase "arrest *warrant*" in ¶ 94 presumably refers to the "arrest *affidavit*" Kennedy wrote and swore to in order to obtain the arrest warrant from the judge.  Reading the paragraph's assertions in that manner, which is the only way they make sense, what the pleader is trying to say is that Kennedy's affidavit seeking an arrest warrant lied about, and manipulated the wording of, what was actually said by Doe #9 during his forensic interview, with the intended result that the judge signed the warrant.

If when Kennedy drafted the arrest affidavit he knowingly and deliberately misstated or misrepresented what Doe #9 said during the August 11, 2011, forensic interview, with the intended effect of inculpating one or both Plaintiffs in criminal offenses in order to obtain a judicial warrant, Kennedy is probably liable for fabrication of evidence.

That seemingly self-evident proposition is supported by case law, exemplified by *Ganek v. Leibowitz*, 167 F. Supp. 3d 623 (S.D.N.Y. 2016), an insider trading criminal investigation and prosecution giving rise to claims by plaintiff Ganek, the owner and operator of the hedge fund involved, that federal agents violated his civil rights.  Ganek alleged that in order to obtain a warrant for a search and seizure at his company and office, a government agent submitted to a magistrate

judge an affidavit containing deliberate misrepresentations. *Id.* at 628. Specifically, on November 19, 2010, the agent signed an affidavit stating that Adondakis, a felonious and cooperating trader in Ganek's employ, reported to the government that he had informed Ganek of the sources of insider information being traded upon. *Id.* The judge issued the search warrant. *Id.* Agents executed it. *Id.* Ganek alleged that as a result, he had to shut his fund and allegedly suffered loss. *Id.* at 630-34.

However, on November 2, 2010—prior to the issuance of the warrant—informer Adondakis had met with government agents and "explicitly denied ever informing Ganek that the information came from corporate insiders." *Id.* at 629. The misrepresentation to the contrary in the agent's affidavit was "later exposed by sworn trial testimony of an FBI agent and a government informant" in the trial of the case, *id* at 628 (Ganek was not charged in the indictment). Ganek's subsequent *Bivens* action against government agents included a claim for "fabrication of evidence by a government officer acting in an investigating capacity." *Id.* at 638 (quoting *Zahrey v. Coffey*, 221 F.3d 342, 344 (2d Cir. 2000)) (internal quotation marks omitted). Judge Pauley denied a defense motion to dismiss that claim, reasoning that "Ganek plausibly alleges that the non-Supervisor Defendants fabricated evidence by misrepresenting in the Affidavit what Adondakis said during the November 2, 2010 Meeting." *Id*.

Harasz and Wirth, Plaintiffs in the case at bar, charge Glastonbury police agent Kennedy with the same form of misrepresentation Ganek claimed against federal agents in his case: fabricating, for inclusion in an affidavit seeking a warrant, evidence materially inconsistent with the substance of an earlier interview with the same source. But the nature of the resulting discrepancies is different. Ganek's situation is the soul of simplicity: Adondakis either told the agents "he could not implicate Ganek in *any* insider trading"(account in the interview), 167 F. Supp. 3d at 635

(emphasis in original) (ellipses omitted), or he told the agents that "Adondakis informed Ganek regarding the sources of the inside information" (account in the affidavit), *id.* at 630. The case for Harasz and Wirth is more complicated. While *Harasz* poses the same basic inquiry as *Ganek*—does the affidavit misrepresent what was said during the earlier interview?—the Amended Complaint introduces that subject with language so general, non-specific, conclusory and accusatory (¶¶ 88 and 94) that it is difficult to qualify them as well-pleaded factual allegations of the sort mandated by *Iqbal* and *Twombly*. And if those paragraphs do not merit that classification, then I cannot accept their truth, and they play no part in this Rule 12(b)(6) evaluation.

To be sure, the Amended Complaint does attempt to specify in other passages specific ways in which Kennedy's arrest affidavit misrepresents the substance of Doe #9's forensic interview.[14] This is the objective of ¶¶ 108-120, a section of the Amended Complaint captioned "Arrest Warrant"; ¶ 108 says that "the arrest warrant was sworn to" by Kennedy and "the following are excerpts from the arrest warrant based on Doe #9's forensic interview." Instead of "arrest warrant," this Part of the Ruling infers to the "arrest affidavit."[15]

This section of the Amended Complaint quotes at length from Kennedy's arrest affidavit, and

---

[14] Plaintiffs also focus on alleged misrepresentations regarding Doe #4's alleged recantation at the Texas Roadhouse grill. However, the police did follow up on this claim, according to the Amended Complaint, and Doe #4 reaffirmed his allegations against the Plaintiffs. The police included a paragraph describing the claims that Doe #4 had recanted, and the follow up investigation in the affidavit used to obtain the warrant. AC ¶ 118. The Plaintiffs take issue with the wording of the paragraph and the light in which it casts Plaintiff Harasz. AC ¶ 119. But this does not rise to the level of fabricating evidence.

