GEORGE HARASZ, and
DOUGLAS WIRTH,

          Plaintiffs,

  v.

JOETTE KATZ,
ELIZABETH FERREIRA,
TOWN OF GLASTONBURY,
JAMES KENNEDY, and
WILLIAM TRANTALIS,

          Defendants.

No. 3:15-cv-001528 (CSH)

July 19, 2018

## OMNIBUS RULING ON DEFENDANTS' AND PLAINTIFFS' CROSS-MOTIONS FOR SUMMARY JUDGMENT

**HAIGHT, Senior District Judge:**

By prior Ruling [Doc. 46] reported at 239 F. Supp. 3d 461 (D. Conn. 2017) ("Conversion Ruling"), familiarity with which is assumed, the Court granted in part Defendants' motion to dismiss Plaintiffs' complaint, and converted that motion to dismiss in part into motions for summary judgment.

Those conversions resulted in three motions for summary judgment, which this Ruling resolves.

## I. Procedural Background

At the pertinent times, Plaintiffs Harasz and Wirth resided in the Town of Glastonbury, Connecticut, and took in foster children for adoption under the supervision of the Connecticut Department of Children and Families ("DCF"). In November 2011, at the initiation of DCF, Harasz and Wirth were arrested by Glastonbury police officers on several charges of misconduct with

respect to certain adopted children in their care. Harasz and Wirth were charged with sexual assault, cruelty to persons, and risk of injury to a minor. A state court bench trial resulted in the acquittal of Wirth on all charges against him. The State subsequently dropped all charges against Harasz.

Plaintiffs then filed a civil rights action in Connecticut Superior Court, which was removed to this Court on the basis of federal question jurisdiction. The defendants were Joette Katz, the DCF Commissioner; Elizabeth Ferreira, a DCF social worker; the Town of Glastonbury; and James Kennedy and William Trantalis, Glastonbury police officers. The individual defendants were involved, in one way or another, with the charging, arrests, or state proceedings against Harasz or Wirth. Plaintiffs alleged federal constitutional and state constitutional and law claims against various individual defendants. Specifically, Plaintiffs asserted claims for failure to train and supervise DCF employees; false arrest; malicious prosecution; and fabrication of evidence. The operative pleading is an Amended Complaint [Doc. 33].

The Conversion Ruling dismissed all of Plaintiffs' claims against Katz and Trantalis. As for Ferreira, the only claims against her were for fabrication of evidence. The Court converted Defendants' motion to dismiss those claims against Ferreira into a motion for summary judgment. As for Kennedy, the only claims against him (and against Glastonbury for indemnification) were for fabrication of evidence and malicious prosecution. The Court converted Defendants' motion to dismiss those claims into a motion for summary judgment.

Those conversions led to the summary judgment motions this Ruling resolves. Defendant Ferreira moves for summary judgment [Doc. 48] with respect to the counts in the Amended Complaint naming her as a defendant. Plaintiffs Harasz and Wirth move for partial summary judgment on liability [Doc. 51] against Defendant Kennedy. Defendants Kennedy and Town of

Glastonbury move for summary judgment [Doc. 52] with respect to the counts in the Amended Complaint naming them as defendants.

## II.  Factual Background

These uncontested facts are drawn from the Parties' various statements of fact, filed in the format prescribed by Local Rule 56(a).  *See* Docs. 48, 52-2, 59-1, 71, 73, 75-1, 76-2.

During the pertinent times, Plaintiffs were citizens of the United States and the State of Connecticut.  They resided together in the Town of Glastonbury, Connecticut.

Defendant Elizabeth Ferreira was employed as a social worker by the Connecticut Department of Children and Families ("DCF"), assigned to its Manchester, Connecticut office.

Defendant Town of Glastonbury, Connecticut is a municipality which operates, directs and controls the Glastonbury Police Department.  Defendant James Kennedy is a Glastonbury police officer.

All claims against named Defendants Joette Katz and William Trantalis were dismissed by prior Ruling [Doc. 46] of this Court.  *See* 239 F. Supp. 3d 461, 506-07.

Plaintiffs advised DCF that they were willing to take in foster children for adoption, providing that none had past sex abuse issues.  Over the years, DCF was responsive to Plaintiffs' offer.  Prior to 2011, Harasz and Wirth adopted nine children, who were born during the years 1990 though 2006.

The events underlying Plaintiffs' remaining claims, which survived the prior motion to dismiss and lie at the heart of the present summary judgment motions, relate to disclosures allegedly made by their youngest child, a boy born August 2006 and adopted by Plaintiffs in April 2007, identified throughout as "Doe #9."  Doe #9 suffers from learning disabilities and developmental

delay.

Doe #9 and four of his siblings were in DCF's care and custody as of February 8, 2011, pursuant to an order of temporary custody. The siblings were removed from Plaintiffs' care following disclosures of abuse made by an older sibling, Doe #4.

Defendant Ferreira was assigned to Doe #9's case as a treatment social worker on or about February 28, 2011. In early June 2011, Doe #9 began receiving therapy from Dr. Carol Kagel, a psychologist.

On August 3, 2011, Doe #9 attended his ninth therapy session with Dr. Kagel. Dr. Kagel reported that, during the August 3 session, Doe #9 made a spontaneous disclosure of sexual abuse by Plaintiff Harasz. On or about August 9, 2011, Dr. Kagel, a mandated reporter, made a report of suspected child abuse to the DCF telephone hotline. On August 9, 2011, Defendant Kennedy received a call from DCF, alerting him to Dr. Kagel's report of Doe #9's disclosure.

As a result of Dr. Kagel's report, Defendant Kennedy arranged for a forensic interview of Doe #9. On August 11, 2011, Doe #9 was interviewed at St. Francis Hospital and Medical Center, in Hartford, Connecticut ("the forensic interview"). The forensic interview was conducted by Ann Glaser, a diagnostic interviewer on the staff of the St. Francis Children's Center, and was video-recorded. Defendants Ferreira and Kennedy observed the forensic interview from behind a one-way mirror in an adjoining room. Glaser wore an earpiece during the interview, through which the observers could communicate with her. Ferreira and Kennedy were also equipped with devices which enabled them to hear what was being said in the interview room.

Following the forensic interview on August 11, and according to the reports of Defendant Ferreira, on Friday, August 12, 2011, Doe #9 made a disclosure of sexual abuse to his foster parent,

Lisa K. That same day, Defendant Ferreira supervised Doe #9 during a sibling visit at DCF's Manchester office. Ferreira reports that Doe #9 made a disclosure of sexual abuse to Ferreira during that sibling visit. Defendant Ferreira reported these additional disclosures to Defendant Kennedy on August 16, 2011.

On September 1, 2011, Defendant Kennedy signed a five-page, 16-numbered-paragraph sworn affidavit captioned "Application for Arrest Warrant" and addressed to "A Judge of the Superior Court." Under the caption on the application reading "Name and Residence of Accused," the name of Plaintiff George F. Harasz and his Glastonbury address are typed in. Kennedy's affidavit supporting the arrest warrant application describes, *inter alia*, the content of the August 11 forensic interview, as well as Doe #9's disclosures to Kagel, Defendant Ferreira, and Lisa K. Defendant Kennedy consulted the videotape of the forensic interview in drafting his affidavit. The affidavit concluded that there was probable cause to believe that Plaintiff Harasz had violated Conn. Gen. Stat. § 53a-70 and § 53a-73 (sexual assault).

On November 22, 2011, Judge Taylor of the Connecticut Superior Court, sitting in Manchester, signed the arrest affidavit, thereby converting that document into a warrant for Plaintiff Harasz's arrest.

On November 30, 2011, Harasz and Wirth were arrested by the State of Connecticut authorities on charges of misconduct with respect to some of the adopted children in their care. Specifically, the Plaintiffs were charged, *inter alia*, with sexual assault, cruelty to persons, and risk of injury to a minor. Plaintiffs denied all charges. In September 2014, following a bench trial before a state court judge, Wirth was found not guilty of all charges against him. In October 2014, Harasz moved successfully for the dismissal of all charges against him. Plaintiffs' state court exonerations

on these charges led directly to the federal constitutional and state law claims they allege in the present action.

### III. Standard for Summary Judgment

The principles governing summary judgment motions are well established. *Smith v. Champion Int'l Corp.*, 573 F. Supp. 2d 599, 607 (D. Conn. 2008) (citing *Gibbs ex rel. Estate of Gibbs v. CIGNA Corp.*, 440 F.3d 571, 575 (2d Cir. 2006)). A motion for summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If, after discovery, the nonmoving party "has failed to make a sufficient showing on an essential element of [his] case with respect to which [he] has the burden of proof," then summary judgment is appropriate. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party must "demonstrate the absence of any material factual issue genuinely in dispute" to be entitled to summary judgment. *Am. Int'l Grp., Inc. v. London Am. Int'l Corp.*, 664 F.2d 348, 351 (2d Cir. 1981) (quoting *Heyman v. Commerce & Indus. Ins. Co.*, 524 F.2d 1317, 1319-20 (2d Cir. 1975)).

"[T]he mere existence of factual issues – where those issues are not material to the claims before the court – will not suffice to defeat a motion for summary judgment." *Quarles v. Gen. Motors Corp.*, 758 F. 2d 839, 840 (2d Cir. 1985) (per curiam). A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "[I]f the evidence is such that a reasonable jury could return a verdict for the nonmoving party," then a dispute concerning the material fact is genuine. *Id.* All inferences and ambiguities must be viewed in the light most favorable to the nonmoving party. *Rogoz v. City of Hartford*, 796 F.3d 236, 245-46 (2d Cir. 2015). However, "mere conclusory allegations, speculation or conjecture

will not avail a party resisting summary judgment." *Cifarelli v. Village of Babylon*, 93 F.3d 47, 51 (2d Cir. 1996) (citing *Western World Ins. Co. v. Stack Oil, Inc.*, 922 F.2d 118, 121 (2d Cir. 1990)). The court's function is to decide "whether, after resolving all ambiguities and drawing all inferences in favor of the nonmoving party, a rational juror could find in favor of that party." *Pinto v. Allstate Ins. Co.*, 221 F.3d 394, 398 (2d Cir. 2000).

These principles apply even where, as here, the Court is presented with cross-motions for summary judgment. *Larsen v. Prudential Ins. Co. of Am.*, 151 F. Supp. 2d 167, 171 (D. Conn. 2001) (citing *Barhold v. Rodriguez*, 863 F.2d 233, 236 (2d Cir. 1988)). "The movant's burden does not shift when cross-motions for summary judgment are before the Court. Rather, each motion must be judged on its own merits." *Id.* (citing *Assoc. of Int'l Auto Mfrs., Inc. v. Abrams*, 84 F.3d 602, 611 (2d Cir. 1996)).

The nonmoving party "must present specific evidence demonstrating a genuine dispute." *Gannon v. UPS*, 529 F. App'x 102, 103 (2d Cir. 2013) (citing *Anderson*, 477 U.S. at 248) (summary order). A genuine issue of fact exists when there is sufficient "evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. The nonmoving party may not "rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Knight v. U.S. Fire Ins. Co.,* 804 F.2d 9, 12 (2d Cir. 1986).

### IV. The Lothstein Affidavit

Plaintiffs filed an affidavit by psychologist Leslie Lothstein, PhD, in support of their opposition to the Defendants' motions for summary judgment. Lothstein Aff., Doc. 62-8. Defendants object to certain of Dr. Lothstein's conclusions, arguing them inadmissable under the federal rules. Ferreira Reply Br. 4-5; Glastonbury Def. Reply Br. 5-6.

Dr. Lothstein states, at paragraph 20 of his affidavit, "It is my opinion within a reasonable degree of psychological certainty that Doe #9 *cannot* tell the objective truth and present a valid, historical recollection." (emphasis added). Dr. Lothstein goes on to opine:

> 38.   It is my opinion that Doe #9's lack of disclosure about Daddy Harasz during the 8/11/2011 forensic interview should have been a red flag that the prior alleged disclosure to Dr. Kagel was fundamentally flawed and thus suspect.
>
> . . . .
>
> 40.   Given the high stakes nature of this case, for Doe #9 to give an allegedly clear disclosure the very next day on 8/12/2011, when he was not able to verbalize any such disclosure during the forensic interview on 8/11/2011, raises a red flag and casts doubt on the veracity of such disclosure.