[15] The pleading persists in its confused nomenclature. As noted *supra*, the phrase "arrest warrant" should be interpreted throughout to read "arrest affidavit" or simply "affidavit." Kennedy signed the affidavit. Judge Taylor reviewed the affidavit and signed a separate section of the form which contained the requisite finding of probable cause. Judge Taylor's signature transformed this document, which is in the present record, for the first time into a "warrant."

pauses on occasion to complain about a particular assertion in it.  The difficulty for Plaintiffs on the present motion is that these criticisms of Kennedy's affidavit, while forcefully expressed and I am prepared to regard as sincerely felt, have little or nothing to do with Plaintiffs' claim that the affidavit fabricates evidence against Plaintiffs.  For example, the Amended Complaint focuses upon an initial disclosure of possible abuse Doe #9 made on August 3, 2011 to Dr. Carol M. Kagel, a treating psychologist, which the Amended Complaint argues is inconsistent with the forensic interview, thereby calling into question the disclosures Kennedy included in his arrest affidavit.  AC ¶¶ 109, 112.  That attack appears to be directed solely at calling into question the value of this evidence, as opposed to the false nature or fabrication of it by Kennedy or anyone else.  That is to say:  Kennedy may have included in his affidavit unpersuasive or valueless evidence, but he is not liable for the tort of fabrication of evidence unless he made it up.  Most of these allegations in the Amended Complaint miss that mark.

Notwithstanding these considerations, the fact remains that the merit of Plaintiffs' claim against officer Kennedy for the serious wrongdoing of fabrication of evidence will depend, at the end of the day, upon two pieces of evidence whose contents cannot reasonably be disputed.  Doe #9's forensic interview was taped.  The tape is available.  It will reveal to any viewer what was said by interviewer and interviewee, together with the physical setting and actions accompanying those utterances.  Kennedy's affidavit is in the record.  Its contents will be revealed to anyone who reads it.  Whether the contents of the affidavit accurately recite the substance of the interview, or materially  misrepresent those contents, is a question forming the stuff of summary disposition by a trial judge or fact finding by a trial jury (as the case may be, and intimating no view on which path this case might or should follow).

58

In these particular circumstances, I reach the conclusion that Defendants' motion under Rule 12(b)(6) to dismiss Plaintiffs' claim against police agent William Kennedy should be converted into a motion for summary judgment under Rule 56.  That will allow full argument about and consideration of the tape and the affidavit.  Counsel for Plaintiffs contend that conversion is unnecessary because the tape of the forensic interview (to which counsel attach great importance) can be viewed by the Court in deciding this motion to dismiss.  I have rejected that argument in Part IV, *supra*.  It is clearly incorrect, under the authorities previously cited, to which I will add the admonition in the leading text that on a motion under Rule 12(b)(6):  "In deciding whether to dismiss, the court  may consider only the facts alleged in the pleadings, documents attached as exhibits or incorporated by reference in the pleadings, and matters of which the judge may take judicial notice."  2 *Moore's Federal Practice*, § 12.34[2] at 12-87 (Matthew Bender, 3d ed. 2014).

The interview tape does not qualify  under any of these limited circumstances, and I exclude it from a Rule 12(b)(6) analysis.  *See* Part IV, *supra*.  Plaintiffs' counsel's view, stripped of rhetoric, is that the interview tape is a source of highly probative proof on the merits.  Perhaps so; but proof cannot be equated with pleadings, and equating the former with the latter would disregard the *raison d'être* of a motion to dismiss as a reading exercise limited to reading the pleading, plus the occasional document so "integral" to the complaint, *Faulkner v. Beer*, 463 F.3d 130, 133-135 (2d Cir. 2006), that it merges into the pleadings, *Young v. Lepone*, 305 F.3d 1, 11 (1st Cir. 2002).  That cannot be said of the forensic interview tape.

However, that does not end the matter.  Rule 12(d) provides:

> If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56.  All parties must be given a reasonable opportunity to present all the

material that is pertinent to the motion.