I understand Dr. Lothstein to say, through the quoted paragraphs, that Doe #9's conduct during the forensic interview, in combination with Dr. Lothstein's professional opinion that Doe #9 "cannot" tell the truth, entirely discredits the veracity of Doe #9's disclosures to Dr. Kagel and Defendant Ferreira.[1]

---

[1] Plaintiffs seek to use the Lothstein Affidavit to cast doubt on the veracity of Dr. Kagel and Defendant Ferreira's *reports* of Doe #9's purported disclosures. *See* Pl. Sur-Reply Br., Doc. 72, 1 ("Plaintiffs' claim is that after viewing the videotape, it becomes abundantly clear that Doe #9 was incapable of making the reported disclosure to Dr. Kagel on 8/3/2011 and to Ferreira on 8/12/2011 – that it was self-evident that such disclosures were impossible.") Plaintiffs urge that "Dr. Lothstein was clear in what he stated – that the 'disclosure' to Dr. Kagel was suspect as was the disclosure to Ferreira – that the **reports** were both lies." *Id.* at 2 (emphasis in the original). I have reviewed the Lothstein Affidavit carefully, and I do not agree with Plaintiffs' reading of the relevant paragraphs. I find the best and most natural reading of Dr. Lothstein's words are that *Doe #9's* "prior alleged disclosure" to Dr. Kagel and "allegedly clear disclosure" to Defendant Ferreira were fundamentally suspect, not that Dr. Kagel and Defendant Ferreira's *accounts* of those alleged disclosures were fundamentally suspect. In any event, if I were to adopt Plaintiffs' proposed reading of the Lothstein Affidavit, the paragraphs at issue would remain inadmissible, as impermissible expert opinion on the credibility of a fact witness, as well as falling outside the boundaries of Dr. Lothstein's expertise as defined by the strictures of Rule 702.

I conclude that the quoted paragraphs of the Lothstein Affidavit are inadmissable. Affidavits submitted in support of, or opposition to, a motion for summary judgment "must . . . set out facts that would be admissible in evidence." Fed. R. Civ. P. 56(c)(4). At trial, experts may not testify as to the credibility of a fellow witness:

> It is a well-recognized principle of our trial system that determining the weight and credibility of a witness's testimony belongs to the jury . . . . Thus, this court, echoed by our sister circuits, has consistently held that expert opinions that constitute evaluations of witness credibility, even when such evaluations are rooted in scientific or technical expertise, are inadmissible under Rule 702.

*Nimely v. City of New York*, 414 F.3d 381, 397–98 (2d Cir. 2005) (citations, alteration, and internal quotation marks omitted). *See also* Fed. R. Evid. 702. "[T]he rationale set forth by the Second Circuit could not be clearer: that the Federal Rules of Evidence do not allow one party to call an expert to opine about the tendencies or incentives of the other party's fact witnesses to lie or not to lie." *United States v. Noze*, 255 F. Supp. 3d 352, 353-54 (D. Conn. 2017). *See also State v. Greiner*, 257 Conn. 797 (Conn. 2001) (admission of improper expert testimony vouching for the credibility of child sexual abuse victim was reversible error).

Accordingly, Dr. Lothstein's opinions as to Doe #9's credibility, articulated in paragraphs 20, 38, and 40 of his affidavit, are inadmissable.[2]

Even if these assessments of Doe #9's credibility were admissible as evidence, Plaintiffs have not made a compelling case for their relevance, and admitting these paragraphs would have no ultimate effect on my resolution of the instant motions.

---

[2] This conclusion would still hold, were I to adopt Plaintiffs' unconvincing reading of the Lothstein Affidavit, and assume Dr. Lothstein, at paragraphs 38 and 40, was attacking the credibility of Dr. Kagel, Lisa K, and Defendant Ferreira, rather than that of Doe #9.

At paragraph 39 of his affidavit, Dr. Lothstein opines, "This was a high stakes case and in my opinion the 8/11/2011 forensic interview was not properly used as evidence of an alleged disclosure against George Harasz by Doe #9. This should have been self-evident to anyone viewing the forensic interview." Defendants object to the admission of this paragraph, on the grounds that it draws conclusions beyond Dr. Lothstein's established expertise. Ferreira Reply Br. at 4; Glastonbury Def. Reply Br. at 6. I find that the first quoted sentence is inadmissable, as not based on any established expertise. Further, to the extent that Dr. Lothstein's conclusion "should have been self-evident to *anyone* viewing the forensic interview" (emphasis added), the conclusion is, by the expert's own admission, not a proper application of expert testimony, which should be limited to circumstances where "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue."[3] Fed. R. Evid. 702(a).

For the foregoing reasons, I find that paragraphs 9, 38, 39, and 40 of the Lothstein Affidavit are inadmissable under the rules of evidence, and therefore may not properly be considered on a motion for summary judgment.[4]

---

[3] Plaintiffs make this point for me, in a supplemental response to the Glastonbury Defendants' Rule 56(a)(2) Statement : "Dr. Lothstein attests that because the marked disparity was 'self-evident' i.e., *obvious*, it thus was a 'red flag' that Doe #9 could not possibly have made the disclosures alleged by Kagel and Ferreira. In other words, *anyone* – even this Court, watching the video could and should draw a conclusion that the unwitnessed disclosures were 'suspect.'" Doc. 76-2 at 3 (emphases in the original). While I appreciate Dr. Lothstein's efforts to assist the Court, to the extent that, in his professional opinion, he thinks *no* professional opinion is necessary to perceive the purported "red flags" in the interview video, he has effectively put himself out of a job.

[4] While I hold that the paragraphs indicated are inadmissible as a matter of law, my evidentiary holding goes no further. In other words, by considering some portions of the Lothstein Affidavit in the remainder of this opinion, I do not necessarily make any final determination as to the *admissibility* of any part of that affidavit. Defendants have, for example, indicated that they question whether Dr. Lothstein had sufficient contact with Doe #9 upon which

## V.  Fabrication of Evidence

Plaintiffs' claims for fabrication of evidence are alleged in Counts Four and Seven of the Amended Complaint.  Those counts named as defendants Ferreira, Kennedy and Trantalis.  The Conversion Ruling dismissed all claims against Trantalis, who accordingly disappeared from the litigation and is not involved in these summary judgment motions.

The fabrication of evidence claims against Ferreira and Kennedy remained, and were converted into motions for summary judgment.   As determined by this Court's prior ruling on Defendants' Motions to Dismiss, "Counts Four and Seven may be regarded as duplicative. They will be considered together."  239 F. Supp. 3d at 488.

The claims are brought under 42 U.S.C. § 1983, for fabrication of evidence in violation of Plaintiffs' Fourteenth Amendment right to due process of laws, and/or Fourth Amendment right to a fair trial.[5]  Amend. Compl. ¶¶ 198-202, 207-10.  Plaintiffs allege that

---

to draw his scientific conclusions, citing for support the fact that Dr. Lothstein refers to his single examination of Doe #9 as a "brief contact."  *See* Def. Ferreira Reply Br. at 3; Glastonbury Def. Reply Br. at 5-6; Lothstein Aff. at ¶¶ 7, 18.  I draw no conclusion as to that evidentiary objection, at this juncture.

[5] As my prior opinion in this case explained at length, the opinions of the Second Circuit "ha[ve] been inconsistent as to whether fabrication of evidence claims arise under the Sixth Amendment right to a fair and speedy trial, or under the due process clauses of the Fifth and Fourteenth Amendments. . . . [R]egardless of which constitutional amendment prohibits government officers from fabricating evidence, these cases clearly establish that the harm caused by such conduct is redressable through a § 1983 action for damages."  *Morse v. Fusto*, 804 F.3d 538, 547 n.7 (2d Cir. 2015) (citations and internal quotation marks omitted) (quoting with approval related district court opinion *Morse v. Spitzer*, No. 07-cv-4793(CBA)(RML), 2013 WL 359326 at *3 n. 1 (E.D.N.Y. Jan. 29, 2013)).  The elements of a denial of the right to a fair trial claim based on fabrication of evidence  are "an (1) investigating official (2) fabricates information (3) that is likely to influence a jury's verdict, (4) forwards that information to prosecutors, and (5) the plaintiff suffers a deprivation of life, liberty, or property as a result."  *Garnett v. Undercover Officer C0039*, 838 F.3d 265, 279 (2d Cir. 2016).  "Under the Second Circuit's holding in *Garnett*, Harasz and Wirth do not need a Fourth Amendment claim in order

The defendants knowingly created false and misleading evidence, twisted and blatantly misrepresented the 8/11/2011 forensic [interview] into gross perversion of the facts, fabricated new "disclosures" which were not witnessed or corroborated, colluded with each other and witnesses to create new "disclosures["] for the sole purpose of winning their case, not in the pursuit of justice.

The fabrication of evidence did not stop with the 8/11/2011 forensic but continued up through September 2014 . . . . From 2011 to 2014, the defendants colluded with each other and with witnesses, coaching them into new "disclosures" for the sole purpose of winning their case . . . .

*Id.* ¶ 199-200.

In ruling on Defendants' Motions to Dismiss, this Court held that "[i]n the circumstances of this case, and on the record generated by the present motion to dismiss, it is apparent that if Plaintiffs are able to prove that the fabrication of evidence they allege actually occurred, Plaintiffs have established all the elements of a constitutional claim against some Defendant or Defendants." 239 F. Supp. 3d at 492. Therefore, to defeat Defendants' motions for summary judgment on this claim, Plaintiffs need only establish a material issue of disputed fact as to whether either Defendant actually fabricated evidence.

In the discussion that follows, the fabrication claims against Kennedy and Ferreira are considered separately. Kennedy's case has generated cross-motions: Kennedy moves for summary judgment on Plaintiffs' claim against him for fabrication of evidence; Plaintiffs cross-move for partial summary judgment on liability on that claim against Kennedy. Ferreira moves for summary judgment on Plaintiffs' claim for fabrication against her. Plaintiffs oppose that motion, but do not cross-move against Ferreira for summary disposition.

---

to state a viable constitutional due process claim, but it is available to them in any event." *Harasz*, 239 F. Supp. 3d at 492.

**A. As to Defendant Kennedy**

As to Defendant Kennedy, much of the Amended Complaint's claim for fabrication of evidence relies on his alleged falsification of the arrest affidavit. Specifically, Plaintiffs assert that Kennedy misstated or misrepresented statements made by Doe #9 at the August 11, 2011 forensic interview, which Kennedy observed: "Plaintiffs' claim is that the statements Kennedy made in his arrest affidavit in regard to the forensic interview were fabricated in that they were affirmative falsehoods in which he deliberately mischaracterized what Doe #9 said, combined with misleading statements and omissions." Pl. Br. in Opp. to Glastonbury Def. [Doc 62] at 19.

The Conversion Ruling summarized the claim against Kennedy thus:

> If when Kennedy drafted the arrest affidavit he knowingly and deliberately misstated or misrepresented what Doe # 9 said during the August 11, 2011, forensic interview, with the intended effect of inculpating one or both Plaintiffs in criminal offenses in order to obtain a judicial warrant, Kennedy is probably liable for fabrication of evidence.
>
> . . . .
>
> [T]he merit of Plaintiffs' claim against officer Kennedy for . . . fabrication of evidence will depend, at the end of the day, upon two pieces of evidence whose contents cannot reasonably be disputed. . . .The tape [of Doe # 9's forensic interview] is available. . . . Kennedy's affidavit is in the record. . . .Whether the contents of the affidavit accurately recite the substance of the interview, or materially misrepresent those contents, is a question forming the stuff of summary disposition by a trial judge or fact finding by a trial jury.