"Rule 12(d) specifically gives the court discretion to accept and consider extrinsic materials offered in conjunction with a Rule 12(b)(6) motion." 2 *Moore's Federal Practice*, § 12.34[3][a] at 12-91 (Matthew Bender, 3d ed. 2014).  Moore comments further: "Courts tend to use the conversion option only in situations in which the materials extrinsic to the pleadings are incontrovertible and pose discrete and dispositive issues."  *Id*. § 12.34[3][a] at 12-93.  That thumbnail sketch fits Plaintiffs' fabrication claim against Kennedy, likely to be determined by a comparison between the interview tape and the Kennedy affidavit.  Use of the conversion option in these circumstances has the potential of resolving this claim in a cost and time efficient manner.  In the exercise of my discretion, I make that direction.

For these reasons, Defendants' motion to dismiss Plaintiffs' Amended Complaint, insofar as that Complaint asserts a claim against Defendant William Kennedy for fabrication of evidence, will be neither granted nor denied.  To that extent, the motion will be  converted to a motion for summary judgment, to proceed in accordance with separate and further Orders of the Court.

**E.      DCF Social Worker Ferreira**

The third Defendant charged in the Amended Complaint with fabrication of evidence is Elizabeth Ferreira, identified in ¶ 6 as "employed as a social worker for DCF, assigned to its Manchester office."  Counts Four and Seven lump Ferreira together with police officers Trantalis and Kennedy.  In consequence, the same preceding paragraphs in the pleading are incorporated as to the fabrication claim against Ferreira as they are for the claims against Trantalis and Kennedy. The  Counts themselves are just as bare of specific allegations of fabrication by Ferreira as they are on the part of Trantalis and Kennedy.

The circumstances of the interactions between Plaintiffs and the two police officers, as opposed to those with Ferreira, are quite different.  The relationship between Plaintiffs on the one hand, and Trantalis and Kennedy on the other, is simply that between Town residents and police officers.  The functioning of Harasz and Wirth as adoptive parents, and the welfare of their adopted children, brought them on occasion into contact with Glastonbury police.  The Amended Complaint describes several of those contacts.  However, the pleading neither alleges directly nor hints in any way that animosity, ill will, hatred, or any negative emotion existed between Harasz and Wirth, on the one hand, and Trantalis or Kennedy on the other.  The reader seems to be in the routine and unremarkable company of local townspeople and constabulary.

The portrait the Amended Complaint paints of Ferreira, the DCF social worker, is markedly and dramatically different.  According to a recurrent theme in the pleading's allegations, Ferreira, acting on the authority of the Department of Children and Families, exercised a continuing responsibility for and supervision over the Harasz-Wirth-Doe children adoptive family.  During that bureaucratic oversight, she consistently exhibited disapproval, criticism, even hatred toward the two Plaintiff fathers, particularly George Harasz.

The Amended Complaint's lengthy and sometimes disjointed narrative of events first mentions Ferreira as a participant in ¶ 56, which alleges: "Right after the allegations by Doe #4 surfaced," a private practice therapist named Landry, who had been treating Doe #4, "called Ferreira and told her: 'You know the allegations are not true.'"  The "allegations" Landry referenced apparently occurred in late January 2011, when during an evaluation by a Dr. Black, Doe #4 "first made the claim of sexual harassment against Harasz."  AC ¶ 45.  Presumably alerted by Dr. Black, DCF arranged a forensic interview of Doe #4 on February 9, 2011, an interview the AC alleges "was

riddled with inconsistencies and outright known lies," *id.* ¶ 52, and included expanded charges of sexual harassment by Plaintiffs, *id.* ¶¶ 53-56.  It is these charges by Doe #4 that, according to ¶ 56, prompted therapist Landry to reach out and tell Ferreira the charges were not true.  Ferreira's immediate response was to indicate that she "was not interested in meeting with Landry and hearing anything else about it." *Id.*  Landry kept on trying; ¶ 57 alleges: "Landry, after calling Ferreira, then called DCF's Manchester office, demanding a meeting."  DCF initially expressed disinterest, but "[n]evertheless, Landry persisted and was finally granted a meeting, and put in a room with two attorneys at the Manchester office.  At the meeting, DCF was not interested in what Landry had to say." *Id.*

The Amended Complaint describes a number of further events occurring up to and including April 11, 2011, the date on which "the arrest warrant submitted by Sgt. Trantalis was signed by the prosecutor and submitted to Judge Taylor," who declined to sign it.  AC ¶ 71.  Ferreira's name next appears in ¶ 70 of the pleading, which reads in its entirety:

> While visiting the children after they were taken in February, Harasz and Wirth were praised by the guards, etc., as to how interactive they were with the kids and how they always were organized with a meal for them and activities.  Wirth's parents came with them on a couple of the visits and remarked at how wonderful they were and how hard it was to end as the boys just wanted to come home.  But when Harasz and Wirth heard from Liz Ferreira about her documentaries of their visits it was how Harasz and Wirth brought something unhealthy to them or were inappropriately affectionate.  DCF was out to make a case against Harasz and Wirth from day one.  There was no mention of reunification and they had to fight each week to get the maximum time they were allotted for their visit.  According to Harasz, Ferreira animatedly hated him and made no qualms about it.