239 F. Supp. 3d at 496-98.

As explained in that Ruling, while these two key pieces of evidence were both technically available to the Court, consideration of the tape of Doe #9's forensic interview was inappropriate on a Rule 12(b)(6) motion to dismiss. The case has now reached the summary disposition stage, where

the tape, as well as the affidavit, may be considered. In addition, the Court has received a certified transcription of the August 11, 2011 forensic interview, filed under seal [Doc. 50]. The transcript does not substitute for the viewing of the tape; it cannot convey the "physical setting and actions" accompanying the words of the interviewer and interviewee. *See* 239 F. Supp. at 497-98. Nonetheless, the transcript, whose accuracy is uncontested, is a useful common ground of understanding, from which this opinion will quote at will, considering it an accurate representation of the *words*, if not the complete context, of the August 11 interview.

In their Opposition Brief to the Glastonbury Defendants' Motion for Summary Judgment [Doc. 62] and the supporting Rule 56(a)(2) Statement [Doc. 73], Plaintiffs make repeated attack upon the third-party sources upon whom Defendant Kennedy reportedly relied for portions of the arrest affidavit. *See, e.g.*, Pl. R. 56(a)(2) Stmt. ¶ 3 ("Doe #9 was forced to attend inappropriate 'therapy' sessions with Dr. Kagel . . . Doe #9's lack of disclosure about Daddy Harasz during the 8/11/2011 forensic interview should have been a red flag that the *report* of the alleged disclosure to Dr. Kagel was fundamentally flawed and thus suspect." (emphasis in the original)). *See also id.* ¶¶ 3, 9-11. To quote this Court's Conversion Ruling, "Kennedy may have included in his affidavit unpersuasive or valueless evidence, but he is not liable for the tort of fabrication of evidence *unless he made it up*." 239 F. Supp. 3d at 497 (emphasis added).

Accordingly, this opinion will limit its evaluation of the Plaintiffs' Rule 56(a)(2) Statement to those allegations of fact which pertain directly to alleged falsehood and misrepresentation *by Kennedy*. Factual disputes as to "actual fabrication or falsification of evidence" are material; factual disputes as to whether Defendant Kennedy merely "omitt[ed] potentially helpful information," such as "interviews with important witnesses and potentially exculpatory video evidence," are not

material, because such omissions, standing alone, do not state a claim for fabrication of evidence *by Kennedy. See Amory v. Katz*, No. 3:15-CV-01535 (VAB), 2016 WL 7377091, at *9 (D. Conn. Dec. 19, 2016) ("Rather than accusing [detective defendants] of creating false evidence against him, Mr. Amory accuses them of omitting potentially helpful information; namely, interviews with important witnesses and potentially exculpatory video evidence," accusations insufficient in law to suggest the detectives "fabricated evidence in violation of Mr. Amory's constitutional rights" during the preparation of an arrest warrant).

The analysis of the fabrication claim against Kennedy will therefore focus upon Plaintiffs' several assertions that the affidavit Kennedy drafted, as his application to Judge Taylor for a warrant to arrest George Harasz, contained significant material misrepresentations or distortions of what occurred during the August 11 forensic interview of the child Doe #9, as revealed by the tape and transcript of that interview.

I will consider separately Plaintiffs' several criticisms of the rendition in the Kennedy affidavit of the contents of the forensic interview. But I preface that analysis by quoting ¶ 8 of the affidavit in its entirety. While the affidavit describes other incidents at other times and in different places, ¶ 8 is the place where Kennedy undertakes to describe the substance of what transpired during the interview. ¶ 8 states:

> THAT the affiant observed the forensic interview of the victim through a one way glass mirror. The victim was asked who he lives with and he said, "Daddy" and "Dad." The victim said that "Daddy" is "Daddy Harasz." The victim identifies his penis as his "Weiner." The victim complains of a headache when he starts to talk about what "Daddy" does to him. The victim says that he gets in trouble and has to sit on the steps. The victim then pointed to his "Weiner" and he said that [name of a sibling, Doe #5, redacted] made him touch his "Weiner." The victim said that "Daddy grabbed his weiner" and the

-15-

victim yelled, "stop it daddy".

Notice should also be taken of ¶ 14 of Kennedy's affidavit, which recounts a number of incidents leading Kennedy to the conclusion that "the victim in this case remained consistent in what he discloses," and says about the forensic interview: "During the forensic interview on 08/11/11, the victim stated again, 'Daddy grabbed his weiner, then the victim yelled 'Stop it Daddy.'"

In order to evaluate Plaintiffs' claim that Kennedy fabricated evidence against Harasz, the Court must carefully compare the video tape and typed transcript of the Doe #9's forensic interview. on the one hand, with what Kennedy said about that interview in the arrest affidavit submitted to Judge Taylor, on the other hand. That necessity arises from Plaintiffs' principal contention: the affidavit repeatedly falsely portrayed what was said or done during the interview, each time to Harasz's disadvantage.

Plaintiffs contend on this motion that ¶ 8 of the affidavit, and its reprise in ¶ 14, contain a number of instances of fabrication of evidence by Kennedy. I consider Plaintiffs' charges separately.[6]

*          *          *          *          *          *

---

[6]  It should be noted at this juncture that the Plaintiffs' submissions on the fabrication claims, while nominally advanced on behalf of "Plaintiffs" in the plural, in fact relate only to Plaintiff Harasz. For example, the Kennedy affidavit Plaintiffs criticize prayed for Judge Taylor to issue a warrant to arrest *Harasz*. While co-Plaintiff Douglas Wirth was also arrested, undoubtedly pursuant to a different judicial warrant issued in response to a different police affidavit, *Wirth* is not involved in the fabrication of evidence Plaintiffs allege taints Kennedy's affidavit about *Harasz*, nor is Wirth mentioned in connection with the other incidents said to constitute fabrication. Accordingly, if this Ruling should conclude that triable issues of fact exist with respect to Plaintiffs' fabrication claims, those triable claims would relate only to Plaintiff Harasz.

*1. "Weiner"*[7]

The arrest affidavit states at ¶ 8 : "The victim identifies his penis as his 'Weiner'" Plaintiffs

criticize this statement as "misleading" because "in fact, the term 'weiner' was suggested to Doe #9

by the interviewer  – it does not appear to be a term that Doe #9 was even aware of."  Suppl. Br.

[Doc. 60] at 3.

The interview transcript at page 8 documents the following exchange:

> ADULT: Okay. Okay. Now, back to this part, this part that's circled
> and you didn't give me a name for it. Can you give me a name for
> that, what you use for that part of your body? Or do you want choices
> again?
>
> CHILD: I want choices.
>
> ADULT: Okay. Some people call that a penis, some people call that
> a wiener, some people call that a pee-pee.
>
> CHILD: (Laughing) A wiener?
>
> ADULT: Yeah. What would you like to call that part?
>
> CHILD: A wiener.
>
> ADULT: Wiener?
>
> CHILD: (Laughing) That's a funny name.

Plaintiffs seem to contend that  it was the interviewer, not Doe #9, who "identified" Doe #9's

penis as his "wiener," given that the interviewer suggested to the child the use of that term (among

others) to signify that body part.  The verb "Identify" is capable of several applications or meanings.

The interviewer presented to Doe #9 three nouns to apply to a body part, and the child chose

_____

[7] The Parties' filings generally spell this word "weiner," while the transcript of the
forensic interview spells it "wiener."  I use both spellings in direct quotation.

-17-

"weiner," a word that apparently amused the child because he prefaced his choice by laughing. That is the exchange recited by the transcript and visible on the tape.

No fabrication of evidence by Kennedy is discernible in his description of it in his affidavit. Just as a statute (or a legal opinion) will be careful to define critical terms, Kennedy's affidavit accurately defines, for the reviewing judge, the terms Doe #9 used in the forensic interview. For the purposes of Doe #9's statements that follow, "Daddy" means Plaintiff Harasz, and "weiner" means penis. On this particular point, Defendant Kennedy has neither fabricated nor falsified any evidence.

## 2. Headache

The issue here arises out of references to *headaches* in the arrest affidavit written by Kennedy.

In ¶ 8 of his affidavit, where Kennedy undertakes to describe the August 11 forensic interview, it is said: "The victim complains of a headache when he starts to talk about what 'Daddy' does to him." ¶ 13 of the affidavit says: "The victim complains of a headache just prior to disclosing things about 'Daddy.'" ¶ 14 says: "The victim consistently would complain of a headache just prior to him disclosing a new piece of information." Judging by the affidavit's phrasing, the references in ¶¶ 8 and 13 relate to utterances made during the forensic interview. The reference in ¶ 14 to headache complaints appears to relate to occasions other than the forensic interview.

On these summary judgment motions, Plaintiffs "deny the references to headaches have to do with Daddy as they are deliberately mischaracterized and taken out of context." Pl. R. 56(a)(2) Stmt. ¶ 7. Plaintiffs' main brief [Doc. 51-1 at 4] argues that the quoted sentence from ¶ 8 of the Kennedy affidavit "is false and misleading. From the video it is clear that the 'headache' was engendered by the interviewer." Similarly, the brief criticizes the quoted sentence from ¶ 14 as

"again false and misleading, as there was no observable link between headaches and Harasz from viewing the video. Again, the headaches are logically induced from the conduct of the interview." Plaintiffs' supplemental brief [Doc. 60 at 4] returns to ¶ 8 of the affidavit, and says of it: "Kennedy claimed the victim complains of a headache when he starts to talk about what 'Daddy' does to him. This is misleading and not accurate, as Kennedy attempted to tie headaches into sexual abuse when in fact Doe #9 referenced headaches in several contexts. Doe #9's first reference to a 'headache' is about dad's headache, not his own."

In point of fact, there were three occasions during the forensic interview when the interviewer asked Doe #9 questions about physical abuse and/or Plaintiff Harasz and Doe #9 responded with references to headaches:

> ADULT [social worker Ann Glaser]: Okay. You know what, it's probably better if you show me on the drawings what happens when you get hugs and kisses .
>
> CHILD [Doe #9]: It gives me a bad headache.
>
> ADULT: It gives you a bad headache? How come?
>
> CHILD: Because - I don't know.
>
> ADULT: Tell me everything you remember about getting hugs and kisses from daddy.
>
> CHILD: Um, because he is happy (unintelligible) because he has a bad headache in there.
>
> . . . .
> ADULT: Has anybody asked you to do spankings?
>
> CHILD: (Unintelligible.)
>
> ADULT: Okay. Are you – are you worried about what we're talking about? Is anything making you worried?

CHILD: Like give me a bad headache.

ADULT: It gives you a bad headache.

CHILD: Yeah.

. . . .
ADULT: Can you show me how daddy touched your wiener?

CHILD: (Unintelligible), but it gives me a bad headache.

ADULT: I understand. Okay. Talking about this gives you a headache?

CHILD: Yeah.

ADULT: Okay. Is there somebody you can talk about this when you're – and when you want to talk about how you feel about it?

CHILD: A bad headache.

ADULT: A bad headache. Okay. How did you feel when daddy touched your wiener?

CHILD: Sad.

Tr. at 19:25-20:9, 40:10-16, 50:18-51:4. In addition to the criticisms previously noted, Plaintiffs contend in their Rule 56(a)(2) statement that Kennedy's characterization in his affidavit of these exchanges during the interview are "mischaracterized and taken out of context," an accusation Plaintiffs expand upon by saying:

> Omitted is that Doe #9 has been barraged with questions for nearly an hour and has asked the interview to stop the questioning numerous times, starting shortly after the session began. When the video is seen as a whole, it can clearly be seen that the headaches were from the barrage of questions thrown at 4-year-old Doe #9 by the interviewer.

Pl. R. 56(a)(2) Stmt. ¶ 7.

The Plaintiffs' argument is that the references in Kennedy's affidavit to "headaches" constitute

deliberate fabrication of evidence by Kennedy for the purpose of influencing Judge Taylor to issue a warrant to arrest George Harasz. A rational jury could not make that finding on the basis of the "headache" references. "Information may be 'false' if material omissions render an otherwise true statement false." *Morse v. Fusto*, 804 F.3d 538, 548 (2d Cir. 2015). Defendant Kennedy's characterization of Doe #9's headache complaints does not contain such *material* omissions. Omitting the fact that Doe #9 had asked for the interview to be stopped does not render Defendant Kennedy's characterization of Doe #9's headache complaints false.