The last quoted sentence is echoed in a subsequent Amended Complaint paragraph, describing a different incident:  "According to Harasz, Ferreira virulently hated him, as is abundantly clear from

her many actions and ploys."  *Id.* ¶ 115.

Ferreira's next appearance by name in the narrative is described in AC ¶ 76, a paragraph captioned "6/1/2011 – False report by DCF."  Its text reads:

> DCF Social Worker Liz Ferreira left Harasz a voice mail that Doe #7 did not want Harasz at a routine doctor's appointment.  Harasz did not get the message until he arrived at the appointment and when Doe #7 was asked by Harasz, Doe #7 denied he ever said he did not want Harasz there and was quite happy to see Harasz.

Ferreira appears again as one of the two DCF observers at the August 11, 2011 forensic interview of Doe #9 conducted by private interviewer Glazer in a manner vigorously criticized by the Amended Complaint.  The circumstances of that interview are discussed *supra* in the context of alleged fabrication of evidence by police officers Trantalis and Kennedy.  As for Ferreira, the DCF social worker, I note again Plaintiffs' assertion in AC ¶ 90 that this interview of Doe #9 was "a vehicle used by DCF to obtain 'evidence' to convict despite false allegations" against Plaintiffs.  The Amended Complaint also alleges at ¶ 94 that the arrest affidavit written and signed by Kennedy, purportedly based on the substance of the interview, "blatantly lied about what was actually said." While the pleading's account of the interview describes Ferreira's presence at this event rather than the specifics of her participation in it, I interpret the Amended Complaint as alleging Ferreira's complicity in what Plaintiffs characterize as improper agency targeting of Plaintiffs by means of misrepresenting a crucial interview.  That is a fair interpretation of the pleading's characterization of Ferreira's role on this occasion, given the Amended Complaint's repeated assertions that Ferreira demonstrated constant animosity toward Harasz "from day one" of the underlying DCF-adoptive family relationship.

Following this description of the August 11, 2011 Doe #9 forensic interview the Amended

Complaint resumes its account of Ferreira's conduct in paragraph 106, which alleges that "plans were made for Doe #9 to spend his 5th birthday with the family [presumably Harasz and Wirtz] during a supervised visit."  Paragraph 106, a relatively lengthy narrative paragraph, goes on to state in substance that "just before the scheduled birthday party" Ferreira "called" and "relayed" that "Doe #9 would not be coming to this birthday party because he had disclosed allegations of sexual misconduct" to Ferreira.  According to Ferreira, Doe #9 made this disclosure while he was alone with Ferreira in her DCF office.  Ferreira "wrote up the entire report after taking the statement alone," although DCF policy  dictated that "a witness be called in."  Paragraph 106 alleges further that "Plaintiff Harasz had a bad rapport with Ferreira which caused her to make up the lie about Doe #9."  AC ¶ 106.  It continues:  "According to Harasz, this was yet another instance of the vindictive and mean-spirited treatment by Ferreira."  *Id.*  I read ¶ 106 as alleging that the conversation described took place solely between Ferreira and Harasz, the former explaining to the latter why Doe #9 would not be attending his birthday party.

The last incident described by the Amended Complaint in which Ferreira plays a named part is found in AC ¶ 114, which in turn quotes this passage from paragraph 10 of police agent Kennedy's arrest warrant: "on 8/16/2011, DCF Social Worker Liz Ferreira contacted the affiant [Kennedy] to report more disclosures made by victim [Does #9]" during a "supervised sibling visit meeting with victim and brothers."  According to Kennedy's arrest warrant, on this occasion Ferreira recounted to Kennedy a number of disclosures Doe #9 made to Ferreira about being abused by Harasz in Harasz's office.  Paragraph 115 of the Amended Complaint challenges the credibility of Ferreira's report to Kennedy, on the ground that while the report said Harasz locked the door to his office, "a lock never existed on the office door as a door never existed," which "calls into question the

64

credibility of the rest of Ferreira's report of Doe #9's alleged disclosure."  Harasz takes this occasion to reiterate that Ferreira hated him, her false report being "evidence of malice."  *Id.* ¶ 115.