The sections of the transcript quoted immediately *supra* are the *only* references Doe #9 makes to his own experience of "headache" in the entire forensic interview. Having reviewed the tape, I find Plaintiffs' explanation for Doe #9's complaints plausible enough – it may well be that the four-year-old Doe #9's complaints of headache were inspired by his subjective experience of the interview *process* as tiresome, rather than any reaction to the *content* of the questions. But that does not negate the factual basis for Defendant Kennedy's affidavit, which is derived from words actually spoken during the interview.

### 3.    *Sitting on the stairs*

Kennedy's arrest affidavit states at ¶ 8: "The victim said that he gets in trouble and has to sit on the steps." That is the only reference in the affidavit to Doe #9 being made to sit on the steps or the stairs. Plaintiffs do not contend on this motion that Doe #9 said *nothing* during the forensic interview about sitting on the steps; rather, Plaintiffs' criticism is that the affidavit's account was incomplete. Plaintiffs argue that the affidavit's reference to sitting on the steps "was deliberately mischaracterized as Doe #9 clearly stated that his SISTER made him sit on the stairs and did not make any reference to Daddy Harasz and sitting on the stairs." Pl. R. 56(a)(2) Stmt. ¶ 7. Plaintiffs'

reply brief [Doc. 60] at 5 says of the statement in the arrest warrant: "This is misleading as Kennedy omits that his sister, not daddy, made him sit on the stairs and nowhere is there any link to Harasz and the stairs and any sexual abuse."

Plaintiffs' account of this aspect of the interview is corroborated by the interview tape and transcript. Doe #9 uttered only one explicit reference to being made to sit on the stairs:

> ADULT: Okay. What does being a bad boy mean?
>
> CHILD: Getting in trouble and sitting on the stairs.
>
> ADULT: Okay. Who makes you sit on the stairs when you get in trouble?
>
> CHILD: My sister.

Tr. 22:12-16. Plaintiffs' reply brief at 5-6 quotes a further exchange, when the interviewer returned to the subject of sitting on the stairs:

> ADULT: You know what, C[redacted], you told me that your daddy makes you sit on the stairs and hits you on the butt.
>
> CHILD: Um-hum.
>
> ADULT: Sends you to time out. What else does daddy do?
>
> CHILD: I don't know.

Tr. 36: 7-11.

Plaintiffs' briefs correctly observe that in the first quoted exchange, Doe #9 said his sister (not his "daddy") made him sit on the stairs. That being the case, one does not know what to make of the interviewer's framing the follow-up question in the second exchange with the words "you told me that your daddy makes you sit on the stairs." If the interviewer's objective was to elicit a particular response from Doe #9, the effort was unsuccessful; the child's response is non-committal.

However, the reference Kennedy makes in his affidavit to what Doe #9 said during the forensic interview about sitting on the stairs does not, by itself or in combination with other utterances, demonstrate fabrication of evidence by Kennedy for the illicit purpose of influencing Judge Taylor to issue an arrest warrant for Harasz. The affidavit Kennedy submitted to Judge Taylor did not explicitly state that Harasz made Doe #9 sit on the stairs. Plaintiffs' complaint is that the affidavit implied Harasz did so, a misleading implication since Doe #9 ascribed that act to his sister.

There is some force to Plaintiffs' criticism. Given that ¶ 8 of the Kennedy affidavit principally describes what Doe #9 said to the interviewer about Harasz, a reasonable reader might infer or assume that it was Harasz (and not Doe #9's sister) who made him sit on the stairs as part of his punishment for being bad). But that circumstance does not rise to the level of "deliberate mischaraterization," nor does it constitute fabrication of evidence.

In any event, the affidavit's omission of the fact that Doe #9 ascribed that part of his punishment to his sister is not material, in the context of the arrest affidavit as a whole. "[G]overnment officials may be held liable for fabricating evidence through false statements or omissions that are both material and made knowingly." *Morse*, 804 F.3d at 547. Fabricated evidence is material when it may, for example, affect a prosecutor's assessment of the strength of a case, a prosecutor's decision to pursue charges, or a jury's verdict. *Davenport v. City of New York*, No. 15-CV-5890 (MKB), 2017 WL 4356883 at *18 (E.D.N.Y. Sept. 28, 2017) (citing *Garnett*, 838 F. 3d at 277; *Ricciuti v. N.Y.C. Transit Auth.*, 124 F. 3d 123, 129-30 (2d Cir. 1997)).

Given the nature of the charges made against Plaintiff Harasz, and the disclosures by Doe #9 reported by the arrest affidavit, I hold that no reasonable trier of fact could find that the plausible implication that Doe #9 reported being sent to sit on the steps by Plaintiff Harasz, rather than by his

sister, was *material* to the case against Plaintiff Harasz. Accordingly, on this aspect of the case, Plaintiffs have failed to establish a genuine dispute as to material fact as to Defendant Kennedy's liability for fabrication of evidence in this instance.

### 4. "Daddy grabbed his weiner"

Paragraph 8 of Kennedy's arrest affidavit, which purports to recount the substance of the forensic interview Kennedy observed, ends with the following sentence, reproduced in boldface for the sake of clarity:

> **The victim said that "Daddy grabbed his weiner" and the victim yelled, "stop it daddy."**

¶ 14 of the affidavit gives this account:

> **During the forensic interview on 08/11/11, the victim stated again, "Daddy grabbed his weiner ," then the victim yelled "Stop it Daddy."**

Plaintiffs reserve their most scornful criticism of the Kennedy affidavit for this concluding sentence in ¶ 8. Their main brief asserts at 4: "Kennedy then makes his most outrageous claim in Paragraph 8 of the arrest affidavit in stating: "The victim said that 'Daddy grabbed his weiner' and the victim yelled, 'Stop it daddy.' That claim is completely false. The victim steadfastly maintained that his brother had grabbed his weiner, and never said that Daddy had grabbed his weiner." Plaintiffs "[d]eny that Doe #9 said that 'Daddy grabbed his weiner.' Doe #9 never actually said Daddy did anything to his weiner, using his own words – he was only giving yes or no answers to a barrage of questions thrown at him by the interviewer." Pl. R. 56(a)(2) Stmt. ¶ 7. They further "[d]eny the 'stop it daddy,' reference because Kenney [*sic*] deliberately mischaracterized the context. Kennedy's phrasing in the arrest affidavit is false and misleading. Kennedy writes as though Doe #9 was immediately yelling 'stop it, daddy' after daddy grabbed his weiner but the video does not reflect

that at all." *Id.*

A review of the taped transcript reveals the following relevant exchanges:

> ADULT: Okay. What did you say when you got spanked and on your butt and got sent to time out?
>
> CHILD: Stop it, daddy.
>
> ADULT: Um-hum. Did daddy stop when you asked him to stop?
>
> CHILD: Yes.
>
> ADULT: Okay. Anything else that happened that hurt you or that you did not like?
> . . . .
> ADULT: All right. . . . [R]emember we were talking about Dr. K[agel]?
>
> CHILD: Yes.
>
> ADULT: Okay. Did you say something to her?
>
> CHILD: Yes.
>
> ADULT: About -
>
> CHILD: Stop it.
>
> ADULT: About how daddy touched you?
>
> CHILD: Stop it.
>
> ADULT: Who are you saying stop it to?
>
> CHILD: Dr. K[agel].
>
> ADULT: Okay. Tell me everything you remember about what you told Dr. K[agel].
>
> CHILD: Stop it, stop it, stop it.

Tr. 31:15-32:21. Later, the interviewer and Doe #9 had the following exchange:

ADULT . . . . you told me that somebody grabbed your wiener, okay?

CHILD: My daddy.

ADULT: Your daddy grabbed your wiener.

CHILD: Yes.

ADULT: Okay. Can you show me on here where your daddy grabbed you?

CHILD: Down there.

Tr. 42:25-43:3. Moments later, the interviewer picked up the subject again:

ADULT: Okay. When daddy touched your wiener, what did he say?

CHILD: Stop it.

ADULT: He said stop it?
. . . .

CHILD: Let's go back home.

ADULT: When daddy touched your wiener, what was daddy saying?

CHILD: Um, I don't know.

ADULT: When daddy touched your wiener, what were you saying?

CHILD: Stop it.

ADULT: Stop it? And then what happened?

CHILD: Um.

*Id.* 47:2-13.

Just before the interviewer terminated the interview, this exchange occurred:

ADULT: I just have a couple more questions and you're almost done. Can you show me how daddy touched your wiener?

CHILD: (Unintelligible), but it gives me a bad headache.

-26-

ADULT: I understand.  Okay.  Talking about this gives you a headache?

CHILD: Yeah.

ADULT: Okay.  Is there somebody you can talk [to] about this when you're – and when you want to talk about how you feel about it?

CHILD: A bad headache.

ADULT: A bad headache.  Okay.  How did you feel when daddy touched your wiener?

CHILD: Sad.

ADULT: Sad?

CHILD: (Making sound).

ADULT: Okay.  Anything else you remember about him touching your wiener?

CHILD Uh, bunny wanna go back to the playroom.

Tr. 50:16 - 51:9.  "Bunny" referred to a well-worn stuffed rabbit Doe #9 kept in his grasp during the interview.  Interviewer Glaser thereupon terminated the interview, the developmentally disabled four-year-old child having clearly reached the end of his tether.  Glaser parted from Doe #9 by assuring him that he could come back and talk more with her, or talk to "Liz" (Ferreira, his case worker) or Dr. Kagel, those being people Doe #9 "can talk to if you remember things or if you're feeling scared or if you need any help ."  Tr. 51-52.

It is necessary, at this stage of the analysis, to pay careful attention to the use Kennedy made of *quotation marks* when he undertook to describe in his September 1, 2011 arrest affidavit what transpired during the August 11 forensic interview.  The account Kennedy gave of the interview appears in ¶ 8 of the affidavit.  The interview video tape, with an elapsed time of 59 minutes 24

-27-

seconds, reveals that Doe #9 was a difficult subject who taxed the patience and skill of the trained interviewer.  ¶ 8 of Kennedy's affidavit ascribes a number of utterances to Doe #9.  Only two of them, both appearing in the last sentence of ¶ 8, are placed within quotation marks:.  That sentence reads:

> **The victim said that "Daddy grabbed his weiner" and the victim yelled, "stop it daddy."**

The other utterances the affidavit ascribes to Doe #9 take the form of substantive paraphrases without being placed in quotation marks, *viz*, "The victim complains of a headache when he starts to talk about what 'Daddy' does to him.  The victim said that he gets in trouble and has to sit on the steps."

In support of their accusation that Kennedy fabricated evidence, Plaintiffs stress that of the several utterances ¶ 8 of the affidavit ascribes to Doe #9, the only two utterances placed in quotation marks are those appearing in the last sentence: "Daddy grabbed his weiner" and "stop it daddy."  If these quotation marks are intended to convey exact words the child uttered at the precise moment, the interview transcript does not support that interpretation.  While Doe #9 replied in the affirmative when the interviewer inquired whether "Your daddy grabbed your weiner," at no time did Doe #9 *say* verbatim: "Daddy grabbed his [my] weiner."  And while according to the transcript Doe #9 *did* say "stop it Daddy," it was in the quite different context of the child describing how Harasz spanked him when he was bad.  The transcript does not reveal Doe#9 uttering the verbatim phrase "stop it daddy" following his affirmative response to the interviewer's inquiry into whether Plaintiff Harasz grabbed Doe #9's penis.  When asked by the interviewer "[w]hen Daddy grabbed your wiener, what were you saying?" Doe #9 responded, "[s]top it."  The interviewer had just previously asked "When daddy touched your weiner, what did he say?" and Doe #9 answered: "Stop it."  Between those two

-28-

answers, the child said "Let's go back home"; he was clearly at the end of his tether; the interview concluded shortly thereafter; the tape and the transcript do not support the verbatim phrase the affidavit ascribes to Doe #9 at the moment of described weiner-grabbing by "Daddy."