I have trawled the contents of the Amended Complaint in order to land all allegations (factual or conclusory) about Ferreira.  When one recalls that the only two counts naming Ferreira as a defendant are for fabrication of evidence, it is apparent that as far as her possible liability to Plaintiffs is concerned, there is less to the resulting haul than meets the eye.  Given the requisite elements of this constitutional violation, only two of the several incidents just described relate to the fabrication of evidence by Ferreira against one or both Plaintiffs.  Those are (1) the August 11, 2011 forensic interview of Doe #9 followed by Kennedy's arrest affidavit based on the interview's substance (counting these components as a single incident); and (2) Ferreira's separate report to Kennedy five days later, on August 16, that Doe #9 had made additional charges of abuse by Harasz, a report Kennedy also included in his arrest warrant submitted to Judge Taylor.

The necessary elements of a claim for fabrication of evidence require a plaintiff to show that an investigating officer fabricated evidence likely to influence a jury's decision of guilt and forwarded that evidence to prosecutors.  *See Garnett*, 838 F.3d at 279.  As for the first specified incident, Plaintiffs allege that Kennedy wrote an arrest affidavit misrepresenting the substance of Doe #9's forensic interview and forwarded that affidavit to prosecutors for submission to Judge Taylor in applying for arrest warrants.  These allegations satisfy all three of these elements: (1) fabrication of (2) evidence of guilt (3) forwarded to prosecutors.  Ferreira is implicated in this incident because she participated in the interview as an observer.  As for the second incident, Ferreira says that she herself separately received disclosures from Doe #9 which she communicated to Kennedy, who included them in his arrest warrant.  Again, the fabrication elements are satisfied.

65

That cannot be said of the other alleged incidents involving Ferreira.  As noted previously, Plaintiffs complain that Ferreira was not receptive to therapist Landry's dismissal of Doe #4's charges as untrue; Ferreira gave inaccurate and unfair accounts of home visits by Harasz and Wirth; Ferreira left Harasz a voice mail falsely stating that Doe #7 did not want Harasz to attend a doctor's appointment; and Ferreira interfered with Doe #9's spending his 5th birthday during a supervised visit with Harasz and Wirth.  Assuming *arguendo* that Ferreira conducted herself in the manners the pleading describes, Plaintiffs' irritation is understandable, particularly on the part of Harasz, who Ferreira is portrayed as having singled out for negative treatment.  But these incidents do not, singly or in concert, amount to fabrication of evidence against Plaintiffs by Ferreira.

In consequence, Plaintiffs' fabrication claim against Ferreira comes down to the Kennedy affidavit's account of the August 11, 2011 forensic interview of Doe #9 (where Ferreira was one of four other participants), and Kennedy's inclusion in the affidavit of Ferreira's subsequent personal account of additional charges ascribed to Doe #9.  I have concluded in the preceding sub-Part that, for the reasons stated and in the exercise of my discretion, the Defendants' motion under Rule 12(b)(6) to dismiss Plaintiffs' claim against Kennedy for fabrication of evidence will be converted into a motion for partial summary judgment under Rule 56.  I reach the same conclusion, and exercise the same discretion, with respect to the motion to dismiss the fabrication claim against Ferreira.  That motion will also be converted into one for summary judgment.  The Court's reasons for doing so are essentially the same.

## VII.   MALICIOUS PROSECUTION - TRANTALIS AND KENNEDY

Reverting to Plaintiffs' claims against Trantalis and Kennedy for malicious prosecution in Counts Two and Five, the allegations made against Trantalis and Kennedy are the same as those

discussed fully in the prior section of this Ruling, Part VI.  The same law applicable to the malicious prosecution claim made by Plaintiffs against Defendant Katz applies to these claims.  *See* Part V, *supra*.  The Court will not repeat those facts or legal standards in detail.  The Court now turns to whether Plaintiffs have adequately pled such claims in Counts Two and Five of the Amended Complaint against Trantalis and Kennedy.[16]

## A.    Trantalis

The circumstances with respect to these two police officers are materially different, as detailed in Part VI of this Ruling.  Kennedy was the police department observer at Doe #9's forensic interview on August 11, 2011, which achieves crucial importance in the narrative recounted by the Amended Complaint.  Shortly thereafter, Plaintiffs allege, Kennedy wrote and swore to an arrest affidavit which fundamentally misrepresented what occurred during the interview, with the desired effect of persuading the initially disinclined Judge Taylor to issue arrest warrants.

Trantalis played no part in any of that.  The Court will return to the elements of malicious prosecution articulated by the Connecticut Supreme Court in *McHale*.  Plaintiffs do not allege that Trantalis was present at the interview, or knew what had transpired during its course, or was aware of Kennedy's alleged misrepresentations, or encouraged or sought to prevent them.  As to Defendant Trantalis, there is a total absence of factual allegations establishing any of the several essential elements of a claim for malicious prosecution.  Trantalis cannot be characterized as having "initiated" the criminal cases against Plaintiffs.  His ministerial act of affixing a notarial jurat to Kennedy's arrest affidavit does not rise to that level; in the police department context, Kennedy is the initiator.  There is no allegation that Trantalis acted with the requisite malice against Harasz or

---

[16] To the extent that Plaintiffs purport to plead a separate and additional claim for false arrest, the passing reference in AC ¶ 189 does not adequately plead or defend such a claim.