These circumstances are relevant to the issue of fabrication because it is reasonable to infer that, by placing these statements ascribed to Doe #9 in quotation marks, Kennedy's arrest affidavit intended the statements to be read as direct quotations, not paraphrased or interpreted dialogue.  In ¶ 8, the paragraph from which they are taken, these are the only two quoted phrases, while other declarations are made without quotation marks, *e.g.*, "The victim complains of a headache . . . . The victim said that he gets in trouble."  In *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 511 (1991), an action for defamation, Justice Kennedy wrote for the Court:

> In general, quotation marks around a passage indicate to the reader that the passage reproduces the speaker's words verbatim. They inform the reader that he or she is reading the statement of the speaker, not a paraphrase or other indirect interpretation by an author. By providing this information, quotations add authority to the statement and credibility to the author's work. Quotations allow the reader to form his or her own conclusions and to assess the conclusions of the author, instead of relying entirely upon the author's characterization of her subject.

In *Costanich v. Department of Social and Health Services*, 627 F.3d 1101, 1112 (9th Cir. 2010), a § 1983 case brought by a foster care provider against state officials who had revoked her license, the Ninth Circuit quoted that language from the Supreme Court's decision in *Masson*, and characterized  *Masson* as holding that "a jury may find knowledge or reckless disregard of falsity when a publication attributes to the plaintiff quoted statements that the plaintiff never actually made."  The *Costanich* plaintiff alleged, *inter alia*, fabrication of evidence by an investigating social worker during the civil custody revocation process.  The Ninth Circuit concluded  that, where the

defendant social worker "purposefully used quotation marks around many of the purported witness statements in her investigative report," the use of quotation marks "could support a trier of fact's conclusion that [she] deliberately fabricated evidence." *Id.*

Two of the witnesses quoted by the defendant social worker's report submitted sworn letters denying they had ever made the statements attributed to them. 627 F.3d at 1112. Those letters, which contrasted dramatically with the purported quotes in the defendant's report, established genuine issues of material fact as to fabrication of evidence (rising above the level of "recording errors" or "misstatements"), so that granting summary judgment to defendants on that claim would be erroneous. *Id.* at 1113. The Ninth Circuit reasoned that "[r]eporting that a witness said something she did not say" cannot "be characterized as a misstatement"; rather, such conduct would constitute "deliberate falsification of evidence." *Id.* Summary judgment was inappropriate because the plaintiff "had a Fourteenth Amendment due process right to be free from deliberately fabricated evidence in a civil child abuse proceeding," and "genuine issues of material fact exist as to whether [defendant] deliberately fabricated evidence, which led to the termination proceedings and license revocation." *Id.* at 1113-14.

In the case at bar, it is important to focus upon the particular conduct of Detective Kennedy that Plaintiffs claim constituted fabrication of evidence. That claim finds forceful expression in Plaintiffs' brief [Doc. 62] at 19: "Plaintiffs' claim is that the statements Kennedy made in his arrest affidavit in regard to the forensic interview were fabricated in that they were affirmative falsehoods in which he deliberately mischaracterized what Doe #9 said, combined with misleading statements and omissions." As noted *supra*, the case turns upon the question of whether Kennedy's account of the interview was comprised of deliberate falsehoods for the illicit purpose of obtaining an arrest

warrant for Harasz (which would be actionable under § 1983), or whether any inaccuracies in the affidavit were the result of reporting error or misstatement (which would not give rise to a viable constitutional claim for fabrication).

That distinction is illustrated by *Reynolds v. County of San Diego*, 224 F. Supp. 3d 1034 (S.D. Cal. 2016), *rev'd in part on other grounds sub nom. Reynolds v. Bryson*, 716 F. App'x 668 (9th Cir. 2018), which cited and applied the Ninth Circuit's holdings in *Costanich*. In *Reynolds* the plaintiffs, parents of children removed from their custody by defendant county and social workers on the ground of suspected child abuse, filed a § 1983 action alleging violation of Fourth and Fourteenth Amendment rights, and state law claims including one for false imprisonment. The report of one defendant, a social worker named Bryson, who investigated the incident, quoted a treating physician as saying that the affected child's injury "is a fracture from non-accidental trauma," phrasing which tended to suggest abuse as the cause of the trauma. In point of fact, that physician's hospital note stated that the child had a "left completely displaced femur fracture" and there was "*suspected* non-accidental trauma." 224 F. Supp. 3d at 1055 (emphasis added). Another physician stated in a letter that the child's femur fracture "is *concerning* for physical abuse." *Id.* (emphasis added). In Bryson's report to the agency, which ordered the children removed from the parents' custody, Bryson omitted the emphasized qualifying adjectives employed by the physicians. Plaintiffs regarded those omissions as a way to fabricate evidence. "Plaintiffs argue that Bryson's omission of the words 'suspected' or 'concerning' in describing R.R.'s injury constitutes a fabrication of evidence." *Id.*

The *Reynolds* district court rejected that claim. The court began its analysis by citing and following *Costanich*:

> Reporting that a witness said something he or she did not cannot reasonably be characterized as a recording error or a misstatement. *Costanich*, 627 F.3d at 1113. Alternatively, the substitution or conflation of a word can be reasonably characterized as a misstatement (e.g., reporting the children tested "positive" for child abuse when the declarant stated the tests were "consistent" with child abuse).

224 F.3d at 1055.

The *Reynolds* court then placed the social worker's omissions in the latter, non-actionable category. There was other evidence in the investigative record pointing toward non-accidental trauma, which led the court to reason that,

> While quotation marks may generally convey a higher degree of authority supporting the statement(s) made . . . Defendants' challenged statements are no more than a conflation of the collected evidence. Bryson reasonably inferred from the investigative information that the fracture resulted from non-accidental trauma, and, as such, her statements were a fair summary of the evidence at the time. At worst, the omission of the word "suspected" or "concerning" is reasonably characterized as a reporting error or misstatement. *Costanich*, 627 F.3d at 1113. The omission of the word "suspected" or "concerning" did not conceal contrary evidence that would have influenced the decision maker's factual conclusion because the witnesses' original statements were incorporated in the detention report and corroborated by other evidence. As a result, the alleged omission was not material.

224 F. 3d at 1056. The court granted summary judgment to certain defendants on plaintiffs' constitutional claims because plaintiffs failed to demonstrate a genuine issue as to whether those defendants "engaged in fabrication of evidence, failed to disclose exculpatory evidence, or obtained evidence by duress." *Id.* at 1057.

Reverting to the case at bar, I agree with the Ninth Circuit's interpretation of *Masson,* whose logical reflections on the use and effect of quotation marks need not be confined to the common law of defamation. That "[q]uotations allow the reader to form his or her own conclusions and to assess

the conclusions of the author, instead of relying entirely upon the author's characterization of her subject," 501 U.S. at 511, is a principle which can be seen at work in an infinite variety of written words. We deal in this case with the arrest affidavit, written by Detective Kennedy for the attention of Judge Taylor, whose eventual finding of probable cause and signature transformed the affidavit it into a warrant for Plaintiff Harasz's arrest.

The state court judges in *Costanich*, charged with deciding whether plaintiff's foster care license should be revoked, did not have the benefit of a recording of the numerous interviews conducted (including six foster children): "None of the interviews was recorded and all but one were conducted without a third person present." 627 F.3d at 1104 n.4. The social worker's report "indicated that she had interviewed thirty-four people. She later admitted that she had made only brief contact with eighteen of the individuals listed." *Id.* at 1112. Moreover, two of the individuals the social worker purported to quote swore they had never made the quoted statements. In those circumstances, the Ninth Circuit held that where the investigator "purposefully used quotation marks around many of the purported witness statements," such conduct "could support a trier of fact's conclusion that [defendant] deliberately fabricated evidence." *Id.*

While there is nothing surprising about the Ninth Circuit's perception of evidence fabrication in the circumstances presented by *Costanich*, the misuse or misplacing of quotation marks does not invariably amount to fabrication. The district court in *Reynolds*, citing and applying *Costanich*, drew this helpful distinction: "Reporting that a witness said something he or she did not cannot reasonably be characterized as a recording error or a misstatement. Alternatively, the substitution or conflation of a word can be reasonably characterized as a misstatement." 224 F. Supp. 3d at 1055. The trial judge in *Reynolds* declined to find a child abuse investigator fabricated evidence when she omitted

the words "suspected" and "concerning" from purported quotations of physicians' reports: "At worst, the omission of the word 'suspected' or 'concerning' is reasonably characterized as a reporting error or misstatement." *Id*. at 1056.

In the case at bar, Plaintiffs' assertions of errors or misstatements appearing within the quotation marks employed by Kennedy come down to this:

(1) Whereas the affidavit states "the victim said that 'Daddy grabbed his weiner,'" the closest the interview transcript comes to this is an exchange at Tr. 42:21-43:3: "ADULT: [Y]ou told me that somebody grabbed your wiener, okay?   CHILD: My daddy.  ADULT: Your daddy grabbed your wiener. CHILD: Yes. ADULT: Okay.  Can you show me on here where your daddy grabbed you? CHILD: Down there."

(2) Whereas the affidavit states "the victim yelled, "stop it daddy," the closest the interview transcript comes to this is an exchange at Tr. 47: 8-11: "ADULT: When daddy touched your wiener, what was daddy saying?  CHILD: Um, I don't know.  ADULT: When daddy touched your wiener, what were you saying?  CHILD: Stop it."

This record shows that Kennedy, by placing them within quotation marks,  ascribed to Doe #9 words which the child did not say verbatim.   Thus, the child did not say "daddy grabbed his [my] wiener"; he responded "my daddy" when the interviewer remarked that the child had told her "somebody grabbed your wiener."  And the child did not say (or yell) "stop it daddy"; he said "stop it" (although daddy's presence is implicated by the phrasing of the interviewer's question: "When daddy touched your wiener, what were you saying?"

While Kennedy's arrest affidavit places within quotation marks certain words that Doe #9 did not utter, no reasonable trier of fact could find that Kennedy's use of quotation marks constituted

fabrication of evidence, as that phrase is defined by the cases. Kennedy's "challenged statements," to quote *Reynolds* again, "are no more than a conflation of the collected evidence." 224 F. Supp. 3d at 1056. Nor do the addition or arrangement of the words in question "conceal contrary evidence that would have influenced the decision maker's factual conclusion because the witnesses' original statements were incorporated in the . . . report and corroborated by other evidence. As a result, the alleged omission was not material." *Id*.

These observations in *Reynolds* resonate in the case at bar because Kennedy, Ferreira and the other members of child abuse investigation team did not conduct the August 11 forensic interview of Doe #9 in a vacuum. The earlier paragraphs in Kennedy's arrest affidavit recite that on August 9, 2011, Kennedy, while on duty with the Glastonbury police, "received a call from the State of Connecticut Department of Children and Families, intake worker Karen Ginand, reporting a disclosure of sexual abuse." Affidavit, ¶ 3. The affidavit describes "the victim in this case" as "a 5 year old male." ¶ 2. It is common ground that this is a reference to Doe #9. Ginand told Kennedy that "the report came from a psychologist, Dr. Carol Kagel, who reported that the victim disclosed being sexually abused at the hands of George S. Harasz" of Glastonbury. Affidavit, ¶ 3. "The affiant [Kennedy] was assigned to investigate." *Id*. Kennedy describes the results of his initial investigation in ¶ 6 of the arrest affidavit:

> [O]n 08/03/11 the victim attended his ninth therapy session with Dr. Kagel. At the beginning of the session the victim grabbed two baby dolls in her office and began to disclose. The victim said, "Daddy" and the doctor asked which Daddy, since the victim has 2 male parents. The victim said "George." The victim then said "put it in my butt." The victim indicated that it hurt. Dr. Kagel asked what was put in to his butt and the victim said, "penis." The victim then went on to explain that he was sleeping and screamed real loud. The victim became distracted and Dr. Kagel tried to reengage the conversation and the victim said, "I am done, call the police, stop

Daddy. He keeps holding my penis."

While the affidavit does not say so explicitly, it is apparent, and I find, that this account of Doe #9's statements to Dr. Kagel during a therapy session on August 3 is based upon an interview Kennedy conducted with Dr. Kagel after receiving the Department's initial telephone call on August 9.