Wirth in a manner related to their prosecution; again Kennedy stands in contrast, the alleged misrepresentations in his affidavit easy to condemn as malicious in nature.

Counts Two and Five, insofar as they assert malicious prosecution claims against Trantalis, will be dismissed.

## B.   Kennedy

Plaintiffs' claims against Kennedy are fundamentally different, principally because of the Amended Complaint's allegations describing his central role in the Doe #9 forensic interview and the arrest affidavit Kennedy purported to base upon the interview.  Given those allegations, Plaintiffs not surprisingly assert claims against Kennedy for both malicious prosecution and fabrication of evidence, a procedure sanctioned by case law.  "While, as noted, fabrication of evidence claims may be alleged as part of a malicious prosecution claim under the Fourth Amendment, such claims may also be alleged as a separate cause of action related to the denial of an accused's right to a fair trial under the Fifth, Sixth and Fourteenth Amendments."  *Bristol v. Queens County*, No. CV-09-5544, 2013 WL 1121264, at *12 (E.D.N.Y. Feb. 27, 2013), *adopting report and recommendation*, 2013 WL 1120895 (Mar. 18, 2013) (citation omitted); *see also Garnett*, 838 F.3d at 278.  Claims for malicious prosecution and fabrication of evidence, "both based on allegations of evidence fabrication, are distinct constitutional claims," *Bristol*, 2013 WL 1121264; *see also Garnett*, 838 F.3d at 278, which may be pleaded separately and joined in the same complaint, as indeed the plaintiff in *Bristol* did, and Plaintiffs do in the Amended Complaint at bar.

Plaintiffs' claims against Kennedy and two other Defendants for fabrication of evidence are discussed in Part VI, *supra*.  The Court must reach here the same conclusion it reached with respect to Defendants' motion to dismiss Plaintiffs' claim against Kennedy for fabrication of evidence.  If

68

Kennedy fabricated evidence as alleged by Plaintiffs, then Plaintiffs may also have satisfied the elements of a malicious prosecution claim.

Reverting again to the four elements of malicious prosecution articulated by the Connecticut Supreme Court in *McHale*, the acts of Kennedy in connection with the preparation and submission of the arrest warrants satisfy the first element:  he may be regarded as an individual who initiated the criminal proceedings against Plaintiffs.   The second element is also satisfied, since those proceedings were terminated in favor of both Plaintiffs.   Plaintiffs have pled that even though the arrest warrant was issued, Kennedy acted without probable cause because of the alleged fabrication of evidence.  *See Bristol*, 2013 WL 1121264, at *11 ("Where an indictment has been issued, the presumption of probable cause may be rebutted by evidence that the indictment was procured by fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith.  Indeed, claims of malicious prosecution may be based on allegations of false evidence provided to prosecutors by police officers or others." (internal quotation marks and citations omitted)).   Given that Kennedy is alleged to have fabricated evidence, the requisite malice has also been pled.  *See id.*

The Court will also convert these claims in Count Two and Five against Kennedy for malicious prosecution to partial summary judgment pursuant to Rule 56.[17]  This is for the same reasons as explained in Part VI.

---

[17] Defendant Kennedy has asserted that he is entitled to qualified immunity against all claims because he "cannot be found liable for any alleged statutory and/or constitutional violations."  Doc. 36-1, at 12.  Having concluded that Defendant Kennedy could in fact be liable for two possible constitutional violations, the Court rejects Defendant Kennedy's narrow argument at this point in the litigation.

## VIII.   FAILURE TO TRAIN AND SUPERVISE

I turn now to a claim Plaintiffs allege in their Amended Complaint against Defendant Joette Katz, the Commissioner of the DCF.

The Amended Complaint states specifically that although Katz is the Commissioner of the DCF, she is "sued only in her individual capacity." AC ¶ 5. Count One, not previously discussed in this Ruling, is solely against Katz. The Count is captioned "Failure to Train / Failure to Supervise." It incorporates AC ¶¶ 1-174 by reference, and then asserts that DCF Commissioner Katz violated Plaintiffs' constitutional rights by failing to adequately train the DCF employees and supervise the DCF agents and employees who were involved in the investigation of Plaintiffs. AC ¶¶ 175-182.