The arrest affidavit then says at ¶ 7 that "as a result of this disclosure, the affiant [Kennedy] made contact with DCF Social Worker Shannon Kiss and the victim was set up with a forensic Interview at Saint Francis Hospital." This is the August 11 forensic interview discussed and quoted in this Ruling, *supra*. As the Conversion Ruling points out, 239 F. Supp. 3d at 501, Kennedy included in his arrest affidavit submitted to Judge Taylor "Ferreira's separate report to Kennedy five days later, on August 16, that Doe #9 had made additional charges of abuse by Harasz." Kennedy's arrest affidavit was sworn to on September 1.

The record having been enlarged since the Court's prior opinion, it is now clear that no reasonable juror could conclude Kennedy committed the tort of fabrication of evidence. At the heart of the case, Plaintiffs' claim of fabrication targets Dr. Kagel and DCF social worker Ferreira, to whom Doe #9 reported on separate occasions that Harasz had abused him. Plaintiffs' final brief on these summary judgment motions argues:

> Plaintiffs deny that Doe #9 made the disclosures that were reported by Dr. Kagel and Ferreira. Plaintiffs claim that these disclosures were fabricated. This is not an issue of the credibility of Doe #9's disclosures but of the *report* of the alleged disclosures. Plaintiffs admit that Dr. Kagel made a report and that Ferreira made a report, but Plaintiffs deny Doe #9 made the disclosures that were reported. . . . . Plaintiffs' claim is that after viewing the videotape, it becomes abundantly clear that Doe #9 was incapable of making the reported disclosure to Dr. Kagel on 8/3/2011 and to Ferreira on 8/12/2011 – that it was self-evident that such disclosures were impossible. . . . Plaintiffs claim that any viewer of the videotape would conclude that Doe #9 was incapable of making the disclosures *reported* by Dr.

Kagel and Ferreira and that the *reports* were thus suspect and not deemed credible. . . . Plaintiffs have consistently used quotation marks around the word "disclosure" to indicate that the disclosure, as *reported*, was not in fact made, but was fabricated – in other word, the *report* was a lie.

Plaintiffs' Sur-Reply Brief [Doc. 72] at 1-2.

Under this scenario, to which Plaintiffs are committed, the fabricators of evidence that Harasz abused Doe #9 are a treating psychologist and a state agency social worker, rather than Kennedy, a Glastonbury police officer, who included the psychologist's and social worker's reports in the arrest affidavit he submitted to Judge Taylor. That theory of the case is fatal to a claim by Plaintiff Harasz that Kennedy fabricated evidence against that Plaintiff. Even if one accepts *arguendo* Plaintiffs' startling assertions that Dr. Kagel and Ferreira fabricated – that is to say, made up – Doe #9's accusations of Harasz, I have previously held in this case: "Kennedy may have included in his affidavit unpersuasive or valueless evidence, but he is not liable for the tort of fabrication of evidence unless *he* made it up." 239 F. Supp. 3d at 497 (emphasis added). That ruling was correct when made and remains so today.

Kennedy is, of course, responsible for the way in which he worded his arrest affidavit. Nothing in that aspect of the case sustains a claim for fabrication of evidence. To the extent the words in the affidavit ascribed to Doe #9 and placed in quotation marks do not fully conform to the interview videotape, the discrepancies constitute reporting errors or misstatements, products of a very low order of negligence which bear no resemblance to the deliberate falsehoods characteristic of an evidence fabricator. Moreover, the quoted language's effect of identifying Harasz as Doe #9's abuser may be regarded as a conflation of the evidence collected in the affidavit, since the affidavit also refers to the reports of Dr. Kagel and Ferreira containing the same identification of Plaintiff

Harasz. It is reasonable to suppose that Kennedy, whose September 1 affidavit depended on his memory and impressions of the August 11 interview, was also influenced by the Kagel and Ferreira accounts of the accusations Doe #9 had made against Harasz. Nor are the quotation-mark discrepancies material to the effect of the arrest affidavit upon Judge Taylor, who issued the warrant to arrest Harasz on the basis of an affidavit which, in addition to Kennedy's account of the forensic interview of Doe #9, also informed the judicial officer about the substance of the Kagel and Ferreira reports.

In short, Kennedy's use of quotation marks in the arrest affidavit does not sustain a claim that he fabricated evidence against Harasz. The other challenges Plaintiffs make to the wording of the affidavit do not sustain a fabrication claim against Kennedy, for the reasons stated *supra*. It follows that Defendant Kennedy is entitled to summary judgment on Plaintiff's fabrication claim.[8]

Plaintiffs' theory of fabrication by Kennedy is summed up in one of their briefs on these motions. "Plaintiffs' claim is that the statements Kennedy made in his arrest affidavit in regard to the forensic interview were fabricated in that they were affirmative falsehoods in which he deliberately mischaracterized what Doe #9 said, combined with misleading statements and omissions." Pl. Br. in Opp. to Glastonbury Def. [Doc 62] at 19. Having reviewed the tape recording of the forensic interview, and considered each of Plaintiffs' specific objections to the language of the

_____

[8]  Plaintiffs may also be contending that Kennedy's inclusion in the arrest affidavit of references to the Kagel and Ferreira reports visit some form of liability upon Kennedy, on the theory that "any viewer of the videotape" (a universe that includes Kennedy) "would conclude that Doe #9 was incapable of making the disclosures reported by Dr. Kagel and Ferreira," a perception that presumably, in Plaintiffs' view, would require Kennedy to disregard the reports and refuse to act upon them. Such a theory of liability on the part of Kennedy is contrary to Second Circuit authority. This subject is discussed further in Part V, *infra*, which considers qualified immunity.

arrest affidavit, I hold that no reasonable trier of fact could find that the arrest affidavit's characterization of the August 11, 2011 forensic interview constituted deliberate fabrication of evidence by Defendant Kennedy.

That conclusion is appropriately reached on this converted motion for summary judgment. Additional discovery, including examination of the forensic interview videotape and its transcript, has been accomplished. Defendants Kennedy and Glastonbury, who move for summary judgment on the factual ground that Kennedy did nothing wrong during his participation in the investigation into whether Harasz abused Doe #9, must show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

Plaintiffs may successfully resist that motion if they assert that the factual propriety of Kennedy's conduct "is genuinely disputed," Rule 56(c)(1), and support that assertion by citing to admissible evidence, Rule 56(c)(1)(A). Plaintiffs at bar assert that Kennedy fabricated evidence against Harasz, a fact which if proved would be *material* to these Defendants' liability. But the dispute cannot be regarded as *genuine*, since Plaintiffs cite to no evidence supporting their factual position. For the reasons stated *supra*, a charge of fabrication by Kennedy is not made out by comparing his arrest affidavit with the interview videotape; and Plaintiffs offer nothing further except calling Kennedy names.

In that respect, this case resembles the one confronting Judge Underhill in *Turner v. Boyle*, 116 F. Supp. 3d 58 (D. Conn. 2015), where the plaintiff charged a particular defendant with maliciously initiating a criminal proceeding against him. Judge Underhill granted a Rule 12(b)(6) motion to dismiss that complaint, reasoning in part:

> Instead of offering any factual allegations indicating that Bednarz
> made a false complaint or otherwise attempted to ensure that Hardy

> initiated criminal proceedings against Turner, Turner relies on
> conjecture, hyperbole and ad hominem attacks to encourage the court
> to speculate that Bednarz acted with malice.

116 F. Supp. 3d at 86. That reasoning echoes the Second Circuit's holding in *Gannon v. United Parcel Service*, 529 F. App'x 102, 103 (2d Cir. 2013): "The non-moving party must present specific evidence demonstrating a genuine dispute, rather than mere conclusory accusations or some metaphysical doubt as to the material facts." (Citations and internal quotation marks omitted). Judge Underhill declined to speculate in *Turner*. So do I in the case at bar, in respect of Plaintiffs' fabrication claim against Kennedy, and also their fabrication claim against Ferreira, which suffers from the same lack of evidence.

## B. As to Defendant Ferreira

### 1. As to Doe #9's purported disclosure to Dr. Kagel

Plaintiffs allege Defendant Ferreira's complicity in fabrication of evidence as to the disclosure Doe #9 reportedly made to Dr. Kagel: "The 'disclosure' to Kagel . . . does not appear to have come out of the blue but could well have been the product of pressure from Ferreira, as seen from the file notes of Dr. Kagel on July 28, 2011." Pl. Br. in Opp. to Ferreira, at 17. In their response to Defendant Ferreira's Rule 56(a)(1) statement of material facts, Plaintiffs characterize the underlying evidence of their suspicion thus:

> Dr. Kagel's file documents that Liz Ferreira had numerous contacts with Dr. Kagel both before and after 8/3/2011. In reviewing Dr. Kagel's file there are some notes that conspicuously stand out. Phone messages document that "Liz" placed numerous calls to Dr. Kagel both prior to after the 8/3/2011 "disclosure." There is a remarkable file note on 7/28/2011 in which Dr. Kagel wrote that she spoke directly with Liz – and noted that there had been "no disclosure" of either boy to date. "She indicated . . . police have not filed criminal charges to date. DCF will list both fathers on their registry of sexual offenders of minors. DCF will seek permanent custody and

> placement of the boys." It is noteworthy, and suspicious, that during the very next session, Doe #9 makes a "disclosure" which was at odds with anything said previously and strikingly at odds with the forensic interview, when the "disclosure" could not be duplicated. Dr. Kagel also notes phone calls with Liz Ferreira on 8/4/2011, 8/7/2011, 8/10/2011, 8/16/2011, as well as on other occasions.

Pl. Amend. Rule 56(a)(2) Stmt. re Def. Ferreira ¶ 61 (citations omitted) (citing to Kagel Records, Doc. 58 (filed under seal)).

Having reviewed the referenced notes in detail, I find that the frequent phone contact between two professionals, who were then collaborating on the treatment and care of a vulnerable child involved in a complicated and delicate civil and criminal investigation, fails to arouse my suspicion. Drawing every reasonable inference in Plaintiffs' favor, the purportedly "suspicious" contact between Dr. Kagel and Defendant Ferreira is not enough to raise a substantive issue of material fact as to whether the August 3, 2011 disclosure to Dr. Kagel was fabricated (whether at Defendant Ferreira's behest or otherwise). "[M]ere conclusory allegations, speculation or conjecture will not avail a party resisting summary judgment." *Cifarelli*, 93 F.3d at 51. Having failed to produce any admissible evidence casting doubt on the evidence proffered by Defendants, I cannot find that the doubt as to whether Doe #9 actually made the disclosure reported by Dr. Kagel amounts to anything more than speculation or conjecture

### 2. As to Doe #9's purported disclosure of August 12, 2011

Plaintiffs also allege fabrication as to Defendant Ferreira's report that Doe #9 made a further disclosure to her, during a sibling visit on August 12, 2011: "The alleged 'disclosure' . . . the very day after the . . . forensic interview is so markedly at odds with Doe #9's behavior, conduct and verbalization (or lack thereof) during the forensic interview that it calls into question the veracity of the 'disclosure' reported by Ferreira." Pl. Br. in Opp. to Ferreira, at 15. "So significant is the

disparity that this raises a material question of fact that should be decided by a trier of fact." *Id.* at 17. In support of this contention, Plaintiffs point to two purported discrepancies in Ferreira's report of the August 12 disclosure, which they allege cast sufficient doubt upon Defendant Ferreira's veracity to preclude her motion for summary judgment.