Defendant Katz contends on this motion that Plaintiffs have failed to state a plausible claim of failure to train or supervise because much of the misconduct in the DCF investigation, alleged by Plaintiffs, occurred before Katz was appointed Commissioner of DCF. Further, Defendant Katz states that there are no plausible allegations, beyond threadbare recitations of the elements of failure to train, that there were deficiencies in training or that these deficiencies led to a mishandling of the case.

Plaintiffs argue that their claim against Commissioner Katz for failure to train and supervise is similar to a *Monell* claim, made viable by the Supreme Court's decision in *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978). Under *Monell*, "[i]n order to prevail on a claim against a municipality under section 1983 based on acts of a public official, a plaintiff is required to prove: (1) actions taken under color of law; (2) deprivation of a constitutional or statutory right; (3) causation; (4) damages; and (5) that an official policy of the municipality caused

70

a constitutional tort." *Roe v. City of Waterbury*, 542 F.3d 31, 36 (2d Cir. 2008) (citing *Monell*, 436 U.S. at 690–91). "In other words, a municipality may not be found liable simply because one of its employees committed a tort." *Id.* (quoting *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 405 (1997)) (internal quotation marks omitted).

Moreover, "[a] *Monell* claim is actionable only as to local governing entities and related municipal officials." *Amory*, 2016 WL 7377091, at *4 (citing *Monell*, 436 U.S. at 690 n.54).[18] "In no event does the *Monell* analysis of governmental policy or practice apply to allegations against someone acting in his or her individual capacity." *Id.* (citing *Kentucky v. Graham*, 473 U.S. 159, 167-68 (1985)). This is because "[a] victory in a personal-capacity action is a victory against the individual defendant, rather than against the entity that employs him." *Id.* (quoting *Graham*, 473 U.S. at 167-68) (internal quotation marks omitted). Plaintiffs Harasz and Wirth, much like the plaintiff in the closely similar case of *Amory*, attempt to bring a *Monell*-model claim against Defendant Katz "only in her individual capacity." AC ¶ 5. As recited above, and as Judge Bolden concluded in *Amory*, "*Monell* does not apply to state officials or individuals sued in their individual capacity." 2016 WL 7377091, at *5. Thus, contrary to Plaintiffs' assertions, "the standards outlined in *Monell* are irrelevant" and Plaintiffs "must show that 'the official, acting under color of state law, caused the deprivation of a federal right' and that the individual is not immune from the claimed liability." *Id.* (citations omitted). As such, the Court will, as Judge Bolden did in *Amory*, construe

---

[18] Although individuals sued in their official capacities may, in some case, be liable for their role in any constitutional violations, a state agency, as a non-municipal entity, is not subject to municipal liability under *Monell*, and any claims, were they brought against Defendant Katz in her official capacity, would not be viable as *Monell* claims. *See Amory*, 2016 WL 7377091, at *4 (citing *Monell*, 436 U.S. at 690 n.54 and *Quern v. Jordan*, 440 U.S. 332, 338 (1979)). That question does not arise in this case because, as noted, Plaintiffs allege claims against Katz only in her individual capacity, *see* AC ¶ 5.

Plaintiff's claims only as Fourth and Fourteenth Amendment claims under section 1983.

Plaintiffs' Amended Complaint asserts approximately 17 separate bases for charging Katz with a failure to train or supervise the DCF employees. These criticisms are insufficient, alone or in concert, to allege a plausible claim of personal liability against Katz. The majority of Plaintiffs' allegations are conclusory assertions, scattered throughout the complaint, unsupported by any well-pleaded facts. Plaintiffs themselves highlight only three such bases in their brief: (1) failure to train regarding RAD, (2) failure to train regarding forensic interviews, and (3) failure to supervise Defendant Ferreira. Plaintiffs never identify any aspects of their constitutional rights that would have required Defendant Katz, or even the DCF, to adjust its training and supervision policies. Nor is the Court aware of any constitutional right that would require them to do so. Plaintiffs have not cited any cases holding or suggesting that such a right exists. *See Amory*, 2016 WL 7377091 at *5 ("The Court is not aware of any clearly established constitutional right that would require DCF to incorporate Mr. Amory's list of specified trainings into their child abuse investigations, and Mr. Amory has not identified any case law suggesting that such a right exists.").