First, Plaintiffs point to Doe #9's reported reference, on August 12, to the locking of the door to "daddy's office." Plaintiffs have provided uncontested affidavits indicating that the room at Plaintiffs' home which was referred to as Plaintiff's Harasz's "office" did not have a door. Pl. Br. in Opp. to Ferreira, at 15. Second, Plaintiffs argue that Defendant Ferreira's report that, on August 12, Doe #9 said he was "scared" of Plaintiff Harasz is inherently suspicious in light of Doe #9's expressions of affection for Plaintiff Harasz during the forensic interview, one day earlier. *Id.*

I find both of these purportedly suspicious discrepancies unavailing. "[M]ere conclusory allegations, speculation or conjecture will not avail a party resisting summary judgment." *Cifarelli*, 93 F.3d at 51. Plaintiffs' own expert opines at length on Doe #9's impaired memory. *See* Lothstein Aff. [Doc. 62-8]. Defendant Ferreira reports statements made by Doe #9 that were inconsistent with statements he made during the forensic interview. Testimonial inconsistency on the part of a four-year-old with significant developmental delay is not evidence of the reporters' mendacity. *See, e.g., Wilkinson ex rel. Wilkinson v. Russell,* 182 F.3d 89, 105 (2d Cir. 1999) ("we are not dealing with a situation in which the evidence should have suggested . . . unequivocally, that Benjamin and Jonathan had been coached rather than abused. The transcript of Benjamin's interview, for instance, reveals that the child at times claimed that he had been coached by his mother, but at other times maintained that his allegations were true."); *Walker v. City of New York*, 63 F. Supp. 3d 301, 314 (E.D.N.Y. 2014) ("The fact that T.W. did not disclose that he was beaten during the at-home

interview . . . does not constitute perjury or fabrication on the part of [individual defendants]. There are numerous reasons why T.W. would not have stated that he was being beaten during that time."), *aff'd,* 621 F. App'x 74 (2d Cir. 2015). As Defendant Ferreira notes, Doe #9 "was familiar with and comfortable with Dr. Kagel, his foster parent [Lisa K] and Ms. Ferreira. [Forensic interviewer] Ann Glaser was essentially a stranger to him." Ferreira Br. at 8 n. 7. Defendant Ferreira could reasonably have believed that Doe #9's lack of familiarity with Glaser might "account for why he was less forthcoming at the St. Francis Hospital interview." *Id.*

The undisputed facts in this matter establish that three adults – Dr. Kagel, Lisa K, and Defendant Ferreira – made first-hand reports of Doe #9's disclosures of sexual abuse. Plaintiffs evidently believe that these three adults conspired to fabricate these reports, but Plaintiffs have not established any genuine issue of material fact as to the veracity of these three adults' *reports* of Doe #9's disclosures (to state it clearly, the veracity of Doe #9's *disclosures* is not at issue in this case).

## C. As to the methods of the forensic interview (Defendants Kennedy and Ferreira)

In addition to their contentions that Defendant Kennedy's arrest affidavit falsified the *contents* forensic interview, Plaintiffs make a distinct, though related, claim that the *methods* employed in the forensic interview amounted to fabrication of evidence, in violation of their constitutional rights, and that Defendants Kennedy and Ferreira share responsibility for the purportedly unconstitutional interviewing methods to such an extent that they should be liable for fabrication of evidence under § 1983.

Defendants contend that they played no active role in the forensic interview. Plaintiffs do not dispute that Defendants had no contact with Doe #9 during the interview. Pl. Rule 56(a)(2) Stmt. re Ferreira, ¶ 9; Pl. Rule 56(a)(2) Stmt. re Glastonbury Def., ¶ 17. However, Plaintiffs have

established a genuine factual dispute as to whether Defendants directed any part of the interview: "It can be seen on the videotape that the interviewer leaves the room on several occasions to consult with the observers. . . . It can be clearly seen that the interviewer DID have contact throughout the interview with the observers through her earpiece, even Doe #9 could hear that the observers were speaking to her." Pl. Rule 56(a)(2) Stmt re Glastonbury Def., ¶¶ 15-16. *See also* Pl. Rule 56(a)(2) Stmt re Ferreira, ¶ 7.

Having reviewed the video tape, I find merit to Plaintiffs' contention that there is a genuine issue of fact as to the level of contact between Defendants and Glaser during the interview, and, consequently, the Defendants' possible direction of some part of that interview. At this summary judgment stage the question is, then, whether this factual dispute is *material*. A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248 (1986). Assuming, *arguendo*, that Defendants did direct Glaser during the forensic interview, and were responsible for some of the questions asked of Doe #9, would that direction affect the outcome of this suit?

Plaintiffs' expert witness, Dr. Lothstein, affies that:

> 22. I am familiar with techniques and protocols for conducting for forensic interviews, including the interviewing of young children. It is very important to ask open-ended questions, rather than leading and coaching the witness.

> 23. Interviewer bias can play a significant role in skewing a forensic interview.

> 24. I have reviewed the forensic interview of Doe #9 on 8/11/2011, as well as reviewed the transcript of that interview. It is my opinion that the leading questions and repeated badgering of Doe #9 by the interviewer led to an extremely tainted forensic interview.

Lothstein Aff., Doc. 62-8.

"Mere allegations that defendants used interviewing techniques that were in some sense improper[,] without more, cannot serve as the basis for a claim under section 1983." *Zahrey v. City of New York*, No. CIV.A. 98-4546 DCPJC, 2009 WL 54495, at *12 (S.D.N.Y. Jan. 7, 2009) (alterations omitted) (quoting *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir.2001) (en banc)), *amended on reconsideration in part*, No. CIVA 98-4546 DCP JCF, 2009 WL 1024261 (S.D.N.Y. Apr. 15, 2009). Plaintiffs have failed to identify what "fabrication" resulted from the disputed interview techniques. Lothstein's affidavit and Plaintiffs' various filings all argue, with great vigor, that no significant disclosure of untoward conduct was made during the forensic interview. To quote, once again, the Conversion Ruling, "a plaintiff fails to state a claim against a defendant for fabrication of evidence sufficiently plausible to survive a motion to dismiss if "his factual allegations regarding the evidence used in the criminal case against him do not actually include any specific claims of fabrication." 239 F. Supp. 3d at 492.

Plaintiffs criticize Glaser's interrogatory techniques as leading, repetitive, badgering, and the like, with reference to Doe #9's descriptions of Harasz's conduct. Such criticisms disregard the fact that Glaser was not interviewing Doe #9 as a matter of routine or for no particular reason. Glaser interviewed Doe #9 on August 11 because Dr. Kagel, the child's treating psychologist, told DCF that eight days earlier Doe #9 accused "Daddy Harasz" of abusing him. Glaser's principal responsibility in interviewing Doe #9 was to follow up on Kagel's report and develop any relevant facts. It is hardly surprising that Glaser's questioning relied, on occasion, upon repetitive or suggestive techniques.

Glaser, it is recalled, is not a defendant in this action. Kennedy and Ferreira are defendants. Glaser having committed no improprieties in interviewing technique, neither by extension did

Kennedy or Ferreira.

## VI. Malicious Prosecution (as to Defendant Kennedy)

As to Defendant Kennedy, the Amended Complaint makes two claims for malicious prosecution, one brought under federal law as an infringement of Plaintiffs' constitutional rights, and the second brought under state tort law. Amend. Compl. ¶¶ 183-93, 203-04.

Under Connecticut law, applicable to both the federal and state law claims, the plaintiff in an action for malicious prosecution must establish each of these elements: "(1) the defendant initiated or procured the institution of criminal proceedings against the plaintiff; (2) the criminal proceedings have terminated in favor of the plaintiff; (3) the defendant acted without probable cause; and (4) the defendant acted with malice, primarily for a purpose other than that of bringing an offender to justice." *Turner*, 116 F. Supp. 3d at 85 (internal quotation marks omitted) (quoting *McHale v. W.B.S. Corp.*, 187 Conn. 444, 447 (Conn. 1982)).

It will be helpful to refer once again to the Conversion Ruling, which laid out the malicious prosecution claim against Kennedy thus:

> If Kennedy fabricated evidence as alleged by Plaintiffs, then Plaintiffs may also have satisfied the elements of a malicious prosecution claim.
>
> Reverting again to the four elements of malicious prosecution . . . the acts of Kennedy in connection with the preparation and submission of the arrest warrants satisfy the first element: he may be regarded as an individual who initiated the criminal proceedings against Plaintiffs. The second element is also satisfied, since those proceedings were terminated in favor of both Plaintiffs. Plaintiffs have pled that even though the arrest warrant was issued, Kennedy acted without probable cause because of the alleged fabrication of evidence. Given that Kennedy is alleged to have fabricated evidence, the requisite malice has also been pled.

239 F. Supp. 3d at 503-04 (citations omitted) (citing *Bristol v. Queens Cty*, No. CV-09-5544, 2013

WL1121264, at *11 (E.D.N.Y. Feb. 27, 2013), *adopting report and recommendation*, 2013 WL 1120895 (Mar. 18, 2013)).  In short, my prior ruling found that the pleaded elements of a fabrication of evidence claim would also be sufficient to plead the third and fourth elements of a malicious prosecution claim, namely the absence of probable cause and the presence of malice.

Having found, as a matter of law, that Plaintiffs cannot establish a claim of fabrication of evidence against Defendant Kennedy, I will now consider the question of probable cause, the existence of which would be dispositive of Plaintiffs' remaining claims against Defendant Kennedy. "The existence of probable cause is a complete defense to a claim of malicious prosecution." *Turner*, 116 F. Supp. 3d at 86 (citing Connecticut cases).  If Defendant Kennedy can demonstrate that, as to probable cause, there is no genuine dispute as to any material fact, he is entitled to summary judgment as to the claims of malicious prosecution.

"[F]ederal and Connecticut law are identical in holding that probable cause to arrest exists when police officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Walczyk v. Rio*, 496 F.3d 139, 156 (2d Cir. 2007) (internal quotation marks omitted) (quoting *Weyant v. Okst*, 101 F. 3d 845, 852 (2d Cir. 1996) and citing *State v. James*, 261 Conn. 395, 405 (Conn. 2002)).

Normally, the issuance of a warrant by a neutral magistrate, which depends on a finding of probable cause, creates a presumption that it was objectively reasonable for the officers to believe that there was probable cause, and a plaintiff who argues that a warrant was issued on less than probable cause faces a heavy burden. In order to mount such a challenge, the plaintiff must make a "substantial preliminary showing that the affiant knowingly and intentionally, or with reckless

disregard for the truth, made a false statement in his affidavit and that the allegedly false statement was necessary to the finding of probable cause." *Golino v. City of New Haven*, 950 F.2d 864, 870 (2d Cir. 1991) (internal quotation marks omitted) (quoting *Franks v. Delaware*, 438 U.S. 154, 155-56 (1978)). *See also Magnotti v. Kuntz*, 918 F. 2d 364, 368 (2d Cir. 1990) (applying the *Franks* standard to civil rights actions).

The Plaintiffs in this case, Harasz and Wirth, were arrested following the issuance of facially valid warrants for their arrests. To defeat the presumption of probable cause, Plaintiffs must challenge the truthfulness of Defendant Kennedy's arrest affidavit. I have evaluated Plaintiffs' various challenges to Defendant Kennedy's truthfulness, in detail, in this opinion's consideration of the fabrication of evidence claims against him. To briefly recapitulate, I find that, drawing all reasonable inferences in Plaintiffs' favor, and evaluating the arrest affidavit with the assistance of the videotape of the forensic interview, no reasonable trier of fact could find that the arrest affidavit's characterization of the August 11, 2011 forensic interview constituted knowing, intentional, or reckless falsification, as required to overcome the presumption of probable cause established by the issuance of an arrest warrant by a neutral magistrate. Plaintiffs' prosecutions were not without probable cause, and their claim for wrongful prosecution therefore fails as a matter of law. Defendant Kennedy is entitled to summary judgment on this count.

## VII. Qualified Immunity

Defendants Ferreira and Kennedy have asserted qualified immunity as an alternative grounds for summary judgment in their favor. *See* Ferreira Br. [Doc. 48] at 5 n. 3; Glastonbury Def. Br.

[Doc. 52-1] at 24.[9]  While the Court rejected Defendant Kennedy's assertion of qualified immunity at the motion to dismiss stage, *see* 239 F. Supp. 3d at 504 n. 17, it is now appropriate to reconsider this question, in light of the evidence presented for summary judgment.  That reconsideration leads to this conclusion:

Even if the analyses set forth *supra* with respect to the liability of Kennedy and Ferreira on various claims are erroneous, all claims against Kennedy and Ferreira are barred by the doctrine of qualified immunity.