Alternatively, "[i]t is well-settled that an individual must be personally involved in a constitutional deprivation in order for that individual to be held liable for damages under section 1983." *Amory*, 2016 WL 7377091, at *6 (citing *Dudek v. Nassau Cnty. Sheriff's Dep't*, 991 F. Supp. 2d 402, 413 (E.D.N.Y. 2013)). It is also "not enough for the defendant simply to be a 'policy maker' at the time the unconstitutional events occur." *Id.* (quoting *Cuoco v. Moritsugu*, 222 F.3d 99, 109 (2d Cir. 2000)) (internal quotation marks omitted). "[W]here liability is based on an individual's policy-making and supervisory responsibilities, a more direct connection to a recognized constitutional violation is needed." *Id.* As was the case in *Amory*, no such connection is plausibly

alleged here by Plaintiffs.  Defendant Katz was not Commissioner of DCF until February 2011 and was not involved in the forensic interview with which Plaintiffs take issue.  Plaintiffs fail to allege any facts suggesting that Defendant Katz was personally involved in a recognized constitutional violation sufficient to state a claim for relief.  Accordingly, Count One, asserting this claim against Katz, will be dismissed.

## IX.   INDEMNIFICATION CLAIM

Count Eight, the last count in the Amended Complaint, asserts a claim for indemnification on behalf of Plaintiffs against the Defendant Town of Glastonbury.  The claim is brought under Conn. Gen. Stat. § 7-465(a), which provides in relevant part that a municipality shall indemnify its employees for any damages awarded for a violation of a plaintiff's civil rights "if the employee, at the time of the occurrence, . . . complained of, was acting in the performance of his duties and within the scope of his employment, and if such occurrence . . . was not the result of any wilful or wanton act of such employee in the discharge of such duty."

The brief for Glastonbury, Doc. 36-1, at 12, accurately refers to claims asserted by Plaintiffs under this statute as "derivative claims for indemnification."  Specifically, Plaintiffs at bar pray that "the Town of Glastonbury pay on behalf of defendants Kennedy and Trantalis to plaintiffs for any liability imposed for civil rights violations."  AC ¶ 212.  Counsel for Glastonbury argue, Doc. 36-1, at 12, that "all the plaintiffs' civil rights claims fail for legal insufficiency and any state law claims similarly fail" as well, with the result that the statutory indemnification claim falls with them, a victim of mootness (although counsel do not use that word).  If one grants the Town's basic premise—the dismissal of all civil rights claims—the conclusion necessarily follows.  However, for the reasons stated *supra*, Plaintiffs' claims against Kennedy for fabrication of evidence and malicious

73

prosecution survive for the present. The claims against Trantalis will be dismissed in their entirety, but the Kennedy claims cling to litigation life, and their continued presence requires that the statutory indemnification claim clings with them, to abide the ultimate event. The motion to dismiss the indemnification claim in Count Eight will accordingly be denied. Judge Underhill reached that conclusion in the comparable circumstances of *Lewis v. City of New Haven*, No. 3:16-cv-1382, 2017 WL 101304, at *7 (D. Conn. Jan 10, 2017).

## X.    CONCLUSION

For the foregoing reasons, the Defendants' Motions [Doc. 35], [Doc.36] to Dismiss the Plaintiffs' Amended Complaint are GRANTED IN PART, DENIED IN PART, and CONVERTED IN PART to Motions for Partial Summary Judgment.

To implement these Rulings, the Court makes the following Orders:

1.    As to Defendant Joette Katz, the Motion to Dismiss is GRANTED. The Counts in the Amended Complaint asserting claims against her, specifically Count One, Count Three, and Count Six, are DISMISSED IN THEIR ENTIRETY, with prejudice.

2.    As to Defendant Elizabeth Ferreira, the Motion to Dismiss is NEITHER GRANTED NOR DENIED. The Motion to Dismiss the Counts in the Amended Complaint asserting claims against her, specifically Count Four and Count Seven, is CONVERTED TO A MOTION FOR PARTIAL SUMMARY JUDGMENT, to proceed in accordance with further Orders subsequently entered by the Court.

3.    As to Defendant William Trantalis, the Motion to Dismiss is GRANTED. The Counts in the Amended Complaint asserting claims against him, specifically Count Two, Count Four, Count Five, and Count Seven, are DISMISSED IN THEIR ENTIRETY, with prejudice.

4.      As to Defendant James A. Kennedy, the Motion to Dismiss is NEITHER GRANTED

NOR DENIED.  The Motion to Dismiss the Counts in the Amended Complaint asserting claims

against him, specifically Count Two, Count Four, Count Five, and Count Seven, is CONVERTED

TO A MOTION FOR PARTIAL SUMMARY JUDGMENT, to proceed in accordance with further

Orders subsequently entered by the Court.

5.      As to Defendant Town of Glastonbury, the Motion to Dismiss Count Eight of the

Amended Complaint is DENIED.

The foregoing is SO ORDERED.

Dated:  New Haven, Connecticut
        March 3, 2017


                                        /s/ Charles S. Haight, Jr.
                                        CHARLES S. HAIGHT, JR.
                                        Senior United States District Judge