The doctrine of qualified immunity "protects government officials from suits seeking to impose personal liability for money damages based on unsettled rights or on conduct that was not objectively unreasonable." *Tenenbaum v. Williams*, 193 F.3d 581, 595-96 (2d Cir. 1999) (quoting *Connell v. Signoracci*, 153 F.3d 74, 79 (2d Cir.1998)) ; *see also Pearson v. Callahan*, 555 U.S. 223 (2009) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

> A government official sued in his individual capacity is entitled to qualified immunity (1) if the conduct attributed to him was not prohibited by federal law; or (2) where that conduct was so prohibited, if the plaintiff's right not to be subjected to such conduct by the defendant was not clearly established at the time it occurred; or (3) if the defendant's action was objectively legally reasonable in light of the legal rules that were clearly established at the time it was taken.

*Manganiello v. City of New York*, 612 F.3d 149, 164 (2d Cir. 2010) (citations, internal quotation marks, and alterations omitted).  Only the third aspect of the qualified immunity doctrine is genuinely at issue in the present case, for freedom from governmental fabrication of evidence and

---

[9] Defendant Ferreira's papers may not explicitly argue that she is entitled to qualified immunity, but the cited footnote quotes *Wilkinson*, 182 F. 3d at 99, for the proposition that "it is well settled that child protective services workers are entitled to qualified immunity for their conduct during the course of abuse investigations."

malicious prosecution are constitutional rights that have long been clearly established.

Since qualified immunity bars liability for an individual-capacity suit, the determination of whether such immunity exists is case-specific. The decisive characteristic specific to the case at bar is that the case arises out of a governmental child abuse investigation. At the pertinent times, Kennedy and Ferreira were local and state officials forming part of a governmental team investigating a report of possible child abuse. In consequence, their actions of omission and commission fall within the Second Circuit's holding in *Wilkinson*, 182 F.3d at 104-05:

> This Circuit has adopted a standard governing case workers which reflects the recognized need for unusual deference in the abuse investigation context. An investigation passes constitutional muster provided simply that case workers have a "reasonable basis" for their findings of abuse. . . . In applying a reasonableness standard in the abuse context, courts must be especially sensitive to the pressurized circumstances routinely confronting case workers, circumstances in which decisions between "difficult alternatives" often need to be made on the basis of limited or conflicting information.

(Quoting *van Emrik v. Chemung County Dep't of Social Servs.*, 911 F.2d 863, 866 (2d Cir.1990)).

In *Wilkinson,* a plaintiff father sued defendant social workers based on an allegedly inadequate child abuse investigation leading to the workers' substantiation of an estranged wife's charges that the father had sexually abused a son. The Second Circuit affirmed summary judgment in favor of the social workers on the ground, *inter alia*, of qualified immunity on federal and state claims for misconduct allegedly committed during the child abuse investigation. Circuit Judge Sotomayor (as she then was) said of prior Second Circuit authority:

> This precedent demonstrates that courts have routinely granted qualified immunity, as a matter of law, even when plaintiffs have alleged the very types of investigative deficiencies now at issue, *e.g.*, where case workers failed to pursue exculpatory information, ignored medical evidence, behaved "unprofessionally," or even manipulated interviews.

-50-

182 F.3d at 108 (alteration omitted).  The "reasonable basis test" the Second Circuit announced in *Wilkinson* "places certain constitutional limitations on case workers, *i.e.*, their decisions to declare claims of abuse substantiated must be consistent with some significant portion of the evidence before them."  *Id.*  Turning to the facts presented by *Wilkinson*, the Second Circuit upheld the alternative defense of qualified immunity for the following reasons:

> Before today . . . courts had excused a broad array of alleged investigative errors without even hinting at the particular circumstances in which such errors might amount to a constitutional violation.  Accordingly, at the time of their investigation, defendants were left with little or no basis to conclude that their alleged misconduct could even potentially intrude upon plaintiffs' constitutional rights.  Thus, while we make a close call in holding that there was no constitutional violation on the record before us, it is abundantly clear that it was objectively reasonable for defendants, in light of prior case law, to conclude that their investigation, however flawed, was consistent with plaintiffs' "clearly established" rights.

182 F.3d at 109.

The Second Circuit applied its *Wilkinson* holding in the subsequent case of *V.S. v. Muhammad*, 595 F.3d 426 (2d Cir. 2010), where the district court denied qualified immunity to defendant child abuse case workers on the ground that an examining physician "was known to defendants to have repeatedly misdiagnosed child injuries as evidence of child abuse," which the district judge felt created "an issue of material fact that goes directly to the objective reasonableness of [the agency] in seizing and removing T.S. from his mother."  593 F.3d at 431.  The Second Circuit reversed on grounds of qualified immunity and remanded with instructions to dismiss plaintiffs' claims.  District Judge Rakoff (sitting by designation) wrote for the Court of Appeals:

> But to impose on a[] . . . caseworker the obligation in such circumstances of assessing the reliability of a qualified doctor's past and present diagnoses would impose a wholly unreasonable burden of the very kind qualified immunity is designed to remove.

*Id.* (citing *Wilkinson*).

*Muhammad* is instructive in the case at bar because Harasz contends that Kennedy and Ferreira should have assessed the reliability of and then disregarded Dr. Kagel's report describing Doe #9's credible statements that Harasz was abusive. Kennedy, a police officer assigned to investigate suspected child abuse, and Ferreira, a state agency case worker sharing that assignment, were under no obligation to conduct that sort of evaluation of a troubling report made by a qualified psychologist who was the child's therapist. The Glastonbury police and the DCF did just what common sense and reason required of them: commencing a child abuse investigation by means of a forensic interview (Kennedy and Ferreira participating together); conveying a further account by Doe #9 of abuse by Harasz (Ferreira reporting to Kennedy); and including these investigatory results in an affidavit seeking Harasz's arrest (Kenendy as author of the affidavit). Kennedy and Ferreira are entitled to qualified immunity because the actions they took during the child abuse investigation in this case were objectively reasonable. Neither individual Defendant had reason to believe he or she was violating the United States Constitution.[10]

The Second Circuit's opinions in *Wilkinson* and *Muhammad*, which address claims against social services case workers, apply to Defendant Ferreira in this case, a case worker with the DCF. The rationale of the cited cases should also, I conclude, apply to Defendant Kennedy, a police agent, since his participation in the pertinent events was as a member of an inter-agency team formed to investigate the report that Harasz had abused Doe #9.

In the alternative, if Kennedy is regarded solely as the author of the arrest warrant presented

---

[10]    Kennedy and Ferreira would not be entitled to qualified immunity if they had fabricated evidence against Harasz. However, for the reasons stated *supra*, Plaintiffs are entitled to summary judgment dismissing Plaintiffs' fabrication claims against them.

to Judge Taylor, he is equally entitled to qualified immunity. When police officers offer an affidavit in support of an application for an arrest warrant, they act in a capacity similar to complaining witnesses. *Malley v. Briggs*, 475 U.S. 335, 341-42 (1986). If an arrest warrant appears on its face to support probable cause, then an officer is entitled to qualified immunity as a matter of law for claims based on that affidavit. *Id.* at 344-45. "Only where the warrant application is so lacking in indicia of probable cause as to render official belief in its existence unreasonable will the shield of immunity be lost." *Id.* (citation omitted). An application is considered to be objectively reasonable "if 'officers of reasonable competence could disagree' on the legality of the defendant's actions." *Lennon v. Miller*, 66 F.3d 416, 420 (2d Cir. 1995) (quoting *Malley*, 475 U.S. at 341). Kennedy's arrest warrant referred to and relied upon the reports of Dr. Kagel and Ferreira that Doe #9 had said Harasz abused him, as well as upon the forensic interview, which despite its imperfections, contained declarations by Doe #9 consistent with that accusation. These are sufficient indicia of probable cause to entitle Kennedy, as author of the arrest affidavit, to qualified immunity from any claims arising out of that conduct on Kennedy's part.

Plaintiffs' citations to other cases do not bring this case out of the qualified immunity rule the Second Circuit has established for government officers conducting child abuse investigations. articulated for those government officers. Plaintiffs rely upon *Hardwick v. County of Orange*, 844 F.3d 1112 (9th Cir. 2017). That case in inapposite. In *Hardwick*, the Ninth Circuit affirmed a district court's denial of qualified immunity, at the summary judgment stage, to defendant social workers. These social workers had been found by a state jury to have, in the conduct of the child removal investigation underlying the federal suit, "lied, falsified evidence and suppressed exculpatory evidence . . . with malice." 844 F.3d at 1114. As the court of appeals rightly noted,

"government perjury and the knowing use of false evidence are absolutely and obviously irreconcilable with the Fourteenth Amendment's guarantee of Due Process in our courts." *Id.* at 1119. Here, Plaintiffs have presented no evidence could lead a reasonable juror to conclude that either individual Defendant perjured him or herself, nor knowingly used false evidence, nor acted with malice towards Plaintiffs.

As to Defendant Kennedy, Plaintiffs cite to *Morse*, 804 F. 3d 538, and argue that "[b]ased on the facts of this case, in which Kennedy submitted his arrest affidavit with material misstatements, deliberate mischaracterizations, and omissions in regard to the forensic interview, he is thus not entitled to qualified immunity." Pl. Br. in Opp. to Glastonbury Def. at 21. The Second Circuit held in *Morse* that:

> qualified immunity is unavailable on a claim for denial of the right to a fair trial where that claim is premised on proof that a defendant knowingly fabricated evidence and where a reasonable jury could so find. . . . [B]ecause there is no plausible legal distinction between misstatements and omissions that we can perceive in this context, we conclude that it was not "objectively legally reasonable" for the defendants in this case to believe that it was permissible for them to knowingly make material omissions in the creation of the billing summaries, thereby knowingly altering evidence during a criminal investigation.

804 F.3d at 550 (internal quotation marks and citations omitted). While one cannot quarrel with this holding in *Morse*, it does not apply to the case at bar, where after discovery Plaintiffs have failed to present evidence (as opposed to innuendo or ad hominem attacks) indicating that either Kennedy or Ferreira "knowingly fabricated evidence," made "material omissions," or "knowingly alter[ed] evidence during a criminal investigation."

Plaintiffs have failed to demonstrate that their rights to due process were violated; and Defendants have shown that their actions were objectively legally reasonable at that time.

Defendants Ferreira and Kennedy each possess qualified immunity in their individual capacities as to Plaintiffs claims of fabrication of evidence and malicious prosecution.

## VIII. Indemnification (as to Defendant Town of Glastonbury)

As to Defendant Town, the Amended Complaint makes a claim for indemnification. Amend. Compl. ¶¶ 210-12. Having found Defendant Kennedy entitled to summary judgment on all claims, there is no dispute of material fact as to the attendant indemnification of Defendant Town of Glastonbury, and the Town is likewise entitled to summary judgment.

## IX. Conclusion

For each of the foregoing reasons, Defendants' Motions for Summary Judgment [Docs. 48, 52] are hereby GRANTED in its entirety. Pursuant to Federal Rule of Civil Procedure 56(a), there is no genuine dispute as to any material fact and the movants are entitled to judgment as a matter of law.

In the alternative, the individual defendants Ferreira and Kennedy are entitled to "qualified immunity" in their individual capacities with respect to damages on Plaintiffs' § 1983 claims.

Because Defendant Kennedy is entitled to summary judgment on all claims against him, Plaintiffs' cross-motion for partial summary judgment [Doc. 51] against Defendant Kennedy is DENIED.

The Court therefore GRANTS Defendants' motions for summary judgment [Docs. 48, 52] as to Defendants Ferreira, Kennedy, and Town of Glastonbury. The Clerk is directed to enter judgment for Defendants in accordance with Federal Rule of Civil Procedure 58. Those judgments will terminate the case, and the Clerk is directed to close the file.

It is SO ORDERED.

Dated: New Haven, Connecticut
       July 19, 2018

                                        _/s/Charles S. Haight, Jr._____
                                        Charles S. Haight, Jr.
                                        Senior United States District Judge